## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROSOMNUS, INC., *et al.*,[1] | Case No. 24-10972 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket Nos. 87 and 179** |

### NOTICE OF FILING OF REDLINE OF DISCLOSURE STATEMENT

**PLEASE TAKE NOTICE** that on May 24, 2024, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of ProSomnus, Inc. and its Debtor Affiliates* [Docket No. 87] with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

**PLEASE TAKE FURTHER NOTICE** that on June 24, 2024, the Debtors filed with the Bankruptcy Court the *Disclosure Statement for the Amended Debtors' Chapter 11 Plan of Reorganization of ProSomnus, Inc. and its Debtor Affiliates* [Docket No. 179] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "**Amended Disclosure Statement**").

*[Remainder of Page Intentionally Blank]*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ProSomnus, Inc. (8216), ProSomnus Holdings, Inc. (3855), and ProSomnus Sleep Technologies, Inc. (0766). The location of the Debtors' principal place of business and the Debtors' mailing address is 5675 Gibraltar Dr., Pleasanton, California 94588.

**PLEASE TAKE FURTHER NOTICE** that, for the convenience of the Bankruptcy Court and all parties in interest, a redline comparison of Amended Disclosure Statement marked against the Disclosure Statement is attached hereto as <u>Exhibit 1</u>.

Dated: June 24, 2024
      Wilmington, Delaware

POLSINELLI PC

*/s/ Shanti M. Katona*

Shanti M. Katona (Del. Bar No. 5352)
Katherine M. Devanney (Del. Bar No. 6356)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
kdevanney@polsinelli.com
mdipietro@polsinelli.com

-and-

Mark B. Joachim (Admitted Pro Hac Vice)
1401 Eye Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 783-3300
Facsimile: (202) 783-3535
mjoachim@polsinelli.com

*Counsel to the Debtors and*
*Debtors in Possession*

95731560.1

**<u>Exhibit 1</u>**

**(Redline Disclosure Statement)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROSOMNUS, INC., *et al.*,[1] | Case No. 24-10972 (JTD) |
| Debtors. | (Jointly Administered) |

### DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PROSOMNUS, INC. AND ITS DEBTOR AFFILIATES

POLSINELLI PC
Shanti M. Katona (Del. Bar No. 5352)
Katherine M. Devanney (Del. Bar No. 6356)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
kdevanney@polsinelli.com
mdipietro@polsinelli.com

*Proposed counsel*Counsel *to the*
*Debtors and Debtors in Possession*

POLSINELLI PC
Mark B. Joachim (Admitted *Pro Hac Vice*)
1401 Eye Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 783-3300
Facsimile: (202) 783-3535
mjoachim@polsinelli.com

*Proposed counsel*Counsel *to the*
*Debtors and Debtors in Possession*

Dated: ~~May~~June 24, 2024

> **THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT, IN ACCORDANCE WITH THE RESTRUCTURING SUPPORT AGREEMENT, PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ProSomnus, Inc. (8216), ProSomnus Holdings, Inc. (3855), and ProSomnus Sleep Technologies, Inc. (0766). The location of the Debtors' principal place of business and the Debtors' mailing address is 5675 Gibraltar Dr., Pleasanton, California 94588.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAWS. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND HOLDERS OF CLAIMS OR INTEREST SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE OF, AND DISTRIBUTIONS UNDER, THE PLAN OF THE NEW COMMON EQUITY AND NEW NOTES (IN EACH CASE, AS DEFINED IN THE PLAN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE PLAN'S EFFECTIVE DATE.

THE NEW NOTES AND NEW COMMON EQUITY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "SHALL," "EXPECTS," "PROJECTS," "FORECASTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION

REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT AND IN THE ANNUAL AND QUARTERLY REPORTS OF DEBTOR CANO HEALTH, INC., INCLUDING AMENDMENTS THERETO. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE SEC FILINGS, INCLUDING IN THE ANNUAL AND QUARTERLY REPORTS OF DEBTOR CANO HEALTH, INC., INCLUDING AMENDMENTS THERETO. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR, ACCOUNTANT OR FINANCIAL ADVISOR HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS OR OTHER TERMS OR PROVISIONS HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
        STATEMENT AND PLAN .................................................................................. 2

        A.      What is chapter 11? ................................................................................ 2

        B.      Why are the Debtors sending me this Disclosure Statement? .............. 2

        C.      Am I entitled to vote on the Plan? ....................................................... 3

        D.      What will I receive from the Debtors if the Plan is consummated? ...... 3

        E.      What will I receive from the Debtors if I hold an Allowed Administrative
                Expense, DIP Administrative Expense, Professional Fee Administrative
                Expense, or a Priority Tax Claim? ........................................................ 5

        F.      Are any regulatory approvals required to consummate the Plan? ......... 8

        G.      What happens to my recovery if the Plan is not confirmed or does not go
                effective? ................................................................................................ 8

        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation
                or when the Plan goes effective, and what is meant by "Confirmation,"
                "Effective Date," and "Consummation?" .............................................. 8

        I.      What are the sources of Cash and other consideration required to fund the
                Plan? ....................................................................................................... 8

        J.      Are there risks to owning the New Common Equity upon emergence from
                chapter 11? ............................................................................................. 9

        K.      Is there potential litigation related to the Plan? .................................... 9

        L.      Will the final amount of Allowed General Unsecured Claims affect the
                recovery of holders of Allowed General Unsecured Claims under the
                Plan? ....................................................................................................... 9

        M.      How will the preservation of the Causes of Action impact my recovery
                under the Plan? ....................................................................................... 9

        N.      Will there be releases and exculpation granted to parties in interest as part
                of the Plan? ............................................................................................ 10

        O.      What is the deadline to vote on the Plan? ..................................... ~~16~~15

        P.      How do I vote to Accept or Reject the Plan? ...................................... 16

        Q.      Why is the Bankruptcy Court holding a Confirmation Hearing? ...... ~~17~~16

        R.      What is the purpose of the Confirmation Hearing? ....................... ~~17~~16

        S.      What is the effect of the Plan on the Debtors' ongoing businesses? ... ~~17~~16

        T.      Are foreign affiliates of ProSomnus included in these Chapter 11 Cases? ~~17~~16

        U.      Will any party have significant influence over the corporate governance
                and operations of the Reorganized Debtors? ....................................... 17

94995804.16

V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ............................................................. ~~18~~17

W.    Do the Debtors recommend voting in favor of the Plan? ........................ ~~19~~18

X.    Who Supports the Plan? ............................................................................ ~~19~~18

III.    THE RESTRUCTURING SUPPORT AGREEMENT AND PLAN ...................... ~~19~~18

A.    Restructuring Support Agreement. ........................................................... ~~19~~18

B.    The Plan. ................................................................................................... ~~19~~18

IV.    DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ........................................................................................................ ~~33~~32

A.    ProSomnus' History and Operations. ....................................................... ~~33~~32

B.    The Debtors' Prepetition Corporate and Capital Structure. ..................... ~~34~~33

C.    Prepetition Funded Debt. .......................................................................... ~~35~~33

D.    Equipment Lease Obligations. .................................................................. ~~38~~36

E.    Trade Payables and Ordinary Course Obligations. ................................... ~~38~~36

V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ................................... ~~38~~37

A.    The Debtors' Business is Overleveraged and has Suffered Significant Capital Shortfalls. ..................................................................................... ~~38~~37

B.    Prepetition Marketing and Restructuring Efforts. .................................... ~~38~~37

C.    The Restructuring Support Agreement. ..................................................... ~~39~~38

VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS  OF THE CHAPTER 11 CASES ......................................................................................... ~~40~~39

A.    First Day Relief ........................................................................................ ~~40~~39

B.    Case Milestones ........................................................................................ ~~43~~41

VII.    RISK FACTORS .............................................................................................. ~~44~~42

A.    Bankruptcy Law Considerations. .............................................................. ~~44~~43

B.    Risks Related to Recoveries Under the Plan and the Debtors' and the Reorganized Debtors' Businesses. ............................................................ ~~49~~48

VIII.    SOLICITATION AND VOTING .................................................................... ~~54~~52

A.    Holders of Claims Entitled to Vote on the Plan. ...................................... ~~54~~52

B.    Voting Record Date. .................................................................................. ~~54~~53

C.    Voting on the Plan. .................................................................................... ~~54~~53

D.    Ballots Not Counted. ................................................................................. ~~54~~53

IX.    CONFIRMATION OF THE PLAN ................................................................. ~~55~~53

A.    The Confirmation Hearing. ....................................................................... ~~55~~53

B.    Requirements for Confirmation of the Plan. ............................................. ~~55~~54

C.      Best Interests of Creditors/Liquidation Analysis. ............................ ~~55~~54

D.      Feasibility. ...................................................................................... ~~56~~55

E.      Acceptance by Impaired Classes and Interests. ............................... ~~57~~55

F.      Confirmation Without Acceptance by All Impaired Classes. ............ ~~57~~56

X.      CERTAIN SECURITIES LAW MATTERS ................................................ ~~58~~57

A.      New Notes and New Common Equity ............................................... ~~59~~57

XI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES TO THE PLAN ...... 57

A.      Certain Tax Consequences to the Debtors ........................................ 59

B.      Holders ............................................................................................. 61

C.      Consequences of Ownership of New Common Equity ....................... 65

D.      Consequences of Ownership of New Notes ....................................... 66

E.      Withholding on Distributions, Interest Payments and Information
        Reporting ......................................................................................... 68

F.      Importance of Obtaining Professional Advice ................................. 68

XII.    RECOMMENDATION ................................................................................. ~~60~~69

## I.    INTRODUCTION

ProSomnus, Inc. ("**ProSomnus**") and certain of its subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**"), submit this joint disclosure statement (as may be amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement and, together with all exhibits and schedules thereto, the "**Disclosure Statement**") in connection with the solicitation of votes on the Amended Joint Chapter 11 Plan of Reorganization of ProSomnus, Inc. and Its Debtor Affiliates, dated ~~May~~June 24, 2024 (as may be further amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement and, together with all exhibits and schedules thereto, the "**Plan**")[2] annexed hereto as **Exhibit A**. The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), beginning on May 7, 2024 (the "**Petition Date**").

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make a reasonably informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

The Debtors are seeking to confirm a pre-arranged plan under chapter 11 of the Bankruptcy Code with the support, pursuant to the terms of a restructuring support agreement entered into on May 7, 2024 (the "**Restructuring Support Agreement**" or "**RSA**"),[3] of the Debtors' prepetition creditors holding approximately (i) 100% of the issued and outstanding Senior Secured Convertible Notes, (ii) 100% of the issued and outstanding Senior Secured Convertible Exchange Notes, (iii) 94.95% of the issued and outstanding Subordinated Secured Convertible Notes, (iv) 100% of the issued and outstanding Subordinated Secured Convertible Exchange Notes, and (v) 100% of the Bridge Notes. (collectively, the "**Sponsoring Noteholders**"). Specifically, as set forth below and in the Restructuring Support Agreement, with the committed support of the Sponsoring Noteholders, the Debtors are seeking to move forward with a committed Plan that would allow for substantial deleveraging and a new capital infusion to right size the Debtors' balance sheet for the benefit of all stakeholders (the "**Reorganization Transaction**"). Through the Reorganization Transaction:

- Each Holder of an Allowed Senior Notes Claims shall receive, in full satisfaction of its Allowed Senior Secured Note Claim: its Pro Rata share of the New Notes; *provided, however*, that holders of Senior Notes Claims that are Excluded Parties shall receive no distribution under the Plan.

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

[3] A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B**.

1

- Each Holder of an Allowed Subordinated Notes Claim shall receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of ~~22.66~~22.48% of New Common Equity, subject to dilution on account of the MIP; *provided, however*, that holders of Subordinated Notes Claims that are Excluded Parties shall receive no distribution under the Plan.

- Allowed General Unsecured Claims will be paid in full in the ordinary course of business on and after the Effective Date; and

- Interests and Section 510(b) Claims will be cancelled, released, and extinguished, and will receive no recovery.

**For the avoidance of doubt, the Plan provides that all Allowed General Unsecured Claims, including trade claims, will be paid in full in the ordinary course of business and otherwise unimpaired by the chapter 11 process.** In light of the foregoing, the Debtors expect to continue operating normally throughout the Chapter 11 Cases and remain focused on serving their customers and working with suppliers on normal terms.

---

**FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTE TO ACCEPT THE PLAN.**

---

## II.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to

prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein). Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Type of Claim or Interest | Impairment | Voting |
|-------|---------------------------|------------|--------|
| Class 1 | Senior Notes Claims | Impaired | Yes |
| Class 2 | Subordinated Notes Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Section 510(b) Claims | Impaired | No (Deemed to reject) |
| Class 7 | Interests | Impaired | No (Deemed to reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

---

[4] The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

94995804.16

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Interest | Projected Amount of Allowed Claims[5] | Projected Recovery Under the Plan |
| 1 | Senior Notes Claims | Each Holder of an Allowed Senior Notes Claim shall receive, in full satisfaction of its Allowed Senior Notes Claim: its Pro Rata share of the New Notes; *provided, however*, that Holders of Senior Notes Claims that are Excluded Parties shall receive no distribution under the Plan. | ~~$15,811,554~~$17,800,000 | 88.77% |
| 2 | Subordinated Notes Claims | Each Holder of an Allowed Subordinated Notes Claim shall receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of ~~22.66~~22.48% of New Common Equity, subject to dilution on account of the MIP; *provided, however*, that Holders of Subordinated Notes Claims that are Excluded Parties shall receive no distribution under the Plan. | $21,000,000 | 33.17% |
| 3 | Other Secured Claims | Except to the extent less favorable treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and a Holder of an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor, with the consent of the Sponsoring Noteholders: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $3,500,000 | 100% |
| 4 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive payment in full, in cash, on the Effective Date. | $0 | 100% |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall continue to pay or dispute | $2,500,000 | 100% |

---

[5] For purposes of the Plan, including the projected recoveries set forth herein, the Debtors and the Sponsoring Noteholders have stipulated to a total pre-money enterprise value of the Reorganized Debtors of $25,700,000.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Interest | Projected Amount of Allowed Claims[5] | Projected Recovery Under the Plan |
| | | each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced. | | |
| 6 | Section 510(b) Claims | On the Effective Date, Section 510(b) Claims will be cancelled, released, and extinguished and will be of no further force and effect and shall receive no recovery. | $0 | 0% |
| 7 | Interests | On the Effective Date, Interests will be cancelled, released, and extinguished and will be of no further force and effect and shall receive no recovery. | N/A | 0% |

**E.     What will I receive from the Debtors if I hold an Allowed Administrative Expense, DIP Administrative Expense, Professional Fee Administrative Expense, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Administrative Expenses, Professional Fee Administrative Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

1.     <u>Administrative Expenses.</u>

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, and unless the Holder of an Allowed Administrative Expense agrees to less favorable treatment or such Holder has been paid by any Debtor on account of such Allowed Administrative Expense prior to the Effective Date, each Holder of an Allowed Administrative Expense (other than holders of Professional Fee Administrative Expenses and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Expense an amount of Cash equal to the amount of such Allowed Administrative Expense in accordance with the following: (1) if an Administrative Expense is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense is due or as soon as reasonably practicable thereafter); (2) if such Administrative Expense is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Expense is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense without any further action by the holders of such Allowed Administrative Expense; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable, and in each case, with the

consent of the Sponsoring Noteholders; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2.    <u>DIP Administrative Expenses.</u>

On the Effective Date, each holder of an Allowed DIP Administrative Expense, shall receive, in full satisfaction of such DIP Administrative Expense, its Pro Rata share of 48.19% of New Common Equity at the New Money Equity Price (defined below).

3.    <u>Professional Fee Administrative Expenses.</u>

a.    Final Fee Applications and Payment of Professional Fee Administrative Expenses.

All requests for payment of Professional Fee Administrative Expenses for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Administrative Expenses after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Administrative Expenses in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

b.    Professional Fee Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Sponsoring Noteholders, establish and fund the Professional Fee Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Account shall be established in trust for the Professionals and maintained solely for Allowed Professional Fee Administrative Expenses. The amount of Allowed Professional Fee Administrative Expenses shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Account as soon as reasonably practicable after such Professional Fee Administrative Expenses are Allowed. When such Allowed Professional Fee Administrative Expenses have been paid in full, any remaining amount in the Professional Fee Account shall promptly be transferred to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

c.    Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Administrative Expenses and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors and the Sponsoring Noteholders no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not

provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional in consultation with the Sponsoring Noteholders.

        d.      Post-Confirmation Fees and Expenses.

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

        4.      <u>Priority Tax Claims.</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

        5.      <u>Payment of Restructuring Expenses.</u>

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, any applicable engagement letter(s), and any DIP Orders, as applicable, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors or the Reorganized Debtors, as applicable. In addition, the Debtors and/or the Reorganized Debtors, as applicable, shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date, without any requirement for Bankruptcy Court review or approval.

Without limiting the foregoing, on the Effective Date, the Disbursing Agent shall pay in full in Cash the Prepetition Agents Expenses without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Case, and without any requirement for further notice or Bankruptcy Court review or approval. In addition, the Disbursing Agent shall continue to pay the Prepetition Agents Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent related to implementation, consummation and defense of the Plan, whether incurred before, on or after the

Effective Date, without any requirement for further notice or Bankruptcy Court review or approval.

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable on account of the reasonable and documented fees and expenses of the Restructuring Expenses that the Debtors are obligated to pay under the Restructuring Support Agreement, and for which the Debtors have received an invoice, shall constitute an Allowed Administrative Expense and shall be paid on a current basis in full in Cash on the Effective Date or as reasonably practicable thereafter, or to the extent accrued after the Effective Date, on a current basis in full in Cash as invoiced. Nothing herein shall require the Sponsoring Noteholders or their professionals to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to payment of such Allowed Administrative Expenses.

6.    <u>Payment of Statutory Fees.</u>

<u>Payment of United States Trustee Quarterly Fees.</u> All fees due and payable pursuant to section 1930~~(a) of Title 28~~ of the ~~Judicial~~U.S. Code, ~~including fees payable to the U.S. Trustee and any interest thereon pursuant to~~together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S.~~C. § 3717~~ Code to the extent applicable ("**Quarterly Fees**") ~~as determined by~~prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, each of the Reorganized Debtors shall file with the Bankruptcy Court~~, shall be paid in full in Cash~~ separate UST Form 11-PCR reports when they become due ~~by~~. each and every one of the ~~applicable~~Debtors and the Reorganized Debtors ~~for each quarter (including any fraction thereof) until the applicable Chapter 11 Case of such Reorganized~~shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor~~is converted~~'s case being closed, dismissed~~,~~ or ~~closed, whichever occurs first. Nothing in the Plan shall discharge or release any Quarterly Fees~~converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file ~~a Proof of~~any Administrative Claim ~~or request for payment for Quarterly Fees. The Reorganized Debtors shall timely file all required monthly operating reports and post-confirmation quarterly reports in a form prescribed by the U.S. Trustee until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first~~in the case and shall not be treated as providing any release under the Plan.

**F.    Are any regulatory approvals required to consummate the Plan?**

The Debtors are evaluating any regulatory approvals that would be required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.    What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case *see* Article VII.B of this Disclosure Statement, entitled "Risks Related to Recoveries under the Plan and the Debtors' and the Reorganized Debtors' Businesses." ~~which begins on page 49.~~ For a more detailed description of a liquidation scenario, *see* Article IX.C of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," ~~which begins on page 55,~~ and the Liquidation Analysis attached hereto as **Exhibit D.**

**H.**    **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"— or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article IX of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan," ~~which begins on page 55,~~ as well as Article IX of the Plan for a discussion of the conditions precedent to consummation of the Plan.

**I.**    **What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with the (i) Debtors' Cash on hand, (ii) Cash generated from operations; (iii) funds from the DIP Facility, and (iv) funds generated through issuance of the New Money Common Equity Investment.

**J.**    **Are there risks to owning the New Common Equity upon emergence from chapter 11?**

Yes. *See* Article VII of this Disclosure Statement, entitled "Risk Factors." ~~which begins on page 44.~~

**K.**    **Is there potential litigation related to the Plan?**

Yes. Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VII.B.11 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases." ~~which begins on page 53.~~

9

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes or other Plan objections, the Debtors may seek, among other things, modification of the Plan or confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.F of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes,." ~~which begins on page 57.~~

**L.    Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?**

No. The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

However, for the avoidance of doubt, and as set forth in the Plan, one of the conditions to the occurrence of the Effective Date is that the aggregate amount of Allowed General Unsecured Claims and Other Priority Claims to be paid under the Plan shall be no more than $2,500,000.

**M.    How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII thereof, each Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII thereof.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished,

exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII thereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**N.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes. The Plan proposes to release the Released Parties _(including, for the avoidance of doubt, the Related Parties)_ and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Sponsoring Noteholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

Released Parties shall not include Excluded Parties under the Plan, that is, any Sponsoring Noteholder that (i) votes to reject the Plan, objects to the Plan, or supports an objection to the Plan or (ii) opts out of any Debtor releases sought in connection with the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, including by funding the Bridge Notes and the DIP Facility, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS (OTHER THAN SECTION 510(b) CLAIMS) WHO DO NOT AFFIRMATIVELY AND VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST**

11

**THE RELEASED PARTIES, EVEN IF SUCH HOLDER AFFIRMATIVELY REJECTS THE PLAN. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

        1.      <u>Release of Liens.</u>

**Except as otherwise provided in the Plan, the Restructuring Support Agreement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

        2.      <u>Releases by the Debtors.</u>

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent permitted by applicable Law, for good and valuable consideration, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released ~~and discharged~~ by each and all of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims (other than Reinstated Claims), Interests,**

12

**obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Plan (including the Plan Supplement), the solicitation of votes on the Plan, the Disclosure Statement, the New Organizational Documents, the pursuit of Confirmation and Consummation, the DIP Facility, the DIP Facility Documents, the New Money Common Equity Investment Documents, the New Note Documents, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (but not, for the avoidance of doubt, any Cause of Action included in the Schedule of Retained Causes of Action, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the indemnification provisions as set forth in the Plan; (b) any Cause of Action included on the Schedule of Retained Causes of Action; (c) the rights of any Holder of an Allowed Claim to receive distributions under the Plan; or (d) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference**

13

**each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.**

3. <u>Releases by the Releasing Parties.</u>

**Effective as of the Effective Date, to the fullest extent permissible under applicable Law, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims (other than Reinstated Claims), interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Plan (including the Plan Supplement), the solicitation of votes on the Plan, the Disclosure Statement, the New Organizational Documents, the pursuit of Confirmation and Consummation, the DIP Facility, the DIP Facility Documents, the New Money Common Equity Investment Documents, the New Note Documents, the administration and implementation of the Plan, including the**

issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan or the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the indemnification provisions as set forth in the Plan; (b) any Cause of Action included on the Schedule of Retained Causes of Action; (c) the rights of any Holder of an Allowed Claim to receive distributions under the Plan; or (d) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

~~Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Plan Transactions and implementing the Plan; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Third-Party Release.~~

       4.    <u>Exculpation.</u>

Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Restructuring Support Agreement, the Disclosure Statement, the Plan (including the Plan Supplement), the DIP Facility, the DIP Facility Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract,

instrument, document, or other agreement contemplated by the Plan), except for claims or Causes of Action related to any act or omission constituting actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

~~Solely with respect to the exculpation provision, notwithstanding anything to the contrary in the Plan or Plan Supplement, each of the 1125(e) Exculpated Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan. No Entity or Person may commence or pursue a Claim or Cause of Action of any kind against any of the Exculpated Parties or the 1125(e) Exculpated Parties that arose or arises from, in whole or in part, a Claim or Cause of Action subject to this paragraph, without this Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim for actual fraud, gross negligence, or willful misconduct against any such Exculpated Party or 1125(e) Exculpated Party and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against such Exculpated Party or 1125(e) Exculpation Party. The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.~~

5.    Injunction.

Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have

**held, hold, or may hold Claims (other than Reinstated Claims), Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Cause of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**O.     What is the deadline to vote on the Plan?**

The Voting Deadline is **July 19, 2024 at 4:00 p.m.(prevailing Eastern Time)** unless otherwise extended by the Bankruptcy Court or the Debtors.

**P.     How do I vote to Accept or Reject the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, the ballot containing your vote must be properly completed, executed, and delivered as directed, so that the ballot containing your vote is **actually received** by the Debtors' voting agent, Kurtzman Carson Consultants LLC (the "**Voting Agent**") **on or before the Voting Deadline,** *i.e.* **July 19, 2024 at 4:00 p.m. (prevailing Eastern Time) .** *See* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting" ~~which begins on page 54~~ for more information.

Holders of Interests are not entitled to vote on the Plan.

**Q.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.      Are foreign affiliates of ProSomnus included in these Chapter 11 Cases?**

No. The foreign affiliates of ProSomnus are not debtors included in these Chapter 11 Cases. The Debtors do not expect that the Chapter 11 Cases will materially disrupt the ongoing operation of such entities.

**U.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the then-sitting members of the boards of directors of the Debtors shall expire, and the New Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Corporate Governance Documents. The New Board shall consist of those individuals that are selected in accordance with Section 4.12 of the Plan and the Restructuring Term Sheet. The New Board shall consist of five members: Ant Raab, Len Liptak, and three directors appointed by the Sponsoring

Noteholders. Additional information regarding the New Board will be included in the Plan Supplement.

On the Effective Date, it is anticipated that the holders of the Subordinated Secured Notes will become the holders of a majority of shares of the New Common Equity, and will be in a position to control matters requiring approval by the holders of shares of New Common Equity, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

### V. Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Voting Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

> By regular mail at:
>
> ProSomnus, Inc., *et al.*, Ballot Processing Center
> c/o KCC
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, California 90245
>
> By hand delivery or overnight mail at:
> ProSomnus, Inc., *et al.*, Ballot Processing Center
> c/o KCC
> 222 N. Pacific Coast Highway, Suite 300
> El Segundo, California 90245
>
> By electronic mail at:
> ProSomnusInfo@kccllc.com
>
> By telephone at:
> (888) 647-1744 (U.S./Canada)
> (310) 751-2628 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Voting Agent at the address above or by downloading the exhibits and documents from the website of the Voting Agent at https://www.kccllc.net/prosomnus (free of charge) or via PACER at http://www.ecf.deb.uscourts.gov/ (for a fee).

### W. Do the Debtors recommend voting in favor of the Plan?

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of

all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### X.        Who Supports the Plan?

The Plan is supported by the Debtors and the Sponsoring Noteholders that have executed the Restructuring Support Agreement, which includes holders of an overwhelming majority in aggregate principal amount of the Debtors Senior Secured Notes and Subordinated Secured Notes.  Specifically, the Plan is supported by holders of approximately (i) 100% of the issued and outstanding Senior Secured Convertible Notes, (ii) 100% of the issued and outstanding Senior Secured Convertible Exchange Notes, (iii) 94.95% of the issued and outstanding Subordinated Secured Convertible Notes, (iv) 100% of the issued and outstanding Subordinated Secured Convertible Exchange Notes, and (v) 100% of the Bridge Notes.

## III.      THE RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.        Restructuring Support Agreement.

As more fully described in Article V.C hereof, after months of arms-length negotiation, the Debtors and the Sponsoring Noteholders entered into the Restructuring Support Agreement on May 7, 2024. Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the restructuring contemplated thereby, including the Plan, the DIP Facility, and this Disclosure Statement.  The restructuring transactions contemplated by the Plan will (i) provide the capital injection needed for the Debtors to conduct competitive operations going forward; (ii) significantly reduce the Debtors' funded-debt obligations and annual interest payments; and (iii) result in a stronger balance sheet for the Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process. Moreover, the Restructuring Support Agreement will allow the Debtors to proceed expeditiously through chapter 11 and consummate the Plan in accordance with the milestones, which are set forth in Article VI.B hereof. Adhering to the milestones is an integral part of the Debtors' restructuring efforts. As set forth in the section entitled "Risk Factors", if the Chapter 11 Cases take longer than expected, the Debtors may exhaust their available cash collateral and postpetition financing. Such a result may significantly impair the Debtors' ability to realize the value inherent in the Plan and the Restructuring Support Agreement.

### B.        The Plan.

The Plan contemplates the following key terms, among others described herein and therein:

####         1.        General Settlement of Claims and Interests.

In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion by the Debtors to approve such compromises and settlements pursuant to Bankruptcy Rule 9019 and

section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and within the range of reasonableness. Subject to Section 7.06 of the Plan, distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

2.    Restructuring Transactions.

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Support Agreement, the Restructuring Term Sheet, and Definitive Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Debtors and Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan before, on, and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors. Such restructuring may include (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and having such other terms to which the applicable Entities may agree; (3) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (4) the issuance of New Common Equity; (5) the execution and delivery of the New Note Documents and the New Money Common Equity Investment Documents; (6) the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such applicable formation documents (if any) of each Reorganized Debtor; and (7) all other actions that the Debtors, Reorganized Debtors and/or the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and any consents or approvals required thereunder.

The Confirmation Order shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan).

3.    Substantive Consolidation

a.    Consolidation of the Chapter 11 Estates

The Plan contemplates and is predicated upon entry of an order (which may be the Confirmation Order) substantively consolidating the Debtors' Estates and Chapter 11 Cases for all purposes, including voting, Distribution, and Confirmation. On the Effective Date, (a) all Intercompany Claims between the Debtors shall be eliminated; (b) all assets and liabilities of the Affiliate Debtors shall be merged or treated as if they were merged with the assets and liabilities of Parent; (c) any obligation of a Debtor and any guarantee thereof by another Debtor shall be deemed to be one obligation of Parent, and any such guarantee shall be eliminated; (d) each Claim Filed or to be Filed against any Debtor shall be deemed Filed only against Parent and shall be deemed a single Claim against and a single obligation of Parent; and (e) any joint or several liability of the Debtors shall be deemed one obligation of Parent. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

The substantive consolidation effected pursuant to Section 4.03 of the Plan shall not, and shall not be deemed to, prejudice the Retained Causes of Action and the Avoidance Actions (subject to the releases set forth in Article VIII of the Plan), which shall survive entry of the Substantive Consolidation Order, as if there had been no substantive consolidation.

b.    Substantive Consolidation Order

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases. If no objection to substantive consolidation is timely Filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the deadline to object to Confirmation of the Plan, or such other date as may be fixed by the Court, the Substantive Consolidation Order (which may be the Confirmation Order) may be approved by the Court. If any such objections are timely Filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

4.    Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by the Plan, by the Debtors, or otherwise, and to the extent such documents are amended, such

documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, one or more of the Reorganized Debtors, or Parent, may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.     Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims.

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

6.     Cancellation of Existing Securities and Agreements.

On the Effective Date, except to the extent otherwise provided in the Plan, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, certificates, securities, purchase rights, options, warrants, collateral agreements, subordination agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and null, void and worthless, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; provided, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or the Confirmation Order, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under the Plan as provided herein; (2) allowing and preserving the rights of the Prepetition Agents and DIP Agent, as applicable, to make distributions as specified under the Plan on account of Allowed Claims, including allowing the Prepetition Agents and DIP Agent to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed by the applicable documents; (3) permitting the Reorganized Debtors and any other Disbursing Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the Prepetition Agents' and DIP Agent's rights, if any, to compensation and indemnification as against any money or property

23

distributable to the Holders of Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses, as applicable, including permitting the Prepetition Agents and DIP Agent, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the Indentures, and DIP Credit Agreement, as applicable, as in effect on or immediately before the Effective Date, (5) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the Prepetition Agents and DIP Agent, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, Non-Debtor Affiliates, and Sponsoring Noteholders), and any exculpations of the Prepetition Agents and DIP Agent, as applicable; provided, that the Prepetition Agents and DIP Agent shall remain entitled to indemnification or contribution from the Holders of Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses, to the extent provided in the respective Indentures and DIP Credit Agreement, as applicable, as in effect on the Effective Date, (6) permitting the Prepetition Agents and DIP Agent, as applicable, to enforce any obligation (if any) owed to them under the Plan, (7) permitting the Prepetition Agents and DIP Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, and (8) permitting the Prepetition Agents and DIP Agent to perform any functions that are necessary to effectuate the foregoing; provided, however, that nothing in 6 of the Plan shall affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or (except as set forth in (5) above) the releases of the Released Parties pursuant to Article IX of the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan. In furtherance of the foregoing, as of the Effective Date, Holders of Senior Notes Claim, Subordinated Notes Claims, and DIP Administrative Expenses shall be deemed to have released any such Claims against the Reorganized Debtors under the Indentures and DIP Facility Documents and are enjoined from pursuing any such claims against any of the Reorganized Debtors in respect of such Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses.

On the Effective Date, the Prepetition Agents, the DIP Agent, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall (i) be automatically and fully released and discharged from any further responsibility under the Indentures and DIP Credit Agreement, as applicable, and (ii) have no further obligation or liability except as provided in the Plan and the Confirmation Order, and after the performance by the Prepetition Agents, DIP Agent, and their representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the Prepetition Agents, DIP Agent, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder. The commitments and obligations of the Holders of the Senior Notes Claims and the Subordinated Notes Claims to extend any further or future credit or financial accommodations to the Debtors, its subsidiaries or assigns under the Indentures, respectively, shall fully terminate and be of no further force or effect on the Effective Date. The reasonable and documented fees, expenses, and costs of the Prepetition Agents and the DIP Agent, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the Indentures or DIP Credit Agreement, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to the Plan, including the fees and expenses of

counsel, if any, shall be paid in accordance with the terms of the Plan and the applicable Definitive Documents.

7. <u>Cancellation of Certain Existing Security Interests.</u>

Upon the full payment or other satisfaction of an Allowed Secured Claim (including Allowed DIP Administrative Expenses), or promptly thereafter, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of an Allowed Secured Claim (including an Allowed DIP Administrative Expense) that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Allowed Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

To the extent that any Holder of a Secured Claim, or any agent for such Holder, has filed or recorded publicly any Lien and/or security interests against the property of the Non-Debtor Subsidiaries, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Non-Debtor Subsidiaries that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Non-Debtor Subsidiaries shall be entitled to make any such filings or recordings on such Holder's behalf.

8. <u>Sources of Consideration for Plan Distributions.</u>

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with the (i) Debtors' Cash on hand, (ii) Cash generated from operations; (iii) funds from the DIP Facility, and (iv) funds generated through issuance of the New Money Common Equity Investment.

9.    <u>Issuance of New Common Equity and Deregistration.</u>

On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all of the New Common Equity in accordance with the terms of the Plan and the New Organizational Documents without the need for further corporate or other action. All of the New Common Equity issuable under the Plan and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and nonassessable.

Reorganized Parent intends to exist and operate as a private company after the Effective Date. As promptly as reasonably practicable following the Effective Date, Reorganized Parent expects to take all necessary steps to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its Existing Equity Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by filing a Form 15 with the SEC under the Exchange Act.

a.    Absence of Listing/Transfer of New Common Equity

On the Effective Date, the Reorganized Debtors shall issue the New Common Equity pursuant to the Plan and the New Organizational Documents. The Reorganized Debtors shall not be obligated to effect or maintain any listing of the New Common Equity for trading on any national securities exchange (within the meaning of the Exchange Act) and it has no current intention of maintaining or obtaining such listing. Unless otherwise provided herein, distributions of the New Common Equity are expected to be made by delivery or book-entry transfer thereof by the Disbursing Agent in accordance with the Plan and the New Organizational Documents, rather than through the facilities of DTC. Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Common Equity shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of New Common Equity shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Stockholders Agreement (if applicable), including the payment of stamp duty tax and completion of registration with the Disbursing Agent.

b.    New Stockholders Agreement

On the Effective Date, to the extent applicable, one or more of the Reorganized Debtors shall enter into the New Stockholders Agreement with the Holders of the New Common Equity, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Stockholders Agreement). On and as of the Effective Date, all of the Holders of New Common Equity shall be deemed to be parties to the New Stockholders Agreement (if applicable), without the need for execution by such Holder.

If applicable, the New Stockholders Agreement shall be binding on all Persons or Entities receiving, and all Holders of, the New Common Equity (and their respective successors and

26

assigns), whether such New Common Equity is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Stockholders Agreement.

10. New Money Common Equity Investment

On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall consummate the New Money Common Equity Investment, pursuant to which participants shall subscribe to purchase New Money Common Equity in an amount of at least $9,000,000 in the aggregate. The New Money Common Equity shall be offered in the form of a rights offering or other subscription process. The price per share of New Money Common Equity shall be based on a total indicative pre-money enterprise value of the Reorganized Debtors of $25,700,000, (a) prior to taking into account the funding of the DIP Facility and the Bridge Notes, and the funding of New Money Common Equity, and (b) assuming an Effective Date of July 31, 2024, or as soon thereafter as is practicable (the "**New Money Equity Price**"). The New Money Common Equity shall be offered for ratable participation by the Sponsoring Noteholders and other third-party purchasers. The New Money Common Equity Investment has been fully backstopped the Backstop Parties on the terms set forth in the Backstop Commitment Documentation attached hereto as **Exhibit F**.

Confirmation of the Plan shall be deemed approval of the New Money Common Equity Investment and the New Money Common Equity Investment Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization for the Reorganized Debtors to enter into and execute the New Money Common Equity Investment Documents as may be required to effectuate the treatment afforded by the New Money Common Equity. All New Money Common Equity issued pursuant to the Plan shall be duly authorized, validly issued and non-assessable.

For the avoidance of doubt, the issuance of the New Money Common Equity shall be exempt from the registration requirements of the Securities Act as a result of Bankruptcy Code section 1145 to the maximum extent permitted by law.

11. The New Notes

On the Plan Effective Date, the Reorganized Debtors shall enter into the New Note Documents. The Confirmation Order shall approve the New Notes and the New Note Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and all Claims, Liens, and security interests to be granted in accordance with the terms of the New Note Documents, if any, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Claims and Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Note Documents, (c) shall be deemed automatically attached and perfected on the Plan Effective Date, subject only to the Liens and security interests as may be permitted under the New Note Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other

voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors and the Reorganized Debtors, as applicable, and the Persons granting such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order with respect to the Plan, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

12.    <u>Corporate Actions.</u>

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including, as applicable: (a) the issuance and distribution of the New Common Equity; (b) the offering and implementation of the New Money Common Equity Investment; (c) the issuance and distribution of the New Notes; (d) implementation of the Restructuring Transactions, (e) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (f) adoption of the New Organizational Documents; (g) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases (as applicable); and (h) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Money Common Equity Investment, the New Organizational Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by 12 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

13.    <u>New Organizational Documents.</u>

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization. The New

Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

> a.     Directors and Officers of the Reorganized Debtors

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and the existing officers of the Debtors shall be automatically removed as officers, and the New Board and new officers of each of the Reorganized Debtors shall be appointed consistent with the terms of the Restructuring Support Agreement and Restructuring Term Sheet. Specifically, the New Board shall consist of five members, including three directors appointed by the Sponsoring Noteholders. For subsequent terms, following the Effective Date, members of the New Boards and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity and affiliation of any Person proposed to serve on the New Boards will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, as well as those Persons that will serve as officers of the Reorganized Debtors. Provisions regarding the removal, appointment, and replacement of members of the New Boards, to the extent applicable, will be disclosed in the New Organizational Documents.

> b.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

> 14.     <u>Management Incentive Plan.</u>

Unless otherwise agreed, the Reorganized Debtors shall be authorized to adopt the MIP, enact and enter into related policies and agreements, and grant awards under the MIP to participants on the terms and conditions determined by the board of the directors of the Reorganized Parent, in all respects consistent with the Plan and the Restructuring Support Agreement.

15.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

16.    Certain Securities Law Matters.

The offering, issuance (or entry into), and distribution of the New Notes, New Common Equity, and all other Securities entered into and/or issued in connection with the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities to the maximum extent permitted by Law, in accordance with, and pursuant

to section 1145 of the Bankruptcy Code and any other available exemption from registration, as applicable.

In addition, the New Notes and New Common Equity issued under section 1145 of the Bankruptcy Code (1) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (2) will be freely tradable and transferable in the United States by a recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer, subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the New Organizational Documents.

To the extent issuance under section 1145(a) of the Bankruptcy Code is unavailable, the New Notes and New Common Equity will be issued without registration under the Securities Act in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act and/or Regulation S under the Securities Act, and similar registration exemptions under state or local securities Laws, in each case to the maximum extent permitted thereunder. Any securities issued in reliance on section 4(a)(2) and/or Regulation S under the Securities Act, will be "restricted securities" under the Securities Act and/or subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable Law and subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the New Money Common Equity Investment Documents and New Organizational Documents, as applicable.

Neither the issuance of the New Notes or New Common Equity nor the New Money Common Equity Investment shall constitute an invitation or solicitation of an invitation or offer to sell or buy, any securities in contravention of any applicable Law in any jurisdiction. No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any of the New Notes or New Common Equity in any jurisdiction where such action for that purpose is required.

Except as otherwise provided in the New Organizational Documents or otherwise elected by the Debtors (with the consent of the Sponsoring Noteholders), the initial ownership of the New Common Equity will be recorded in a register maintained by a transfer agent. To the extent provided in the New Organizational Documents or as elected by the Debtors (with the consent of the Sponsoring Noteholders), some or all Holders entitled to receive distributions of New Common Equity (which may be determined based on the percentage of New Common Equity issued on the Effective Date to which such Holder is entitled) may receive and hold such New Common Equity through the facilities of DTC. Upon the Effective Date, each Holder that receives New Common Equity pursuant to the terms hereof will be deemed to be a party to the New Organizational Documents, as applicable (even if such holder of New Common Equity does not execute a signature page to the New Organizational Documents); provided, that, without in any way reducing the force and effect of the foregoing, the Debtors may, in their

discretion and as a means of further assurance (and with the consent of the Sponsoring Noteholders) require that such Holders become party to the New Organizational Documents, either as a condition to distribution of the New Common Equity, or at a later date. The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Equity under applicable securities Laws. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC and any transfer agent shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

17.    <u>1146 Exemption.</u>

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or Reorganized Debtors, including the New Common Equity and the New Notes; (2) the restructuring transactions contemplated under the Plan; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

18.    <u>Governmental Regulatory Applications.</u>

The Debtors or the Reorganized Debtors, as applicable, shall use best efforts to obtain any and all required governmental, regulatory, and/or third-party approvals, and shall promptly provide such additional documents or information requested by any governmental regulatory

authority in connection with the review of the foregoing. Any agreements with or commitments to any governmental regulatory authorities by the Debtors, including any decision to accept and/or not to oppose any proposed material conditions or limitations on any such required approvals, shall require the prior approval of the Sponsoring Noteholders. Any other person required or reasonably requested by the Debtors (in each case with the consent of the Sponsoring Noteholders) shall use commercially reasonable efforts to make or assist in submissions necessary or appropriate for the consummation of the Restructuring Transactions.

19.    <u>Director and Officer Liability Insurance.</u>

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

20.    <u>Indemnification Obligations.</u>

Consistent with applicable Law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

21.    <u>No Change in Control.</u>

For the avoidance of doubt, except as provided in (x) the cancellation of any Interests pursuant to the Plan, (y) any issuance, transfer or acquisition of New Common Equity or other Securities pursuant to the Plan or in connection with the Debtors' restructuring, and (z) the

33

revesting of assets in the Reorganized Debtors as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "change in control" or "change of control" under any contract or other document to which any Debtor or Reorganized Debtor is a party.

## IV.    DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

### A.    ProSomnus' History and Operations.

#### 1.    ProSomnus' Business and Operations.

The Debtors' business (formerly known as DTI Holdings Inc. and MicroDental Inc.) began in 2006, and for most of the Debtors' history, their primary activity was the operation of a chain of dental laboratories. In October 2016, the dental laboratory business was sold and the Debtors refocused their efforts on the development, manufacturing, and marketing of personalized, precision intraoral medical devices, a novel non-invasive option for treating and managing patients with obstructive sleep apnea ("**OSA**"). Sleep apnea is a serious and chronic, respiratory, disease that negatively impacts a patient's sleep, breathing, health, and quality of life. OSA is the most common form of sleep apnea. If untreated, OSA increases the risk of high blood pressure, hypertension, heart failure, stroke, coronary artery disease and other life-threatening diseases.

The Debtors' precision intraoral devices are classified by the United States Food and Drug Administration (the "**FDA**") as Class II medical devices for the treatment of snoring and mild to moderate OSA. The Debtors received pre-market notification and FDA clearance pursuant to Section 510(k) of the Federal Food, Drug, and Cosmetic Act (the "**FDCA**") for their first intraoral device in July 2014 and their devices have been commercially available in the United States since August of 2014.

The Debtors' primary customers consist of medical providers who prescribe the Debtors' precision devices to patients suffering from OSA, but who, for a variety of reasons, have not found success with traditional treatment using a continuous positive airway pressure machine. To date, over 250,000 of the Debtors' precision devices have been prescribed for patients with sleep apnea.

#### 2.    The De-SPAC Transaction.

In order to take advantage of the capital raising potential of public equity markets, in December of 2022, Lakeshore Acquisition I Corp. ("**Lakeshore**") consummated a de-SPAC transaction to take the Company public (the "**Business Combination**"), pursuant to which: (i) Lakeshore merged with and into LAAA Merger Corp. ("**Surviving PubCo**"), (ii) a wholly owned subsidiary of Lakeshore merged with and into Holdings, with Holdings surviving such merger, and (iii) Surviving PubCo changed its name to ProSomnus, Inc. Prior to the Business Combination with Lakeshore, ProSomnus was not publicly traded.

Before the Business Combination, Lakeshore's units, public shares, and public warrants were listed on Nasdaq under the symbols "LAAU," "LAAA," and "LAAW," respectively. On

December 6, 2022, the common stock and public warrants of ProSomnus, Inc. began trading on Nasdaq, under the symbols "OSA" and "OSAAW," respectively. The Company's operations and mission did not change; it continued focusing on non-invasive, intra-oral medical devices to treat patients with mild to moderate OSA.

**B.    The Debtors' Prepetition Corporate and Capital Structure.**

1.    ProSomnus' Organizational Structure and Corporate Governance.

As set forth on the organizational chart attached hereto as **Exhibit C**, ProSomnus, Inc. wholly owns ProSomnus Holdings, Inc., which, in turn, wholly owns ProSomnus Sleep Technologies, Inc. Each of the Debtors is an obligor under the Senior Secured Notes and Subordinated Secured Notes as issuer (in the case of ProSomnus, Inc.) or as guarantor (in the case of the remaining Debtors). The two non-Debtor entities identified **Exhibit C** are foreign affiliates of the Debtors and have not commenced chapter 11 cases.

The Debtors are governed by a Board of Directors (the "**Board**"), which is composed of seven (7) members. including Jason Orchard, who serves as a Managing Director of Spring Mountain Capital ("**SMC**"). As of the Petition Date, SMC held (i) 13.2% of the common stock of ProSomnus, Inc., and (ii) approximately 28.2% of the Subordinated Secured Convertible Exchange Notes. SMC is also a Sponsoring Noteholder under the Restructuring Support Agreement and a DIP Lender under the DIP Facility. SMC has provided a total commitment of $3,354,632 under the DIP Facility, inclusive of its rolled-in Bridge Notes, which represents approximately 26.0% of the DIP Facility. Other than Mr. Orchard, no member of the Board is an Affiliate of any Sponsoring Noteholder or other Entity that holds Senior Secured Notes or Subordinated Secured Notes.

On March 24, 2024, the Board established a separate special committee to, among other things, exercise all power and authority that may be exercised by the Board in exploring, considering, reviewing, evaluating, negotiating, approving and, as appropriate, making recommendations to the Board concerning certain strategic transactions that may involve a debt or equity issuance by the Company or a related bankruptcy filing or other restructuring (the "**Special Committee**"), which consists of three (3) independent and disinterested directors. Mr. Orchard did not sit on the Special Committee and was not privy to the discussions among the Special Committee members. The Special Committee, in consultation with the Debtors' financial and legal advisors, reviewed and considered, among other things, the Company's financial and operational condition, historical performance, current and long-term liabilities, and non-bankruptcy alternatives. Ultimately, the Special Committee recommended to the Board that the Company enter into the Restructuring Support Agreement and commence the Chapter 11 Cases in accordance therewith.

2.    Equity Ownership.

As of December 31, 2023, ProSomnus, Inc. is authorized to issue (i) 150,000,000 shares of common stock and (ii) 1,500,000 shares of preferred stock, of which 25,000 shares have been authorized in respect of ProSomnus's Series A Convertible Preferred Stock. As of April 26,

2024, ProSomnus, Inc. had 17,394,064 shares of common stock outstanding and 10,426 shares of Series A Preferred Stock outstanding.

### C. Prepetition Funded Debt.

As of the Petition Date, the Debtors had approximately **$42,600,000** in aggregate funded debt obligations. These obligations are summarized as follows:

| Funded Debt | Maturity | Approximate Outstanding Amount as of Petition Date (including capitalized interest and fees) |
| --- | --- | --- |
| Senior Convertible Notes (excluding the Bridge Notes) | December 6, 2025 | $14,000,000 |
| Senior Convertible Notes (Bridge Notes) | December 6, 2025 | $4,000,000 |
| Senior Secured Convertible Exchange Notes | December 6, 2025 | $3,500,000 |
| Subordinated Convertible Notes | April 6, 2026 | $7,700,000 |
| Subordinated Secured Convertible Exchange Notes | April 6, 2026 | $13,400,000 |
| **Total Funded Debt as of Petition Date:** | | $42,600,000 |

    1.    Senior Secured Convertible Notes (Initial Notes).

Each of the Debtors is party to that certain *Indenture*, dated as of December 6, 2022 (as amended from time to time, the "**2022 Senior Indenture**") among (i) Parent, as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Senior Convertible Notes Agent**"). Pursuant to the 2022 Senior Indenture, Parent issued Senior Secured Convertible Notes due December 6, 2025 (the "**Senior Secured Convertible Notes**") in the original aggregate principal amount of $16,959,807 (the "**Senior Secured Convertible Initial Notes**") to certain investors (the "**Senior Convertible Noteholders**"). The Senior Secured Convertible Initial Notes accrue interest at the rate of 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Senior Secured Convertible Initial Notes including accrued but unpaid interest thereunder was approximately $14,000,000.00.

    2.    Senior Secured Convertible Notes (Bridge Notes).

On April 17, 2024 and April 29, 2024, pursuant to the 2022 Senior Indenture, Parent issued additional Senior Secured Convertible Notes in the aggregate principal amount of $4,000,000.00 (the "**Bridge Notes**") to certain of the Subordinated Noteholders (defined below) who are Sponsoring Noteholders. The Bridge Notes had not matured as of the Petition Date, but had outstanding accrued and unpaid interest thereunder in the approximate amount of $14,000.

On May 9, 2024, the Bankruptcy Court entered the Interim DIP Order (defined below), which approved the "roll-in" of the Bridge Notes into the DIP Facility. Accordingly, Claims

derived from, based upon, or arising under the Bridge Notes shall be treated for all purposes under the Plan as DIP Administrative Expenses and not as Senior Notes Claims. Additional information regarding the Interim DIP Order and the roll-in of Bridge Notes obligations is located in Article ~~II~~VI.A.2 of this Disclosure Statement~~, which begins on page 40~~.

### 3. Senior Secured Convertible Exchange Notes.

Each of the Debtors is party to that certain *Indenture*, dated as of October 11, 2023 (as amended from time to time, the "**2023 Senior Indenture**" and together with the 2022 Senior Indenture, the "**Senior Indentures**") among (i) Parent, as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Prepetition Senior Convertible Exchange Notes Agent**" and together with the Prepetition Senior Convertible Notes Agent, the "**Prepetition Senior Agents**"). Pursuant to the 2023 Senior Indenture, Parent issued Senior Secured Convertible Exchange Notes due December 6, 2025 (the "**Senior Secured Convertible Exchange Notes**" and together with the Senior Secured Convertible Notes and the Bridge Notes, the "**Senior Secured Notes**") to certain investors (the "**Senior Exchange Noteholders**" and together with the Senior Convertible Noteholders, the "**Senior Noteholders**") in the aggregate principal amount of $3,391,961 in exchange for $3,391,961 principal amount of Senior Secured Convertible Notes. The Senior Secured Convertible Exchange Notes accrue interest at the rate of 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Senior Secured Convertible Exchange Notes including accrued but unpaid interest thereunder was approximately $3,500,000.

### 4. The Senior Liens and Senior Collateral.

In connection with the issuance of the Senior Secured Notes, the Debtors, as issuers and guarantors under the Senior Indentures, granted the Prepetition Senior Agents, for the benefit of the Senior Noteholders, valid, binding, non-avoidable, properly-perfected and enforceable first priority continuing liens on and security interests in (the "**Senior Liens**") substantially all of their assets (the "**Senior Collateral**").

### 5. Subordinated Secured Convertible Notes.

Each of the Debtors is party to that certain *Indenture*, dated as of December 6, 2022 (as amended from time to time, the "**2022 Subordinated Indenture**") among (i) Parent, as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Prepetition Subordinated Convertible Notes Agent**"). Pursuant to the 2022 Subordinated Indenture, Parent issued Subordinated Secured Convertible Notes due April 6, 2026 (the "**Subordinated Secured Convertible Notes**") to certain investors (the "**Subordinated Convertible Noteholders**") in the original aggregate principal amount of $17,453,141.00. The Subordinated Secured Convertible Notes accrue interest at the Prime Rate (as defined in the 2022 Subordinated Indenture) plus 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Subordinated Secured Convertible Notes including accrued but unpaid interest thereunder was approximately $7,700.000.

6. <u>Subordinated Secured Convertible Exchange Notes.</u>

Each of the Debtors is party to that certain *Indenture*, dated as of October 11, 2023 (as amended from time to time, the "**2023 Subordinated Indenture**" and together with the 2022 Subordinated Indenture, the "**Subordinated Indentures**") among (i) Parent. as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Prepetition Subordinated Convertible Exchange Notes Agent**" and together with the Prepetition Subordinated Convertible Notes Agent, the "**Prepetition Subordinated Agents**"). Pursuant to the 2023 Subordinated Indenture, Parent issued Subordinated Secured Convertible Exchange Notes due April 6, 2026 (the "**Subordinated Secured Convertible Exchange Notes**" and together with the Subordinated Secured Convertible Notes, the "**Subordinated Secured Notes**") to certain investors (the "**Subordinated Exchange Noteholders**" and together with the Subordinated Convertible Noteholders, the "**Subordinated Noteholders**") in the original aggregate principal amount of $12,137,889 in exchange for $12,137,889 principal amount of Subordinated Secured Convertible Notes. The Subordinated Secured Convertible Exchange Notes accrue interest at the Prime Rate (as defined in the 2022 Subordinated Indenture) plus 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Subordinated Exchange Notes including accrued but unpaid interest thereunder was approximately $13,400,000.

7. <u>The Subordinated Liens on the Subordinated Collateral and the Intercreditor Agreement.</u>

In connection with the issuance of the Subordinated Secured Notes, the Debtors, as issuers and guarantors under the Subordinated Indentures, granted the Prepetition Subordinated Agents, for the benefit of the Subordinated Noteholders, valid, binding, non-avoidable, properly-perfected and enforceable second priority continuing liens on and security interests in (the "**Subordinated Liens**") substantially all of their assets (the "**Subordinated Collateral**" and together with the Senior Collateral, the "**Prepetition Collateral**").

The Debtors, Senior Noteholders, Subordinated Noteholders, and Prepetition Agents are parties to that certain Amended and Restated Intercreditor Agreement, dated as of October 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**") that sets forth the relative priority of such parties' respective liens in the Prepetition Collateral.

**D.     Equipment Lease Obligations.**

In the ordinary course of business, the Debtors are parties to certain equipment leases. The Debtors are substantially current on their obligations thereunder, and no amounts were due and owing on account of such obligations as of the Petition Date.

**E.     Trade Payables and Ordinary Course Obligations.**

In addition to ProSomnus' funded debt obligations, as of the Petition Date, ProSomnus owed an estimated $3.5 million to third party suppliers, vendors, and other ordinary course

38

unsecured creditors. The Plan provides that all such creditors will be unimpaired and paid in the ordinary course of business.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Debtors' Business is Overleveraged and has Suffered Significant Capital Shortfalls.

Notwithstanding the continued growth of the Debtors' business, the Debtors' public listing via de-SPAC in which the funding raised was predominantly debt, resulting in a balance sheet overleveraged with debt structures inconducive to securing additional capital, paired with a challenging capital markets environment, has led to the Debtors' ongoing and current inability to raise additional capital to fund the company's business plan and/or refinance their current debt structure. In light of the foregoing, the Debtors' management determined that without additional funding and liquidity, the Debtors' business would be unable to continue as a going concern and began pursuing marketing and restructuring efforts. Consequently, the Debtors began taking steps to effect a strategic realignment of their balance sheet in order to optimize their financial position while preserving the continued growth of their operations.

### B.    Prepetition Marketing and Restructuring Efforts.

In May of 2023, the Debtors engaged Oppenheimer and Co., Inc. ("**Oppenheimer**") to assist with raising capital. After extensive marketing to over 70 institutional investors, of which over two-thirds agreed to be "wall crossed" and receive material non-public information, a limited number of investors (5) agreed to have initial meetings with management. However, no substantive follow-up discussions developed, and the Debtors were unable to any find interested parties due to the structure and magnitude of the Company's indebtedness.

The Debtors subsequently went to extensive lengths to consummate a $10.4 million PIPE financing in September and October 2024 through the issuance of the Series A Convertible Preferred Stock, warrants to purchase common stock and, as applicable, the issuance of the Senior Exchange Notes and Subordinated Exchange Notes. Following such financing, the Debtors engaged Piper Sandler & Co. ("**Piper Sandler**") to advise the Company on further strategic and financing options. With the assistance of Piper Sandler, the Company ran a robust strategic evaluation process involving outreach to over 70 institutional investors and approximately a dozen strategic acquirers over five (5) months.

Similar to the earlier process run by Oppenheimer, initial interest was strong with over 50% of contacted financial and strategic investors agreeing to be wall crossed and receive material non-public information. Unlike the previous process, when wall crossing investors, the expressed intention of the Piper Sandler process was to restructure the balance sheet through a financial or strategic acquisition. Several parties scheduled multiple, in-depth meetings with management, including business overview, financial modeling, and new product development meetings, and pre-term sheet due diligence requests were submitted and fulfilled.

As the process continued two financial investors and one strategic investor emerged as leading suitors. After additional weeks of diligence, the Debtors received one offer from a third

party looking to purchase the Company's assets. The Debtors' board initially assessed the offer as in the best interest of the Company and stakeholders in that, although not affording full recovery to any class of creditors, would provide some recovery to many of the various stakeholders while providing a fully funded prospective operating plan with an institutional investor focused on the long-term success of the Company.

Notwithstanding, after consultation with the Company's senior and subordinated lenders, the third party offer was rejected on account of its short-term feasibility and inability to provide the necessary liquidity to consummate the sale. The Company did not receive any other offers other than from the Sponsoring Noteholders, which ultimately led to the execution of the Restructuring Support Agreement, described in Article V.C of this Disclosure Statement.

## C.        The Restructuring Support Agreement.

After extensive arms-length negotiation between and among the Debtors and the Sponsoring Noteholders, the Debtors entered into the Restructuring Support Agreement on May 7, 2024, embodying the terms of a comprehensive restructuring transaction to be implemented through a pre-negotiated plan of reorganization. As described below, the Restructuring Support Agreement and the restructuring transactions contemplated thereby will allow the Company to substantially deleverage the balance sheet while posing minimal disruptions to the business operations.

The Restructuring Support Agreement has the unanimous support of the Senior Noteholders and the near-unanimous support of the Subordinated Noteholders—the only two classes of impaired creditors in the Chapter 11 Cases. Pursuant to the Restructuring Support Agreement, the Sponsoring Noteholders have agreed to, among other things:

- Subject to proper solicitation, vote to accept the Plan; and

- Refrain from taking any action inconsistent with the Restructuring Support Agreement, Restructuring Term Sheet, or the confirmation or consummation of the Plan.

The Restructuring Support Agreement and Plan contemplate a recapitalization transaction that will allow for substantial deleveraging and a new capital infusion to right-size the Company's balance sheet for the benefit of all stakeholders. As detailed in the Plan and in this Disclosure Statement, the Plan and Restructuring Support Agreement provide for:

- The full equitization of the Company's indebtedness under the Subordinated Secured Notes;

- The provision of the New Notes in exchange of the Senior Secured Notes that are not equitized under the terms of the DIP Facility, which New Notes have an extended maturity date, a reduced interest rate, a PIK debt service obligation, and are no longer convertible to equity;

- The equitization of the Company's indebtedness under the DIP Facility;

- The infusion of $9 million by the Sponsoring Noteholders and other third party investors through the purchase of equity in the Reorganized Debtors upon emergence from these Chapter 11 Cases; and

- Payment in full in the ordinary course of business of all General Unsecured Claims.

## VI.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.  First Day Relief

On and shortly after the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/prosomnus.

1. First Day Motions and Orders (other than the DIP Motion and Interim DIP Order)

- Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases [Docket No. 2]

  - Approved on a final basis May 9, 2024 [Docket No. 41]

- Application of Debtors Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date [Docket No. 3]

  - Approved on a final basis May 9, 2024 [Docket No. 51]

- Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File Consolidated Top 20 Creditors List, (II) Modifying Requirements to File a List of, and Provide Notice to, All Equity Holders, (III) Authorizing Redaction of Certain Personally Identifiable Information, and (IV) Granting Related Relief [Docket No. 4]

  - Approved on an interim basis May 9, 2024 [Docket No. 42] and a final basis June 3, 2024 [Docket No. 109]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of

Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices [Docket No. 5]

- ▪ Approved on an interim basis May 9, 2024 [Docket No. 43] and a final basis June 5, 2024 [Docket No. 127]

- Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment [Docket No. 6]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 44] and a final basis June 3, 2024 [Docket No. 108]

- Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies from Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief from the Automatic Stay, and (IV) Authorizing the Debtors to Continue Installment Payments and Brokerage Obligations [Docket No. 7]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 45] and a final basis on June 3, 2024 [Docket No. 107]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Taxes and Fees [Docket No. 8]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 46] and a final basis June 4, 2024 [Docket No. 117]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain and Administer Customer Programs, Promotions, and Practices and (II) Pay and Honor Related Prepetition Obligations [Docket No. 9]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 47] and a final basis June 3, 2024 [Docket No. 106]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Employee Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers'

42

Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers [Docket No. 10]

- ▪ Approved on an interim basis May 9, 2024 [Docket No. 48] and a final basis June 4, 2024 [Docket No. 116]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations Owed to Critical Vendors [Docket No. 11]

- ▪ Approved on an interim basis May 9, 2024 [Docket No. 49] and a final basis June 13, 2024 [Docket No. 156]

- Motion of Debtors for Entry of Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of, or Worthlessness Deductions with Respect to, Stock of the Debtors and (II) Granting Related Relief [Docket No. 15] (the "**NOL Motion**")

- ▪ Approved on an interim basis May 9, 2024 [Docket No. 50]

~~With the exception of the NOL Motion, all of the First Day Motions that have been approved on an interim basis are scheduled to be considered by the Bankruptcy Court on~~ and a final basis ~~on~~ June ~~5~~20, 2024 ~~at 10:00 a.m. (prevailing Eastern Time) (the "**Second Day Hearing**"). The final hearing on the NOL Motion is scheduled for June 24, 2024 at 1:00 p.m. (prevailing Eastern Time).~~ [Docket No. 170]

2.    DIP Motion and Interim DIP Order

On the Petition Date, the Debtor filed a motion [Docket No. 12] (the "**DIP Motion**") seeking interim and final approval of senior subordinate secured post-petition financing (the "**DIP Facility**") to be provided by certain of the Sponsoring Noteholders (in such capacity, the "**DIP Lenders**") consisting of (1) a new money multi-draw term loan facility consisting of $7 million, of which $2.5 million was made available upon entry of the Interim DIP Order, and (2) a "roll-in" of obligations under (i) the Bridge Notes in the aggregate principal amount of $4 million plus all accrued interest through the date of entry of the Interim DIP Order, and (ii) the Senior Secured Notes in the aggregate principal amount of $2 million. The Debtors' obligations under the DIP Facility are secured by a lien on substantially all of the Debtors' assets that is senior to the Subordinated Liens, and junior to the Senior Liens. Upon emergence from the Chapter 11 Cases, in accordance with the terms of Restructuring Support Agreement, all claims under the DIP Facility (including interest and fees) will convert into New Common Equity.

On May 9, 2024, the Bankruptcy Court approved the Debtors' entry into the DIP Facility and granted the DIP Motion on an interim basis [Docket No. 54] (the "**Interim DIP Order**"). The Court ~~will consider~~entered a final ~~approval of~~order approving the DIP Motion ~~at the Second Day Hearing~~on June 5, 2024 [Docket No. 128] (the "**Final DIP Order**").

**B.    Case Milestones**

43

As part of the Restructuring Support Agreement, the Debtors agreed to the following case milestones to ensure that the Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation:[6]

- the Petition Date shall be on or before May 17, 2024;

- no later than 5 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than 40 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- no later than 15 Business Days following the Petition Date, the Debtors shall have filed the Plan, the Disclosure Statement, and a motion seeking approval of the Disclosure Statement

- no later than 50 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

- no later than 90 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

- no later than 105 calendar days following the Petition Date, the Effective Date shall have occurred.

In connection with the foregoing, the Debtors have proposed the following schedule of proposed dates (the "**Proposed Confirmation Schedule**" subject to the Bankruptcy Court's availability and approval thereof:

| Proposed Confirmation Schedule | |
|---|---|
| Disclosure Statement Objection Deadline | June ~~17~~20, 2024 at 4:00 p.m. (prevailing Eastern Time) |
| Disclosure Statement Hearing | June ~~24~~26, 2024 at ~~1:00 p~~10:00 a.m. (prevailing Eastern Time) |
| Voting Record Date | June 24, 2024 |
| Solicitation Commencement | No later than June 28, 2024 |
| Voting Deadline | July 19, 2024 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to file Plan Supplement | July 19, 2024 |
| Confirmation Objection Deadline | July 22, 2024 at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Hearing | July 30, 2024 at 10:00 a.m. (prevailing Eastern Time) |

---

[6] The milestones below may be extended or waived by the Sponsoring Noteholders in accordance with the Restructuring Support Agreement.

## VII.    RISK FACTORS

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS OR THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan and may affect the validity of the vote of the Impaired Classes to accept or reject the Plan and may require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.    There is a Risk of Termination of the Restructuring Support Agreement.

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important stakeholder constituencies and could result in the loss of the Debtors' use of cash collateral and/or the proceeds of the DIP Facility under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan. If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to holders of Claims or Interests as the current Plan.

#### 2.    The ~~Bankruptcy Court May Not Approve the~~ Debtors May Exhaust Their Use of Cash Collateral ~~or Entry into~~Under the DIP Facility ~~on a Final Basis~~.

On the Petition Date, the Debtors filed the DIP Motion, which requested authorization to enter into the DIP Facility and use cash collateral to fund the Chapter 11 Cases in accordance with the terms of the Restructuring Support Agreement. Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. While the Bankruptcy Court has entered the ~~Interim~~Final DIP Order~~, there can be no assurance that the Bankruptcy Court will approve the debtor-in-possession financing and/or such use of cash collateral on the terms requested on a final basis. Moreover~~, if the Chapter 11 Cases take longer

45

than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

        3.        <u>Parties in Interest May Object to the Plan's Classification of Claims and Interests.</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan (subject to the terms of the Restructuring Support Agreement). The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

        4.        <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur.</u>

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent. These conditions precedent include, among other things, (i) that the aggregate amount of Allowed General Unsecured Claims and Other Priority Claims to be paid under the Plan shall be no more than $2,500,000, (ii) that the amount of Allowed Professional Fee Administrative Expenses to be paid under the Plan shall be no more than $3,000,000, and (iii) that the Backstop Commitment Documentation shall not have been terminated, and shall be in full force and effect. If all conditions precedent are not satisfied or waived, the Confirmation Date or the Effective Date will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan (if available). If the Debtors do not secure sufficient working capital to continue their operations and/or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

        5.        <u>The Debtors May Fail to Satisfy Vote Requirements.</u>

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the

holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.    <u>The Debtors May Not Be Able to Secure Confirmation of the Plan.</u>

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code and/or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7.    <u>The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.</u>

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with

47

subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.     Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the services the Debtors provide, and increasing expenses. *See* Article VII.B of this Disclosure Statement, entitled "Risks Related to Recoveries under the Plan and the Debtors' and the Reorganized Debtors' Businesses." which begins on page 49. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

9.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing the business in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) a materially longer case timeline and agreed to in the Restructuring Support Agreement; and (d) as a result of a longer case timeline, additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

10.      The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

12.    <u>Releases, Injunctions, and Exculpation Provisions May Not Be Approved.</u>

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are critical to the success of the Plan (including, but not limited to, funding the Bridge Notes and the DIP Facility), but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

13.    <u>The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy, and Time Spent in Bankruptcy Could Disrupt the Debtors' Business.</u>

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Plan by the Bankruptcy Court could last approximately 90 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation, including obtaining any required regulatory approvals, are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' future, such that, among other things:

(i)    employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

(ii)    suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects. A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan in accordance with the milestones, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an

extended period of time. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

**B.  Risks Related to Recoveries Under the Plan and the Debtors' and the Reorganized Debtors' Businesses.**

1.  <u>The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.</u>

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Equity may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

2.  <u>Estimated Valuations of the Debtors and the New Common Equity, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.</u>

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries on account of New Common Equity are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers; and (g) an indicative pre-money total enterprise value of the Reorganized Debtors of $25,700,000.

3.  <u>The Terms of the New Organizational Documents Are Not Yet Final.</u>

The terms of the New Organizational Documents are not yet final, and are still being negotiated between the Debtors and the Sponsoring Noteholders, subject to the terms and conditions of the Plan and the Restructuring Support Agreement. Holders of Claims that are not the Sponsoring Noteholders will not participate in these negotiations, and the results of such

negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.

4.    <u>The Support of the Supporting Noteholders is Subject to the Terms of the Restructuring Support Agreement, which is Subject to Termination in Certain Circumstances.</u>

Pursuant to the Restructuring Support Agreement, the Sponsoring Noteholders have agreed to support the Reorganization Transactions set forth in the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events (including the failure of the Debtors to satisfy the milestones set forth therein). Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of the Sponsoring Noteholders.

5.    <u>The Debtors May Not Be Able to Accurately Report Their Financial Results.</u>

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

6.    <u>The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.</u>

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

7.    <u>Certain Tax Implications of the Plan.</u>

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" which begins on page 59, to determine how the federal income tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

8.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Reorganization Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

9.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of

53

the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the chapter 11 proceedings last longer than anticipated, the Debtors may require additional debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

10.    Financial Results May Be Volatile and May Not Reflect Historical Trends.

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

11.    The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to

94995804.16

the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

> 12.    Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## VIII.  SOLICITATION AND VOTING

This Disclosure Statement is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.    Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article II.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 3, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 1 and 2 (collectively, the "**Voting Classes**"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 3-7.

### B.    Voting Record Date.

The voting record date is June 24, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "**Voting Record Date**"), which is the date for determining which Holders of Claims in Classes 1 and 2 are entitled to vote on the Plan.

### C.    Voting on the Plan.

The deadline for voting on the Plan is July 19, 2024 (the "**Voting Deadline**"). In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Voting Agent on or before the Voting Deadline. Ballots or master ballots returned by facsimile will not be counted.

> IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT YOU RECEIVED OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY TELEPHONE AT (888) 647-1744 (TOLL FREE IN THE U.S. OR CANADA) OR AT (310) 751-2628 (INTERNATIONAL).

### D.    Ballots Not Counted.

**The following Ballots will NOT be counted:** (i) any Ballot received after the Voting Deadline, unless the Debtors shall have granted, or the Court shall have ordered, an extension of the Voting Deadline in writing with respect to such Ballot;(ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant or interest holder;(iii) any Ballot cast by a person or entity that does not hold a Claim or Interest in a Class that is entitled to vote to accept or reject the Plan;(iv) any Ballot cast by a person who is not entitled to vote, even if such individual holds a Claim or Interest in a Voting Class;(v) any unsigned Ballot, provided, however, that any Ballot cast via the E-Ballot Portal will be deemed to contain an electronic signature; (vi) any Ballot which the Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or (vii) any Ballot transmitted to KCC by means not specifically approved herein.

## IX.    CONFIRMATION OF THE PLAN

### A.    The Confirmation Hearing.

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors have requested that the Bankruptcy Court set a hearing to confirm the Plan (the "**Confirmation Hearing**") for July 30, 2024 at 10:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, have requested that the Bankruptcy Court set the date and time for parties in interest to file objections to Confirmation of the Plan as 4:00 p.m. (prevailing Eastern Time)

on July 22, 2024. An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served.

**B.      Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**C.      Best Interests of Creditors/Liquidation Analysis.**

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in each impaired class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Based on this Liquidation Analysis attached hereto as **Exhibit D,** the Debtors, with the assistance of their advisors, believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Liquidation Analysis and the conclusions set forth therein are fair and represent the Debtors' best judgment regarding the results of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is, therefore, a hypothetical analysis based on certain assumptions discussed therein and in this Disclosure Statement. As such, asset values and claims discussed therein may differ materially from amounts referred to in the Plan and this Disclosure Statement. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth in the Liquidation Analysis.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, economic, competitive uncertainties and

contingencies beyond the control of the Debtors, their management and their advisors. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

### D. Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of the Debtors' advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (collectively, the "**Financial Projections**"). Creditors and other interested parties should review VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 44, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections, along with the assumptions upon which they are based, are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E. Acceptance by Impaired Classes and Interests.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[7]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

---

[7] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Pursuant to Section 3.05 of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### F.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, subject to the Restructuring Support Agreement, to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.,* classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount

94995804.16

of Allowed Claims or Allowed Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## X.    CERTAIN SECURITIES LAW MATTERS

The offering, issuance, and Distribution of any securities pursuant to the Plan, including the New Notes and New Common Equity issuable pursuant to the Plan, will be issued without registration under the Securities Act, or any similar federal, state, provincial, or local law in reliance upon section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code). The following discussion of the issuance and transferability of the New Notes and New Common Equity relates solely to matters arising under federal and state securities laws. The rights of Holders of New Notes and New Common Equity, including the right to transfer such interests, will also be governed by the New Organizational Documents. The Debtors currently contemplate that the New Organizational Documents will prohibit trading of the New Common Equity for a period of two years.

### A.    New Notes and New Common Equity

As discussed herein, the Plan provides for the offer, issuance, sale, and Distribution of the New Notes and New Common Equity under section 1145 of the Bankruptcy Code. Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a Claim against, an interest in, or Claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a Claim against or interest in a debtor or are issued principally in such exchange or partly for Cash and property. The Debtors believe that the issuance of the New Notes and the New Common Equity in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code (except with respect to an underwriter as described below).

Accordingly, no registration statement is expected to be filed under the Securities Act or any state securities laws with respect to the offer, issuance, sale and distribution of the New Common Equity.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES TO THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan. Thus, the following summary applies only to certain U.S. Holders of Senior Notes Claims and Subordinated Notes Claims. The following summary also does not address the federal income tax consequences to a Holder of a Relevant Claim that is not treated as debt for U.S. federal income tax purposes.

94995804.16

This summary is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims that are not U.S. Holders (as defined below) or to U.S. Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, persons who are non-U.S. persons, controlled foreign corporations, passive foreign investment companies, Persons who are related to the Debtors within the meaning of the IRC, Persons liable for alternative minimum tax, U.S. Holders (as defined herein) whose functional currency is not the U.S. dollar, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the Common Stock, or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan) nor does it address provisions of the IRC commonly referred to as "FATCA.". This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "**U.S. Holder**" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY, IS NOT BINDING, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN INTEREST OR A CLAIM. ALL HOLDERS OF INTERESTS AND CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.    **Certain Tax Consequences to the Debtors**

1.    Cancellation of Indebtedness Income

a.    In General

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the IRC, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers.  Section 163(j) Carryforwards are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

b.    Limitation of NOL Carryforwards and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income and the effect of any allowed worthless stock deductions on the Debtor's net operating losses, Debtors' ability to use any remaining tax attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the IRC.

(a)    General Section 382 Annual Limitation

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and, if the corporation has an overall "net unrealized built in loss" in its assets, and certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "**Pre Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation. This discussion refers to the limitation determined under section 382 of the IRC in the case of an "ownership change" as the "**Section 382 Limitation**."

If the transactions trigger the Section 382 Limitation and if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

In general, the annual Section 382 Limitation on the use of Pre Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs). If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65 (as modified by Notice 2018-30), the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65). Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

(b)    Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and

63

value of the stock of the Debtors (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Under the 382(l)(5) Exception, the Debtors' Pre Change Losses are not limited on an annual basis but, instead, the Debtors' NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another ownership change within two years after consummation, then the Debtors' Pre Change Losses are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule may apply (the "**382(l)(6) Exception**"). When the 382(l)(6) Exception applies, the annual limitation will be calculated by reference to the lesser of (a) the value of the Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre Change Losses.

In addition, the Debtors currently contemplate that the New Organizational Documents will prohibit trading of the New Common Equity, which will substantially reduce the likeliness of an ownership change under section 382 after the Effective Date.

**B.     Holders**

1.     Consequences to U.S. Holders

a.     Consequences of Exchange to U.S. Holders of Subordinated Notes Claims:

Each Holder of an Allowed Subordinated Notes Claim that is not an Excluded Party is expected to receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of 22.48% of New Common Equity, subject to dilution on account of the MIP.  The U.S. federal income tax consequences to a U.S. Holder of receiving its distribution under the Plan will depend on whether (a) the Subordinated Notes Claims are treated as securities for purposes of the reorganization provisions of the Tax Code and (b) the transactions contemplated hereby are structured as a Tax-Free Transaction.

Whether a debt instrument constitutes a security is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of 10 years or more is

64

evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others, whether the debt instrument is secured, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

It is unclear whether the Subordinated Notes are properly treated as securities and U.S. Holders of Subordinated Notes Claims should consult their tax advisors as to whether such claims are properly treated as securities.

### (a)    Tax-Free Reorganization

If the Subordinated Notes Claims are treated as securities and the transactions contemplated hereby are structured as a Tax-Free Transaction, then Debtors expect that the exchange of the Subordinated Notes Claims for New Common Equity should be treated as a tax-free reorganization, other than with respect to amounts attributable to accrued but unpaid interest (including OID).

Such a U.S. Holder's aggregate tax basis in the New Common Equity received in satisfaction of its Subordinated Note Claim generally is expected to equal the U.S. Holder's aggregate adjusted tax basis in its Subordinated Notes Claim decreased by the fair market value of any other assets received in respect of such Claim and increased by any gain recognized by such U.S. Holder in the exchange. In general, the U.S. Holder's holding period for the New Equity Interests received in the exchange is expected to include the U.S. Holder's holding period for the Subordinated Notes Claim.

### (b)    Taxable Exchange

If the Subordinated Notes Claims are not treated as securities or the transactions contemplated hereby are structured as a Taxable Transaction, a U.S. Holder of a Subordinated Notes Claim generally is expected to be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than any consideration attributable to a Subordinated Notes Claim for accrued but unpaid interest or OID, a U.S. Holder generally is expected to recognize gain or loss equal to the difference between (i) the sum of the fair market value of any New Common Equity received in the exchange and (ii) the U.S. Holder's adjusted basis, if any, in the Subordinated Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Subordinated Notes Claim in such U.S. Holder's hands, and whether the Subordinated Notes were purchased at a discount. If any recognized gain is capital gain, it generally would be long¬ term capital gain if the U.S. Holder held its Subordinated Notes for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.

Any New Common Equity received by a U.S. Holder of such a Subordinated Notes Claim is generally expected to have a basis equal to the fair market value of the New Common

65

Equity as of the applicable Distribution Date and a holding period starting on the day following the applicable Distribution Date.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount, see the sections entitled "Accrued Interest and OID" and "Market Discount" below.

(c)    Accrued Interest and OID

[To come]the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest (or OID) on the Claim, the receipt of such amount is generally expected to be recognized by the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder may be able to recognize a deductible loss to the extent that any accrued interest previously was recognized by the U.S. Holder but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any New Common Equity treated as received in satisfaction of accrued but unpaid interest (or OID) is generally expected to equal the amount of such accrued but unpaid interest (or OID). The holding period for such New Common Equity is generally expected to begin on the day following the receipt of such consideration.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all the principal and interest on a Claim, the extent to which such consideration will be attributable to accrued interest (or OID) is unclear. Under the Plan, the aggregate consideration received in respect of a relevant Claim will be allocated first to the principal amount of such relevant Claim, with any excess allocated to unpaid interest, if any, that accrued on such Claim before the Petition Date, or such other allocation in accordance with the Indentures or other applicable documents. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain U.S. Treasury Regulations treat payments under a debt instrument as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of relevant Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(d)    Market Discount

U.S. Holders of Claims may be affected by the market discount provisions of sections 1276 through 1278 of the Tax Code. Under these rules, some or all of any gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of market discount on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with market discount as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its

66

acquisition. However, a debt obligation will not be a market discount obligation if such excess is less than a statutory *de minimis* amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by the number of complete years remaining to maturity as of the time the holder acquired the debt obligation).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount is generally expected to be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). If a Subordinated Notes Claim that was acquired with market discount is exchanged in a Tax-Free Transaction (as described above) for New Common Equity, any market discount that accrued on the Subordinated Notes Claim (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the New Common Equity received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such New Common Equity is treated as ordinary income to the extent of such accrued market discount.

> b.     Consequences of Exchange to U.S. Holders of Senior Notes Claims:

Each Holder of an Allowed Senior Notes Claim that is not an Excluded Party is expected to receive, in full satisfaction of its Senior Notes Claim its Pro Rata share of the New Notes.  Whether this transaction is treated as a physical exchange of Senior Notes for New Notes or a significant modification of a debt instrument, the transaction is expected to be treated as an exchange of debt instruments.  Under applicable Treasury Regulations, the modification of the terms of a debt instrument (including pursuant to an exchange of a new debt instrument for the existing debt instrument) generally is a significant modification if, based on all of the facts and circumstances and taking into account all modifications of the debt instrument, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." A modification that changes the timing of payments due under a debt instrument is a significant modification if it results in a material deferral of scheduled payments. However, a deferral of one or more scheduled payments is not a material deferral if it is within a safe-harbor period beginning on the original due date of the first scheduled payment that is deferred and extending for a period equal to the lesser of five years and fifty percent of the original term of the instrument. A change in the yield of a debt instrument is a significant modification if the yield of the modified instrument (as computed under the applicable Treasury Regulations) varies from the annual yield of the unmodified instrument (determined as of the date of the modification) by more than the greater of (i) 0.25% or (ii) 5% of the annual yield of the unmodified instrument.

Based on such applicable Treasury Regulations, the Debtors expect, and the remainder of this discussion assumes, that an exchange of the Senior Notes for the New Notes pursuant to the Plan should be treated for U.S. federal income tax purposes as an "exchange" of such Claims.

The U.S. federal income tax consequences to a U.S. Holder of an Allowed Senior Notes Claim of receiving the New Notes under the Plan will depend on whether (a) the Senior Notes Claims are treated as securities for purposes of the reorganization provisions of the Tax Code,

(b) the New Notes are treated as securities for purposes of the reorganization provisions of the Tax Code and (c) the transactions contemplated hereby are structured as a Tax-Free Transaction.

As discussed in more detail above, whether a debt instrument constitutes a security is determined based on all the facts and circumstances.  Please refer to the discussion of the definition of a security in Section XI(C)(1)(a), above.  It is unclear whether either the Senior Notes or the New Notes are properly treated as securities and U.S. Holders of such notes should consult their tax advisors as to whether such claims are properly treated as securities.

(a)    Tax-Free Reorganization

If the exchange of Senior Notes Claims for New Notes constitutes a tax-free reorganization to a U.S. Holder, such U.S. Holder generally would not recognize any gain or loss (other than with respect to amounts attributable to accrued but unpaid interest, including OID) and would have a tax basis in the New Notes equal to the adjusted tax basis in the Senior Notes exchanged therefor. The U.S. Holder's holding period in the New Notes received in the exchange generally would include the period the U.S. Holder held its Senior Notes.  However, to the extent that a U.S. holder receives any cash or property other than stock or a security of the Debtor ("Boot"), gain should be recognized.  Gain should also be recognized on any excess principal amount of the New Notes over the principal amount of the Senior Notes.

In a case where any gain is recognized in the exchange, the amount of the tax basis of the New Notes will be reduced by the fair market value of the Boot and increased by any gain recognized on the exchange.  The Boot will obtain a basis equal to its fair market value and will have a new holding period. For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, original issue discount ("OID"), or market discount, see the sections entitled "Payments of Interest", "Original Issue Discount" and "Market Discount," below.

(b)    Taxable Exchange

If either the Senior Notes or the New Notes do not constitute a security, the tax-free recapitalization exchange provisions will not apply. The consequences of an exchange of Senior Notes for New Notes in these circumstances should be as follows:  Such U.S. Holder should recognize all realized gain or loss (equal to the difference between its amount realized and its adjusted basis in the Senior Notes) and should have a tax basis in the New Notes equal to the issue price of such instruments for U.S. federal income tax purposes.  The holding period in the New Notes should commence on the day following the Effective Date.

**C.    Consequences of Ownership of New Common Equity**

    1.    Distributions

The gross amount of any distribution on New Common Equity that is made out of current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally is expected to be taxable to a U.S. Holder as ordinary dividend income on the date such distribution is actually or constructively received. Any such dividends generally would be

68

expected to be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations. To the extent that the amount of the distribution exceeds current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such excess amount is generally expected to be treated first as a nontaxable return of capital to the extent of the U.S. Holder's tax basis in its New Common Equity, and thereafter as capital gain recognized on a sale or exchange. U.S. Holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received.

Dividends paid to non-corporate U.S. Holders who meet certain requirements are generally expected to be eligible to be treated as "qualified dividend income" and therefore taxable at rates applicable to long-term capital gains. U.S. Holders should consult their own tax advisors regarding the availability of these favorable tax rates on dividends in their particular circumstances.

> **2.** Sale, Exchange, Redemption, or Other Taxable Disposition of New Common Equity

Subject to the market discount rules discussed above, a U.S. Holder generally is expected to recognize gain or loss on any sale, exchange, redemption, or other taxable disposition of New Common Equity in an amount equal to the difference between (a) the amount realized on the disposition and (b) such U.S. Holder's adjusted tax basis in such New Common Equity. Any gain or loss recognized by a U.S. Holder on a taxable disposition of New Common Equity generally is expected to be capital gain or loss and is expected to be long-term capital gain or loss if the U.S. Holder's holding period in such New Common Equity exceeds one year at the time of the disposition. Preferential tax rates may apply to long-term capital gains of non-corporate U.S. Holders (including individuals). The deductibility of capital losses is subject to limitations.

> **D.** **Consequences of Ownership of New Notes**

> **1.** Payments of Interest.

Payments of interest on the New Notes generally will be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the U.S. Holder's regular method of tax accounting), provided such interest is qualified stated interest.

> **2.** Original Issue Discount.

Original issue discount will arise for U.S. federal income tax purposes in respect of any New Notes if the stated redemption price at maturity exceeds its issue price by more than a de minimis amount (as determined for tax purposes). For New Notes issued with original discount, the excess of the stated redemption price at maturity of the New Notes over their issue price will constitute original issue discount for U.S. federal income tax purposes. The stated redemption price at maturity of the New Notes is the sum of all scheduled amounts payable on such New Notes other than qualified stated interest. U.S. Holders of New Notes generally will be required

to include any original issue discount in income for U.S. federal income tax purposes as it accrues, in accordance with a constant yield to maturity method based on compounding interest. Accordingly, U.S. Holders may be required to recognize original issue discount income before they receive any cash payments attributable to such income. The amount of original issue discount as accrued in a particular accrual period will be considered to be received ratably on each day of the accrual period and will increase the U.S. Holder's tax basis in such New Notes.

3.    Market Discount.

If a U.S. Holder purchases New Notes, other an original issue discount New Notes ("**OID Notes**"), for an amount that is less than their issue price (or, in the case of a subsequent purchaser, its stated redemption price at maturity) or, in the case of an OID Note, for an amount that is less than its adjusted issue price as of the purchase date, such U.S. Holder will be treated as having purchased such New Notes at a "market discount," unless the amount of such market discount is less than the specified de minimis amount.  See the discussion above, entitled Market Discount in Section XI(C)(1)(a)(4).

4.    Premium.

If a U.S. Holder purchases New Notes for an amount that is greater than the sum of all amounts payable on the New Notes after the purchase date, other than payments of qualified stated interest, such U.S. Holder will be considered to have purchased the New Notes with "amortizable bond premium" equal in amount to such excess. A U.S. Holder may elect to amortize such premium using a constant yield method over the remaining term of the New Notes and may offset interest otherwise required to be included in respect of the New Notes during any taxable year by the amortized amount of the amortized premium for the taxable year. A U.S. Holder of a New Notes is required to reduce such U.S. Holder's basis in such New Notes by the amount of amortizable bond premium attributable to each taxable year. This will result in an increase in the gain (or decrease in the loss) to be recognized for federal income tax purposes on the sale or disposition of the New Notes prior to maturity. Any election to amortize bond premium applies to all taxable debt instruments held by the U.S. Holder on or after the first day of the first taxable year to which such election applies and may be revoked only with the consent of the IRS. A U.S. Holder that does not make the election to amortize New Notes premium will decrease the amount of the amount of gain (or increase the amount of loss) otherwise recognized on the disposition of such New Notes by the amount of the New Notes premium.

If the New Notes may be optionally redeemed after the U.S. Holder acquires it at a price in excess of its stated redemption price at maturity, special rules apply which could result in deferral of the amortization of some bond premium until later in the term of the New Notes. Prospective purchasers are urged to consult with, and must rely upon, their own tax advisors regarding the application of the amortizable bond premium rules to their particular situation.

5.    Disposition of New Notes.

Unless a nonrecognition provision of the Code applies, upon the sale, exchange or retirement of New Notes, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange or retirement (other than amounts

representing accrued and unpaid interest) and such U.S. Holder's adjusted tax basis in the New Notes. A U.S. Holder's adjusted tax basis in a New Notes generally will equal such U.S. Holder's initial investment in the New Notes increased by any original issue discount included in income (and accrued market discount, if any, if the U.S. Holder has included market discount in income) and decreased by the amount of payments, other than qualified stated interest payments, received and amortizable bond premium taken with respect to such New Notes. Such gain or loss generally will be long-term capital gain or loss if the New Notes have been held by the U.S. Holder at the time of disposition for more than one year. If the U.S. Holder is an individual, long-term capital gain will generally be subject to reduced rates of taxation. The deductibility of capital losses is subject to certain limitations.

6.    Medicare Tax.

For taxable years beginning after December 31, 2012, an additional 3.8% tax is imposed on the net investment income (which includes interest, original issue discount and gains from the sale or other disposition of a New Notes) of certain individuals, trust and estates. Prospective investors in the New Notes should consult with, and must rely upon, their tax advisors regarding the possible applicability of this tax to an investment in the New Notes.

E.    **Withholding on Distributions, Interest Payments and Information Reporting**

All distributions to Holders of Relevant Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder (1) fails to furnish its social security number or other taxpayer identification number, (2) furnishes an incorrect taxpayer identification number, (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Relevant Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

F.    **Importance of Obtaining Professional Advice**

71

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY NON-U.S. OR U.S. STATE OR LOCAL TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

94995804.16

## XII.    RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders. Accordingly, the debtors recommend that Holders of Claims in Classes 1 and 2 accept the Plan and support Confirmation of the Plan.

Dated: ~~May~~June 24, 2024                **PROSOMNUS, INC.**
                                            **PROSOMNUS HOLDINGS, INC.**
                                            **PROSOMNUS SLEEP TECHNOLOGIES, INC.**


                                            */s/ Brian Dow*
                                            Name:  Brian Dow
                                            Title:  Chief Financial Officer

73