## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PROSOMNUS, INC., *et al.*,[1] | Case No. 24-10972 (JTD) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN
## OF REORGANIZATION OF PROSOMNUS, INC. AND ITS DEBTOR AFFILIATES

POLSINELLI PC
Shanti M. Katona (Del. Bar No. 5352)
Katherine M. Devanney (Del. Bar No. 6356)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
kdevanney@polsinelli.com
mdipietro@polsinelli.com

*Counsel to the*
*Debtors and Debtors in Possession*

Dated: June 24, 2024

POLSINELLI PC
Mark B. Joachim (Admitted *Pro Hac Vice*)
1401 Eye Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 783-3300
Facsimile: (202) 783-3535
mjoachim@polsinelli.com

*Counsel to the*
*Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ProSomnus, Inc. (8216), ProSomnus Holdings, Inc. (3855), and ProSomnus Sleep Technologies, Inc. (0766). The location of the Debtors' principal place of business and the Debtors' mailing address is 5675 Gibraltar Dr., Pleasanton, California 94588.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAWS. HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND HOLDERS OF CLAIMS OR INTEREST SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE OF, AND DISTRIBUTIONS UNDER, THE PLAN OF THE NEW COMMON EQUITY AND NEW NOTES (IN EACH CASE, AS DEFINED IN THE PLAN) WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B)(1) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE PLAN'S EFFECTIVE DATE.

THE NEW NOTES AND NEW COMMON EQUITY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "SHALL," "EXPECTS," "PROJECTS," "FORECASTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM

ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT AND IN THE ANNUAL AND QUARTERLY REPORTS OF DEBTOR CANO HEALTH, INC., INCLUDING AMENDMENTS THERETO. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE SEC FILINGS, INCLUDING IN THE ANNUAL AND QUARTERLY REPORTS OF DEBTOR CANO HEALTH, INC., INCLUDING AMENDMENTS THERETO. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR, ACCOUNTANT OR FINANCIAL ADVISOR HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS OR OTHER TERMS OR PROVISIONS HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

94995804.17

### TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
        STATEMENT AND PLAN.................................................................................. 2

        A.      What is chapter 11?................................................................................. 2

        B.      Why are the Debtors sending me this Disclosure Statement? ................ 2

        C.      Am I entitled to vote on the Plan? ......................................................... 3

        D.      What will I receive from the Debtors if the Plan is consummated? ....... 3

        E.      What will I receive from the Debtors if I hold an Allowed Administrative
                Expense, DIP Administrative Expense, Professional Fee Administrative
                Expense, or a Priority Tax Claim?.......................................................... 5

        F.      Are any regulatory approvals required to consummate the Plan? .......... 8

        G.      What happens to my recovery if the Plan is not confirmed or does not go
                effective?................................................................................................ 8

        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation
                or when the Plan goes effective, and what is meant by "Confirmation,"
                "Effective Date," and "Consummation?" ............................................... 8

        I.      What are the sources of Cash and other consideration required to fund the
                Plan?........................................................................................................ 8

        J.      Are there risks to owning the New Common Equity upon emergence from
                chapter 11?.............................................................................................. 9

        K.      Is there potential litigation related to the Plan? .................................... 9

        L.      Will the final amount of Allowed General Unsecured Claims affect the
                recovery of holders of Allowed General Unsecured Claims under the
                Plan?........................................................................................................ 9

        M.      How will the preservation of the Causes of Action impact my recovery
                under the Plan?........................................................................................ 9

        N.      Will there be releases and exculpation granted to parties in interest as part
                of the Plan? ........................................................................................... 10

        O.      What is the deadline to vote on the Plan?............................................. 15

        P.      How do I vote to Accept or Reject the Plan?....................................... 16

        Q.      Why is the Bankruptcy Court holding a Confirmation Hearing? ......... 16

        R.      What is the purpose of the Confirmation Hearing? .............................. 16

        S.      What is the effect of the Plan on the Debtors' ongoing businesses? .... 16

        T.      Are foreign affiliates of ProSomnus included in these Chapter 11 Cases? .......... 16

        U.      Will any party have significant influence over the corporate governance
                and operations of the Reorganized Debtors? ....................................... 17

V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .......................................................... 17

W.    Do the Debtors recommend voting in favor of the Plan? ..................................... 18

X.    Who Supports the Plan? ...................................................................................... 18

III.    THE RESTRUCTURING SUPPORT AGREEMENT AND PLAN .............................. 18

A.    Restructuring Support Agreement. ..................................................................... 18

B.    The Plan. .............................................................................................................. 18

IV.    DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ............................................................................................................... 32

A.    ProSomnus' History and Operations. .................................................................. 32

B.    The Debtors' Prepetition Corporate and Capital Structure. ................................ 33

C.    Prepetition Funded Debt. .................................................................................... 33

D.    Equipment Lease Obligations. ............................................................................ 36

E.    Trade Payables and Ordinary Course Obligations. ............................................ 36

V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................................. 37

A.    The Debtors' Business is Overleveraged and has Suffered Significant Capital Shortfalls. .............................................................................................. 37

B.    Prepetition Marketing and Restructuring Efforts. .............................................. 37

C.    The Restructuring Support Agreement. .............................................................. 38

VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS  OF THE CHAPTER 11 CASES ................................................................................................ 39

A.    First Day Relief .................................................................................................. 39

B.    Case Milestones .................................................................................................. 41

VII.    RISK FACTORS ......................................................................................................... 42

A.    Bankruptcy Law Considerations. ....................................................................... 43

B.    Risks Related to Recoveries Under the Plan and the Debtors' and the Reorganized Debtors' Businesses. ...................................................................... 48

VIII.    SOLICITATION AND VOTING .................................................................................. 52

A.    Holders of Claims Entitled to Vote on the Plan. ................................................ 52

B.    Voting Record Date. ........................................................................................... 53

C.    Voting on the Plan. ............................................................................................. 53

D.    Ballots Not Counted. .......................................................................................... 53

IX.    CONFIRMATION OF THE PLAN .............................................................................. 53

A.    The Confirmation Hearing. ................................................................................. 53

B.    Requirements for Confirmation of the Plan. ...................................................... 54

94995804.17

C.      Best Interests of Creditors/Liquidation Analysis. ................................................. 54

D.      Feasibility. ............................................................................................................ 55

E.      Acceptance by Impaired Classes and Interests. .................................................... 55

F.      Confirmation Without Acceptance by All Impaired Classes. ................................. 56

X.      CERTAIN SECURITIES LAW MATTERS ..................................................................... 57

A.      New Notes and New Common Equity ................................................................... 57

XI.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES TO THE PLAN ................. 57

A.      Certain Tax Consequences to the Debtors ............................................................ 59

B.      Holders ................................................................................................................. 61

C.      Consequences of Ownership of New Common Equity ......................................... 65

D.      Consequences of Ownership of New Notes ........................................................... 66

E.      Withholding on Distributions, Interest Payments and Information
        Reporting .............................................................................................................. 68

F.      Importance of Obtaining Professional Advice ..................................................... 68

XII.    RECOMMENDATION ................................................................................................. 69

94995804.17

## I.      INTRODUCTION

ProSomnus, Inc. ("**ProSomnus**") and certain of its subsidiaries, as debtors and debtors in possession (collectively, the "**Debtors**"), submit this joint disclosure statement (as may be amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement and, together with all exhibits and schedules thereto, the "**Disclosure Statement**") in connection with the solicitation of votes on the Amended Joint Chapter 11 Plan of Reorganization of ProSomnus, Inc. and Its Debtor Affiliates, dated June 24, 2024 (as may be further amended, supplemented, or modified from time to time in accordance with the Restructuring Support Agreement and, together with all exhibits and schedules thereto, the "**Plan**")[2] annexed hereto as **Exhibit A**. The Debtors commenced their chapter 11 cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the U.S. Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), beginning on May 7, 2024 (the "**Petition Date**").

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of the Debtors that are entitled to vote on the Plan to make a reasonably informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the Chapter 11 Cases, and certain documents related to the Plan.

The Debtors are seeking to confirm a pre-arranged plan under chapter 11 of the Bankruptcy Code with the support, pursuant to the terms of a restructuring support agreement entered into on May 7, 2024 (the "**Restructuring Support Agreement**" or "**RSA**"),[3] of the Debtors' prepetition creditors holding approximately (i) 100% of the issued and outstanding Senior Secured Convertible Notes, (ii) 100% of the issued and outstanding Senior Secured Convertible Exchange Notes, (iii) 94.95% of the issued and outstanding Subordinated Secured Convertible Notes, (iv) 100% of the issued and outstanding Subordinated Secured Convertible Exchange Notes, and (v) 100% of the Bridge Notes. (collectively, the "**Sponsoring Noteholders**"). Specifically, as set forth below and in the Restructuring Support Agreement, with the committed support of the Sponsoring Noteholders, the Debtors are seeking to move forward with a committed Plan that would allow for substantial deleveraging and a new capital infusion to right size the Debtors' balance sheet for the benefit of all stakeholders (the "**Reorganization Transaction**"). Through the Reorganization Transaction:

- Each Holder of an Allowed Senior Notes Claims shall receive, in full satisfaction of its Allowed Senior Secured Note Claim: its Pro Rata share of the New Notes; *provided, however*, that holders of Senior Notes Claims that are Excluded Parties shall receive no distribution under the Plan.

- Each Holder of an Allowed Subordinated Notes Claim shall receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of 22.48% of New Common Equity,

---

[2] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.

[3] A copy of the Restructuring Support Agreement is attached hereto as **Exhibit B**.

subject to dilution on account of the MIP; *provided, however*, that holders of Subordinated Notes Claims that are Excluded Parties shall receive no distribution under the Plan.

- Allowed General Unsecured Claims will be paid in full in the ordinary course of business on and after the Effective Date; and

- Interests and Section 510(b) Claims will be cancelled, released, and extinguished, and will receive no recovery.

**For the avoidance of doubt, the Plan provides that all Allowed General Unsecured Claims, including trade claims, will be paid in full in the ordinary course of business and otherwise unimpaired by the chapter 11 process.** In light of the foregoing, the Debtors expect to continue operating normally throughout the Chapter 11 Cases and remain focused on serving their customers and working with suppliers on normal terms.

---

**FOR THESE REASONS, THE DEBTORS STRONGLY RECOMMEND THAT HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTE TO ACCEPT THE PLAN.**

---

## II.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan

and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein). Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Type of Claim or Interest | Impairment | Voting |
|-------|---------------------------|------------|--------|
| Class 1 | Senior Notes Claims | Impaired | Yes |
| Class 2 | Subordinated Notes Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Section 510(b) Claims | Impaired | No (Deemed to reject) |
| Class 7 | Interests | Impaired | No (Deemed to reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[4]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Interest | Projected Amount of Allowed Claims[5] | Projected Recovery Under the Plan |
| 1 | Senior Notes Claims | Each Holder of an Allowed Senior Notes Claim shall receive, in full satisfaction of its Allowed Senior Notes Claim: its Pro Rata share of the New Notes; *provided, however,* | $17,800,000 | 88.77% |

---

[4] The recoveries set forth below may change based upon changes in the amount of Claims that are Allowed as well as other factors related to the Debtors' business operations and general economic conditions.

[5] For purposes of the Plan, including the projected recoveries set forth herein, the Debtors and the Sponsoring Noteholders have stipulated to a total pre-money enterprise value of the Reorganized Debtors of $25,700,000.

3

| Class | Claim/Equity Interest | Treatment of Claim/Interest | Projected Amount of Allowed Claims[5] | Projected Recovery Under the Plan |
|---|---|---|---|---|
| | | SUMMARY OF EXPECTED RECOVERIES | | |
| | | that Holders of Senior Notes Claims that are Excluded Parties shall receive no distribution under the Plan. | | |
| 2 | Subordinated Notes Claims | Each Holder of an Allowed Subordinated Notes Claim shall receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of 22.48% of New Common Equity, subject to dilution on account of the MIP; *provided, however*, that Holders of Subordinated Notes Claims that are Excluded Parties shall receive no distribution under the Plan. | $21,000,000 | 33.17% |
| 3 | Other Secured Claims | Except to the extent less favorable treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and a Holder of an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the applicable Debtor, with the consent of the Sponsoring Noteholders: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | $3,500,000 | 100% |
| 4 | Other Priority Claims | Each Holder of an Allowed Other Priority Claim shall receive payment in full, in cash, on the Effective Date. | $0 | 100% |
| 5 | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced. | $2,500,000 | 100% |
| 6 | Section 510(b) Claims | On the Effective Date, Section 510(b) Claims will be cancelled, released, and extinguished and will be of no further force and effect and shall receive no recovery. | $0 | 0% |
| 7 | Interests | On the Effective Date, Interests will be cancelled, released, and extinguished and will be of no further force and effect and shall receive no recovery. | N/A | 0% |

94995804.17

E.     **What will I receive from the Debtors if I hold an Allowed Administrative Expense, DIP Administrative Expense, Professional Fee Administrative Expense, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Administrative Expenses, Professional Fee Administrative Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

1.     <u>Administrative Expenses.</u>

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, and unless the Holder of an Allowed Administrative Expense agrees to less favorable treatment or such Holder has been paid by any Debtor on account of such Allowed Administrative Expense prior to the Effective Date, each Holder of an Allowed Administrative Expense (other than holders of Professional Fee Administrative Expenses and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Expense an amount of Cash equal to the amount of such Allowed Administrative Expense in accordance with the following: (1) if an Administrative Expense is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense is due or as soon as reasonably practicable thereafter); (2) if such Administrative Expense is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Expense is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense without any further action by the holders of such Allowed Administrative Expense; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable, and in each case, with the consent of the Sponsoring Noteholders; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2.     <u>DIP Administrative Expenses.</u>

On the Effective Date, each holder of an Allowed DIP Administrative Expense, shall receive, in full satisfaction of such DIP Administrative Expense, its Pro Rata share of 48.19% of New Common Equity at the New Money Equity Price (defined below).

3.     <u>Professional Fee Administrative Expenses.</u>

a.     Final Fee Applications and Payment of Professional Fee Administrative Expenses.

All requests for payment of Professional Fee Administrative Expenses for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the

Allowed amounts of such Professional Fee Administrative Expenses after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Administrative Expenses in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date.

        b.      Professional Fee Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Sponsoring Noteholders, establish and fund the Professional Fee Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Account shall be established in trust for the Professionals and maintained solely for Allowed Professional Fee Administrative Expenses. The amount of Allowed Professional Fee Administrative Expenses shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Account as soon as reasonably practicable after such Professional Fee Administrative Expenses are Allowed. When such Allowed Professional Fee Administrative Expenses have been paid in full, any remaining amount in the Professional Fee Account shall promptly be transferred to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

        c.      Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Administrative Expenses and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors and the Sponsoring Noteholders no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional in consultation with the Sponsoring Noteholders.

        d.      Post-Confirmation Fees and Expenses.

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

        4.      <u>Priority Tax Claims.</u>

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

5.      Payment of Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, any applicable engagement letter(s), and any DIP Orders, as applicable, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors or the Reorganized Debtors, as applicable. In addition, the Debtors and/or the Reorganized Debtors, as applicable, shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date, without any requirement for Bankruptcy Court review or approval.

Without limiting the foregoing, on the Effective Date, the Disbursing Agent shall pay in full in Cash the Prepetition Agents Expenses without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Case, and without any requirement for further notice or Bankruptcy Court review or approval.  In addition, the Disbursing Agent shall continue to pay the Prepetition Agents Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent related to implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date, without any requirement for further notice or Bankruptcy Court review or approval.

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable on account of the reasonable and documented fees and expenses of the Restructuring Expenses that the Debtors are obligated to pay under the Restructuring Support Agreement, and for which the Debtors have received an invoice, shall constitute an Allowed Administrative Expense and shall be paid on a current basis in full in Cash on the Effective Date or as reasonably practicable thereafter, or to the extent accrued after the Effective Date, on a current basis in full in Cash as invoiced. Nothing herein shall require the Sponsoring Noteholders or their professionals to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to payment of such Allowed Administrative Expenses.

6.      Payment of Statutory Fees.

Payment of United States Trustee Quarterly Fees. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all monthly operating reports due

7

prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, each of the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

**F.      Are any regulatory approvals required to consummate the Plan?**

The Debtors are evaluating any regulatory approvals that would be required to consummate the Plan. To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 case *see* Article VII.B of this Disclosure Statement, entitled "Risks Related to Recoveries under the Plan and the Debtors' and the Reorganized Debtors' Businesses." For a more detailed description of a liquidation scenario, *see* Article IX.C of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit D.**

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"— or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article IX of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan," as well as Article IX of the Plan for a discussion of the conditions precedent to consummation of the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with the (i) Debtors' Cash on hand, (ii) Cash generated from operations; (iii) funds from the DIP Facility, and (iv) funds generated through issuance of the New Money Common Equity Investment.

**J.**     **Are there risks to owning the New Common Equity upon emergence from chapter 11?**

Yes. *See* Article VII of this Disclosure Statement, entitled "Risk Factors."

**K.**     **Is there potential litigation related to the Plan?**

Yes. Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VII.B.11 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases."

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes or other Plan objections, the Debtors may seek, among other things, modification of the Plan or confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article IX.F of this Disclosure Statement, entitled "Confirmation Without Acceptance by All Impaired Classes."

**L.**     **Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?**

No. The legal, equitable, and contractual rights of the holders of Allowed General Unsecured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

However, for the avoidance of doubt, and as set forth in the Plan, one of the conditions to the occurrence of the Effective Date is that the aggregate amount of Allowed General Unsecured Claims and Other Priority Claims to be paid under the Plan shall be no more than $2,500,000.

**M.**     **How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII thereof, each Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in

9

the Plan, including in Article VIII thereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII thereof.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII thereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### N.    Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes. The Plan proposes to release the Released Parties (including, for the avoidance of doubt, the Related Parties) and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Sponsoring Noteholders in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

Released Parties shall not include Excluded Parties under the Plan, that is, any Sponsoring Noteholder that (i) votes to reject the Plan, objects to the Plan, or supports an objection to the Plan or (ii) opts out of any Debtor releases sought in connection with the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan,

10

including by funding the Bridge Notes and the DIP Facility, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS (OTHER THAN SECTION 510(b) CLAIMS) WHO DO NOT AFFIRMATIVELY AND VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES, EVEN IF SUCH HOLDER AFFIRMATIVELY REJECTS THE PLAN. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

   1.  <u>Release of Liens.</u>

   **Except as otherwise provided in the Plan, the Restructuring Support Agreement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

   **To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.**

2. <u>Releases by the Debtors.</u>

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent permitted by applicable Law, for good and valuable consideration, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims (other than Reinstated Claims), Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Plan (including the Plan Supplement), the solicitation of votes on the Plan, the Disclosure Statement, the New Organizational Documents, the pursuit of Confirmation and Consummation, the DIP Facility, the DIP Facility Documents, the New Money Common Equity Investment Documents, the New Note Documents, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (but not, for the avoidance of doubt, any Cause of Action included in the Schedule of Retained Causes of Action, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction or any document, instrument, or agreement (including those set forth in the**

Plan Supplement) executed to implement the Plan, including the assumption of the indemnification provisions as set forth in the Plan; (b) any Cause of Action included on the Schedule of Retained Causes of Action; (c) the rights of any Holder of an Allowed Claim to receive distributions under the Plan; or (d) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

3.    Releases by the Releasing Parties.

Effective as of the Effective Date, to the fullest extent permissible under applicable Law, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims (other than Reinstated Claims), interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any

intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Plan (including the Plan Supplement), the solicitation of votes on the Plan, the Disclosure Statement, the New Organizational Documents, the pursuit of Confirmation and Consummation, the DIP Facility, the DIP Facility Documents, the New Money Common Equity Investment Documents, the New Note Documents, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan or the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the indemnification provisions as set forth in the Plan; (b) any Cause of Action included on the Schedule of Retained Causes of Action; (c) the rights of any Holder of an Allowed Claim to receive distributions under the Plan; or (d) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

<div align="center">4.   <u>Exculpation.</u></div>

Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Restructuring Support Agreement, the Disclosure Statement, the Plan (including the Plan Supplement), the DIP Facility, the DIP Facility Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims or Causes of Action related to any act or omission constituting actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or

<div align="center">14</div>

regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

5.    Injunction.

Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims (other than Reinstated Claims), Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Cause of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**O.    What is the deadline to vote on the Plan?**

The Voting Deadline is **July 19, 2024 at 4:00 p.m.(prevailing Eastern Time)** unless otherwise extended by the Bankruptcy Court or the Debtors.

94995804.17

**P.      How do I vote to Accept or Reject the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan. For your vote to be counted, the ballot containing your vote must be properly completed, executed, and delivered as directed, so that the ballot containing your vote is **actually received** by the Debtors' voting agent, Kurtzman Carson Consultants LLC (the "**Voting Agent**") **on or before the Voting Deadline,** *i.e.* **July 19, 2024 at 4:00 p.m. (prevailing Eastern Time)** *. See* Article VIII of this Disclosure Statement, entitled "Solicitation and Voting" for more information.

Holders of Interests are not entitled to vote on the Plan.

**Q.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      What is the effect of the Plan on the Debtors' ongoing businesses?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code. As a result, the occurrence of the Effective Date means that the Debtors will ***not*** be liquidated or forced to go out of business. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (1) no stay of the Confirmation Order is in effect and (2) all conditions to Consummation have been satisfied or waived (*see* Article IX of the Plan). On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.      Are foreign affiliates of ProSomnus included in these Chapter 11 Cases?**

No. The foreign affiliates of ProSomnus are not debtors included in these Chapter 11 Cases. The Debtors do not expect that the Chapter 11 Cases will materially disrupt the ongoing operation of such entities.

**U.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the terms of the then-sitting members of the boards of directors of the Debtors shall expire, and the New Board, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Corporate Governance Documents. The New Board shall consist of those individuals that are selected in accordance with Section 4.12 of the Plan and the Restructuring Term Sheet. The New Board shall consist of five members: Ant Raab, Len Liptak, and three directors appointed by the Sponsoring Noteholders. Additional information regarding the New Board will be included in the Plan Supplement.

On the Effective Date, it is anticipated that the holders of the Subordinated Secured Notes will become the holders of a majority of shares of the New Common Equity, and will be in a position to control matters requiring approval by the holders of shares of New Common Equity, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors.

**V.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Voting Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

By regular mail at:

ProSomnus, Inc., *et al.*, Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245

By hand delivery or overnight mail at:
ProSomnus, Inc., *et al.*, Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245

By electronic mail at:
ProSomnusInfo@kccllc.com

By telephone at:
(888) 647-1744 (U.S./Canada)
(310) 751-2628 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Voting Agent at the address above or by downloading the exhibits and documents from the website of the Voting Agent at https://www.kccllc.net/prosomnus (free of charge) or via PACER at http://www.ecf.deb.uscourts.gov/ (for a fee).

**W.     Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**X.     Who Supports the Plan?**

The Plan is supported by the Debtors and the Sponsoring Noteholders that have executed the Restructuring Support Agreement, which includes holders of an overwhelming majority in aggregate principal amount of the Debtors Senior Secured Notes and Subordinated Secured Notes. Specifically, the Plan is supported by holders of approximately (i) 100% of the issued and outstanding Senior Secured Convertible Notes, (ii) 100% of the issued and outstanding Senior Secured Convertible Exchange Notes, (iii) 94.95% of the issued and outstanding Subordinated Secured Convertible Notes, (iv) 100% of the issued and outstanding Subordinated Secured Convertible Exchange Notes, and (v) 100% of the Bridge Notes.

## III.    THE RESTRUCTURING SUPPORT AGREEMENT AND PLAN

**A.     Restructuring Support Agreement.**

As more fully described in Article V.C hereof, after months of arms-length negotiation, the Debtors and the Sponsoring Noteholders entered into the Restructuring Support Agreement on May 7, 2024. Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the restructuring contemplated thereby, including the Plan, the DIP Facility, and this Disclosure Statement.  The restructuring transactions contemplated by the Plan will (i) provide the capital injection needed for the Debtors to conduct competitive operations going forward; (ii) significantly reduce the Debtors' funded-debt obligations and annual interest payments; and (iii) result in a stronger balance sheet for the Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process. Moreover, the Restructuring Support Agreement will allow the Debtors to proceed expeditiously through chapter 11 and consummate the Plan in accordance with the milestones, which are set forth in Article VI.B hereof. Adhering to the milestones is an integral part of the Debtors' restructuring efforts. As set forth in the section entitled "Risk Factors", if the Chapter 11 Cases take longer than expected, the Debtors may exhaust their available cash collateral and postpetition financing. Such a result may significantly impair the Debtors' ability to realize the value inherent in the Plan and the Restructuring Support Agreement.

**B.     The Plan.**

The Plan contemplates the following key terms, among others described herein and therein:

1.       <u>General Settlement of Claims and Interests.</u>

In consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan. The Plan shall be deemed a motion by the Debtors to approve such compromises and settlements pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and within the range of reasonableness. Subject to Section 7.06 of the Plan, distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

2.       <u>Restructuring Transactions.</u>

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Support Agreement, the Restructuring Term Sheet, and Definitive Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Debtors and Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan before, on, and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors. Such restructuring may include (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and having such other terms to which the applicable Entities may agree; (3) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (4) the issuance of New Common Equity; (5) the execution and delivery of the New Note Documents and the New Money Common Equity Investment Documents; (6) the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such applicable formation documents (if any) of each Reorganized Debtor; and (7) all other actions that the Debtors, Reorganized Debtors and/or the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions, but in all cases subject to the terms and conditions of the Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and any consents or approvals required thereunder.

The Confirmation Order shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any other transaction described in, approved by, contemplated by, or necessary to effectuate the Plan).

3.    Substantive Consolidation

a.    Consolidation of the Chapter 11 Estates

The Plan contemplates and is predicated upon entry of an order (which may be the Confirmation Order) substantively consolidating the Debtors' Estates and Chapter 11 Cases for all purposes, including voting, Distribution, and Confirmation. On the Effective Date, (a) all Intercompany Claims between the Debtors shall be eliminated; (b) all assets and liabilities of the Affiliate Debtors shall be merged or treated as if they were merged with the assets and liabilities of Parent; (c) any obligation of a Debtor and any guarantee thereof by another Debtor shall be deemed to be one obligation of Parent, and any such guarantee shall be eliminated; (d) each Claim Filed or to be Filed against any Debtor shall be deemed Filed only against Parent and shall be deemed a single Claim against and a single obligation of Parent; and (e) any joint or several liability of the Debtors shall be deemed one obligation of Parent. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

The substantive consolidation effected pursuant to Section 4.03 of the Plan shall not, and shall not be deemed to, prejudice the Retained Causes of Action and the Avoidance Actions (subject to the releases set forth in Article VIII of the Plan), which shall survive entry of the Substantive Consolidation Order, as if there had been no substantive consolidation.

b.    Substantive Consolidation Order

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases. If no objection to substantive consolidation is timely Filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the deadline to object to Confirmation of the Plan, or such other date as may be fixed by the Court, the Substantive Consolidation Order (which may be the Confirmation Order) may be approved by the Court. If any such objections are timely Filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

4.    Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each

Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by the Plan, by the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, one or more of the Reorganized Debtors, or Parent, may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

     5.    <u>Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims.</u>

Except as otherwise expressly provided in the Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

     6.    <u>Cancellation of Existing Securities and Agreements.</u>

On the Effective Date, except to the extent otherwise provided in the Plan, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, certificates, securities, purchase rights, options, warrants, collateral agreements, subordination agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and null, void and worthless, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; provided, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or the Confirmation Order, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under the Plan as provided herein; (2) allowing and preserving the rights of the Prepetition Agents and DIP Agent, as applicable, to make distributions as specified under the Plan on account of Allowed Claims, including allowing the Prepetition Agents and DIP Agent to submit invoices for any amount and enforce any obligation owed to them under the Plan to the extent authorized or allowed

by the applicable documents; (3) permitting the Reorganized Debtors and any other Disbursing Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the Prepetition Agents' and DIP Agent's rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses, as applicable, including permitting the Prepetition Agents and DIP Agent, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the Indentures, and DIP Credit Agreement, as applicable, as in effect on or immediately before the Effective Date, (5) preserving all rights, remedies, indemnities, powers, and protections, including rights of enforcement, of the Prepetition Agents and DIP Agent, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, Non-Debtor Affiliates, and Sponsoring Noteholders), and any exculpations of the Prepetition Agents and DIP Agent, as applicable; provided, that the Prepetition Agents and DIP Agent shall remain entitled to indemnification or contribution from the Holders of Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses, to the extent provided in the respective Indentures and DIP Credit Agreement, as applicable, as in effect on the Effective Date, (6) permitting the Prepetition Agents and DIP Agent, as applicable, to enforce any obligation (if any) owed to them under the Plan, (7) permitting the Prepetition Agents and DIP Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, and (8) permitting the Prepetition Agents and DIP Agent to perform any functions that are necessary to effectuate the foregoing; provided, however, that nothing in 6 of the Plan shall affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or (except as set forth in (5) above) the releases of the Released Parties pursuant to Article IX of the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan. In furtherance of the foregoing, as of the Effective Date, Holders of Senior Notes Claim, Subordinated Notes Claims, and DIP Administrative Expenses shall be deemed to have released any such Claims against the Reorganized Debtors under the Indentures and DIP Facility Documents and are enjoined from pursuing any such claims against any of the Reorganized Debtors in respect of such Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses.

On the Effective Date, the Prepetition Agents, the DIP Agent, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall (i) be automatically and fully released and discharged from any further responsibility under the Indentures and DIP Credit Agreement, as applicable and (ii) have no further obligation or liability except as provided in the Plan and the Confirmation Order, and after the performance by the Prepetition Agents, DIP Agent, and their representatives and professionals of any obligations and duties required under or related to the Plan or the Confirmation Order, the Prepetition Agents, DIP Agent, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder. The commitments and obligations of the Holders of the Senior Notes Claims and the Subordinated Notes Claims to extend any further or future credit or financial accommodations to the Debtors, its subsidiaries or assigns under the Indentures, respectively, shall fully terminate and be of no further force or effect on the Effective Date. The reasonable and documented fees, expenses, and costs of the Prepetition Agents and the DIP Agent, including fees, expenses, and costs of each of their respective professionals incurred

after the Effective Date in connection with the Indentures or DIP Credit Agreement, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to the Plan, including the fees and expenses of counsel, if any, shall be paid in accordance with the terms of the Plan and the applicable Definitive Documents.

7.    Cancellation of Certain Existing Security Interests.

Upon the full payment or other satisfaction of an Allowed Secured Claim (including Allowed DIP Administrative Expenses), or promptly thereafter, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of an Allowed Secured Claim (including an Allowed DIP Administrative Expense) that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Allowed Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

To the extent that any Holder of a Secured Claim, or any agent for such Holder, has filed or recorded publicly any Lien and/or security interests against the property of the Non-Debtor Subsidiaries, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Non-Debtor Subsidiaries that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Non-Debtor Subsidiaries shall be entitled to make any such filings or recordings on such Holder's behalf.

8.    Sources of Consideration for Plan Distributions.

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with the (i) Debtors' Cash on hand, (ii) Cash generated from operations; (iii) funds from the DIP Facility, and (iv) funds generated through issuance of the New Money Common Equity Investment.

9.    <u>Issuance of New Common Equity and Deregistration.</u>

On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all of the New Common Equity in accordance with the terms of the Plan and the New Organizational Documents without the need for further corporate or other action. All of the New Common Equity issuable under the Plan and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and nonassessable.

Reorganized Parent intends to exist and operate as a private company after the Effective Date. As promptly as reasonably practicable following the Effective Date, Reorganized Parent expects to take all necessary steps to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its Existing Equity Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by filing a Form 15 with the SEC under the Exchange Act.

a.    Absence of Listing/Transfer of New Common Equity

On the Effective Date, the Reorganized Debtors shall issue the New Common Equity pursuant to the Plan and the New Organizational Documents. The Reorganized Debtors shall not be obligated to effect or maintain any listing of the New Common Equity for trading on any national securities exchange (within the meaning of the Exchange Act) and it has no current intention of maintaining or obtaining such listing. Unless otherwise provided herein, distributions of the New Common Equity are expected to be made by delivery or book-entry transfer thereof by the Disbursing Agent in accordance with the Plan and the New Organizational Documents, rather than through the facilities of DTC. Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Common Equity shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of New Common Equity shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Stockholders Agreement (if applicable), including the payment of stamp duty tax and completion of registration with the Disbursing Agent.

b.    New Stockholders Agreement

On the Effective Date, to the extent applicable, one or more of the Reorganized Debtors shall enter into the New Stockholders Agreement with the Holders of the New Common Equity, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Stockholders Agreement). On and as of the Effective Date, all of the Holders of New Common Equity shall be deemed to be parties to the New Stockholders Agreement (if applicable), without the need for execution by such Holder.

If applicable, the New Stockholders Agreement shall be binding on all Persons or Entities receiving, and all Holders of, the New Common Equity (and their respective successors and

assigns), whether such New Common Equity is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Stockholders Agreement.

10.    New Money Common Equity Investment

On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall consummate the New Money Common Equity Investment, pursuant to which participants shall subscribe to purchase New Money Common Equity in an amount of at least $9,000,000 in the aggregate. The New Money Common Equity shall be offered in the form of a rights offering or other subscription process. The price per share of New Money Common Equity shall be based on a total indicative pre-money enterprise value of the Reorganized Debtors of $25,700,000, (a) prior to taking into account the funding of the DIP Facility and the Bridge Notes, and the funding of New Money Common Equity, and (b) assuming an Effective Date of July 31, 2024, or as soon thereafter as is practicable (the "**New Money Equity Price**"). The New Money Common Equity shall be offered for ratable participation by the Sponsoring Noteholders and other third-party purchasers. The New Money Common Equity Investment has been fully backstopped the Backstop Parties on the terms set forth in the Backstop Commitment Documentation attached hereto as **Exhibit F**.

Confirmation of the Plan shall be deemed approval of the New Money Common Equity Investment and the New Money Common Equity Investment Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization for the Reorganized Debtors to enter into and execute the New Money Common Equity Investment Documents as may be required to effectuate the treatment afforded by the New Money Common Equity. All New Money Common Equity issued pursuant to the Plan shall be duly authorized, validly issued and non-assessable.

For the avoidance of doubt, the issuance of the New Money Common Equity shall be exempt from the registration requirements of the Securities Act as a result of Bankruptcy Code section 1145 to the maximum extent permitted by law.

11.    The New Notes

On the Plan Effective Date, the Reorganized Debtors shall enter into the New Note Documents. The Confirmation Order shall approve the New Notes and the New Note Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and all Claims, Liens, and security interests to be granted in accordance with the terms of the New Note Documents, if any, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Claims and Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Note Documents, (c) shall be deemed automatically attached and perfected on the Plan Effective Date, subject only to the Liens and security interests as may be permitted under the New Note Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other

25

voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors and the Reorganized Debtors, as applicable, and the Persons granting such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order with respect to the Plan, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

12. <u>Corporate Actions.</u>

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including, as applicable: (a) the issuance and distribution of the New Common Equity; (b) the offering and implementation of the New Money Common Equity Investment; (c) the issuance and distribution of the New Notes; (d) implementation of the Restructuring Transactions, (e) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (f) adoption of the New Organizational Documents; (g) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases (as applicable); and (h) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Money Common Equity Investment, the New Organizational Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by 12 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy Law.

13. <u>New Organizational Documents.</u>

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization. The New

Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

<p style="text-align:center">a.      Directors and Officers of the Reorganized Debtors</p>

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and the existing officers of the Debtors shall be automatically removed as officers, and the New Board and new officers of each of the Reorganized Debtors shall be appointed consistent with the terms of the Restructuring Support Agreement and Restructuring Term Sheet. Specifically, the New Board shall consist of five members, including three directors appointed by the Sponsoring Noteholders. For subsequent terms, following the Effective Date, members of the New Boards and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity and affiliation of any Person proposed to serve on the New Boards will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, as well as those Persons that will serve as officers of the Reorganized Debtors. Provisions regarding the removal, appointment, and replacement of members of the New Boards, to the extent applicable, will be disclosed in the New Organizational Documents.

<p style="text-align:center">b.      Effectuating Documents; Further Transactions</p>

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

<p style="text-align:center">14.   <u>Management Incentive Plan.</u></p>

Unless otherwise agreed, the Reorganized Debtors shall be authorized to adopt the MIP, enact and enter into related policies and agreements, and grant awards under the MIP to participants on the terms and conditions determined by the board of the directors of the Reorganized Parent, in all respects consistent with the Plan and the Restructuring Support Agreement.

<p style="text-align:center">27</p>

15.    Preservation of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

16.    Certain Securities Law Matters.

The offering, issuance (or entry into), and distribution of the New Notes, New Common Equity, and all other Securities entered into and/or issued in connection with the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities to the maximum extent permitted by Law, in accordance with, and pursuant to

section 1145 of the Bankruptcy Code and any other available exemption from registration, as applicable.

In addition, the New Notes and New Common Equity issued under section 1145 of the Bankruptcy Code (1) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (2) will be freely tradable and transferable in the United States by a recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer, subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the New Organizational Documents.

To the extent issuance under section 1145(a) of the Bankruptcy Code is unavailable, the New Notes and New Common Equity will be issued without registration under the Securities Act in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act and/or Regulation S under the Securities Act, and similar registration exemptions under state or local securities Laws, in each case to the maximum extent permitted thereunder. Any securities issued in reliance on section 4(a)(2) and/or Regulation S under the Securities Act, will be "restricted securities" under the Securities Act and/or subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable Law and subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the New Money Common Equity Investment Documents and New Organizational Documents, as applicable.

Neither the issuance of the New Notes or New Common Equity nor the New Money Common Equity Investment shall constitute an invitation or solicitation of an invitation or offer to sell or buy, any securities in contravention of any applicable Law in any jurisdiction. No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any of the New Notes or New Common Equity in any jurisdiction where such action for that purpose is required.

Except as otherwise provided in the New Organizational Documents or otherwise elected by the Debtors (with the consent of the Sponsoring Noteholders), the initial ownership of the New Common Equity will be recorded in a register maintained by a transfer agent. To the extent provided in the New Organizational Documents or as elected by the Debtors (with the consent of the Sponsoring Noteholders), some or all Holders entitled to receive distributions of New Common Equity (which may be determined based on the percentage of New Common Equity issued on the Effective Date to which such Holder is entitled) may receive and hold such New Common Equity through the facilities of DTC. Upon the Effective Date, each Holder that receives New Common Equity pursuant to the terms hereof will be deemed to be a party to the New Organizational Documents, as applicable (even if such holder of New Common Equity does not execute a signature page to the New Organizational Documents); provided, that, without in any way reducing the force and effect of the foregoing, the Debtors may, in their discretion and as a means of further

assurance (and with the consent of the Sponsoring Noteholders) require that such Holders become party to the New Organizational Documents, either as a condition to distribution of the New Common Equity, or at a later date. The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Equity under applicable securities Laws. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC and any transfer agent shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

17.    1146 Exemption.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or Reorganized Debtors, including the New Common Equity and the New Notes; (2) the restructuring transactions contemplated under the Plan; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

18.    Governmental Regulatory Applications.

The Debtors or the Reorganized Debtors, as applicable, shall use best efforts to obtain any and all required governmental, regulatory, and/or third-party approvals, and shall promptly provide such additional documents or information requested by any governmental regulatory authority in connection with the review of the foregoing. Any agreements with or commitments to any

governmental regulatory authorities by the Debtors, including any decision to accept and/or not to oppose any proposed material conditions or limitations on any such required approvals, shall require the prior approval of the Sponsoring Noteholders. Any other person required or reasonably requested by the Debtors (in each case with the consent of the Sponsoring Noteholders) shall use commercially reasonable efforts to make or assist in submissions necessary or appropriate for the consummation of the Restructuring Transactions.

<p style="text-align:center">19.    <u>Director and Officer Liability Insurance.</u></p>

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

<p style="text-align:center">20.    <u>Indemnification Obligations.</u></p>

Consistent with applicable Law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

<p style="text-align:center">21.    <u>No Change in Control.</u></p>

For the avoidance of doubt, except as provided in (x) the cancellation of any Interests pursuant to the Plan, (y) any issuance, transfer or acquisition of New Common Equity or other Securities pursuant to the Plan or in connection with the Debtors' restructuring, and (z) the revesting of assets in the Reorganized Debtors as of the Effective Date pursuant to the Plan, shall

not, and shall not be deemed to, result in a "change in control" or "change of control" under any contract or other document to which any Debtor or Reorganized Debtor is a party.

## IV.    DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

### A.    ProSomnus' History and Operations.

1.    <u>ProSomnus' Business and Operations.</u>

The Debtors' business (formerly known as DTI Holdings Inc. and MicroDental Inc.) began in 2006, and for most of the Debtors' history, their primary activity was the operation of a chain of dental laboratories. In October 2016, the dental laboratory business was sold and the Debtors refocused their efforts on the development, manufacturing, and marketing of personalized, precision intraoral medical devices, a novel non-invasive option for treating and managing patients with obstructive sleep apnea ("**OSA**"). Sleep apnea is a serious and chronic, respiratory, disease that negatively impacts a patient's sleep, breathing, health, and quality of life. OSA is the most common form of sleep apnea. If untreated, OSA increases the risk of high blood pressure, hypertension, heart failure, stroke, coronary artery disease and other life-threatening diseases.

The Debtors' precision intraoral devices are classified by the United States Food and Drug Administration (the "**FDA**") as Class II medical devices for the treatment of snoring and mild to moderate OSA. The Debtors received pre-market notification and FDA clearance pursuant to Section 510(k) of the Federal Food, Drug, and Cosmetic Act (the "**FDCA**") for their first intraoral device in July 2014 and their devices have been commercially available in the United States since August of 2014.

The Debtors' primary customers consist of medical providers who prescribe the Debtors' precision devices to patients suffering from OSA, but who, for a variety of reasons, have not found success with traditional treatment using a continuous positive airway pressure machine. To date, over 250,000 of the Debtors' precision devices have been prescribed for patients with sleep apnea.

2.    <u>The De-SPAC Transaction.</u>

In order to take advantage of the capital raising potential of public equity markets, in December of 2022, Lakeshore Acquisition I Corp. ("**Lakeshore**") consummated a de-SPAC transaction to take the Company public (the "**Business Combination**"), pursuant to which: (i) Lakeshore merged with and into LAAA Merger Corp. ("**Surviving PubCo**"), (ii) a wholly owned subsidiary of Lakeshore merged with and into Holdings, with Holdings surviving such merger, and (iii) Surviving PubCo changed its name to ProSomnus, Inc. Prior to the Business Combination with Lakeshore, ProSomnus was not publicly traded.

Before the Business Combination, Lakeshore's units, public shares, and public warrants were listed on Nasdaq under the symbols "LAAU," "LAAA," and "LAAW," respectively. On December 6, 2022, the common stock and public warrants of ProSomnus, Inc. began trading on Nasdaq, under the symbols "OSA" and "OSAAW," respectively. The Company's operations and mission did not change; it continued focusing on non-invasive, intra-oral medical devices to treat patients with mild to moderate OSA.

B.    **The Debtors' Prepetition Corporate and Capital Structure.**

1.    ProSomnus' Organizational Structure and Corporate Governance.

As set forth on the organizational chart attached hereto as **Exhibit C**, ProSomnus, Inc. wholly owns ProSomnus Holdings, Inc., which, in turn, wholly owns ProSomnus Sleep Technologies, Inc. Each of the Debtors is an obligor under the Senior Secured Notes and Subordinated Secured Notes as issuer (in the case of ProSomnus, Inc.) or as guarantor (in the case of the remaining Debtors). The two non-Debtor entities identified **Exhibit C** are foreign affiliates of the Debtors and have not commenced chapter 11 cases.

The Debtors are governed by a Board of Directors (the "**Board**"), which is composed of seven (7) members. including Jason Orchard, who serves as a Managing Director of Spring Mountain Capital ("**SMC**"). As of the Petition Date, SMC held (i) 13.2% of the common stock of ProSomnus, Inc., and (ii) approximately 28.2% of the Subordinated Secured Convertible Exchange Notes. SMC is also a Sponsoring Noteholder under the Restructuring Support Agreement and a DIP Lender under the DIP Facility. SMC has provided a total commitment of $3,354,632 under the DIP Facility, inclusive of its rolled-in Bridge Notes, which represents approximately 26.0% of the DIP Facility. Other than Mr. Orchard, no member of the Board is an Affiliate of any Sponsoring Noteholder or other Entity that holds Senior Secured Notes or Subordinated Secured Notes.

On March 24, 2024, the Board established a separate special committee to, among other things, exercise all power and authority that may be exercised by the Board in exploring, considering, reviewing, evaluating, negotiating, approving and, as appropriate, making recommendations to the Board concerning certain strategic transactions that may involve a debt or equity issuance by the Company or a related bankruptcy filing or other restructuring (the "**Special Committee**"), which consists of three (3) independent and disinterested directors. Mr. Orchard did not sit on the Special Committee and was not privy to the discussions among the Special Committee members. The Special Committee, in consultation with the Debtors' financial and legal advisors, reviewed and considered, among other things, the Company's financial and operational condition, historical performance, current and long-term liabilities, and non-bankruptcy alternatives. Ultimately, the Special Committee recommended to the Board that the Company enter into the Restructuring Support Agreement and commence the Chapter 11 Cases in accordance therewith.

2.    Equity Ownership.

As of December 31, 2023, ProSomnus, Inc. is authorized to issue (i) 150,000,000 shares of common stock and (ii) 1,500,000 shares of preferred stock, of which 25,000 shares have been authorized in respect of ProSomnus's Series A Convertible Preferred Stock. As of April 26, 2024, ProSomnus, Inc. had 17,394,064 shares of common stock outstanding and 10,426 shares of Series A Preferred Stock outstanding.

C.    **Prepetition Funded Debt.**

As of the Petition Date, the Debtors had approximately **$42,600,000** in aggregate funded debt obligations. These obligations are summarized as follows:

| Funded Debt | Maturity | Approximate Outstanding Amount as of Petition Date (including capitalized interest and fees) |
|---|---|---|
| Senior Convertible Notes (excluding the Bridge Notes) | December 6, 2025 | $14,000,000 |
| Senior Convertible Notes (Bridge Notes) | December 6, 2025 | $4,000,000 |
| Senior Secured Convertible Exchange Notes | December 6, 2025 | $3,500,000 |
| Subordinated Convertible Notes | April 6, 2026 | $7,700,000 |
| Subordinated Secured Convertible Exchange Notes | April 6, 2026 | $13,400,000 |
| **Total Funded Debt as of Petition Date:** | | $42,600,000 |

1.    Senior Secured Convertible Notes (Initial Notes).

Each of the Debtors is party to that certain *Indenture*, dated as of December 6, 2022 (as amended from time to time, the "**2022 Senior Indenture**") among (i) Parent, as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Senior Convertible Notes Agent**"). Pursuant to the 2022 Senior Indenture, Parent issued Senior Secured Convertible Notes due December 6, 2025 (the "**Senior Secured Convertible Notes**") in the original aggregate principal amount of $16,959,807 (the "**Senior Secured Convertible Initial Notes**") to certain investors (the "**Senior Convertible Noteholders**"). The Senior Secured Convertible Initial Notes accrue interest at the rate of 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Senior Secured Convertible Initial Notes including accrued but unpaid interest thereunder was approximately $14,000,000.00.

2.    Senior Secured Convertible Notes (Bridge Notes).

On April 17, 2024 and April 29, 2024, pursuant to the 2022 Senior Indenture, Parent issued additional Senior Secured Convertible Notes in the aggregate principal amount of $4,000,000.00 (the "**Bridge Notes**") to certain of the Subordinated Noteholders (defined below) who are Sponsoring Noteholders. The Bridge Notes had not matured as of the Petition Date, but had outstanding accrued and unpaid interest thereunder in the approximate amount of $14,000.

On May 9, 2024, the Bankruptcy Court entered the Interim DIP Order (defined below), which approved the "roll-in" of the Bridge Notes into the DIP Facility. Accordingly, Claims derived from, based upon, or arising under the Bridge Notes shall be treated for all purposes under the Plan as DIP Administrative Expenses and not as Senior Notes Claims. Additional information regarding the Interim DIP Order and the roll-in of Bridge Notes obligations is located in Article VI.A.2 of this Disclosure Statement.

3.     Senior Secured Convertible Exchange Notes.

Each of the Debtors is party to that certain *Indenture*, dated as of October 11, 2023 (as amended from time to time, the "**2023 Senior Indenture**" and together with the 2022 Senior Indenture, the "**Senior Indentures**") among (i) Parent, as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Prepetition Senior Convertible Exchange Notes Agent**" and together with the Prepetition Senior Convertible Notes Agent, the "**Prepetition Senior Agents**"). Pursuant to the 2023 Senior Indenture, Parent issued Senior Secured Convertible Exchange Notes due December 6, 2025 (the "**Senior Secured Convertible Exchange Notes**" and together with the Senior Secured Convertible Notes and the Bridge Notes, the "**Senior Secured Notes**") to certain investors (the "**Senior Exchange Noteholders**" and together with the Senior Convertible Noteholders, the "**Senior Noteholders**") in the aggregate principal amount of $3,391,961 in exchange for $3,391,961 principal amount of Senior Secured Convertible Notes. The Senior Secured Convertible Exchange Notes accrue interest at the rate of 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Senior Secured Convertible Exchange Notes including accrued but unpaid interest thereunder was approximately $3,500,000.

4.     The Senior Liens and Senior Collateral.

In connection with the issuance of the Senior Secured Notes, the Debtors, as issuers and guarantors under the Senior Indentures, granted the Prepetition Senior Agents, for the benefit of the Senior Noteholders, valid, binding, non-avoidable, properly-perfected and enforceable first priority continuing liens on and security interests in (the "**Senior Liens**") substantially all of their assets (the "**Senior Collateral**").

5.     Subordinated Secured Convertible Notes.

Each of the Debtors is party to that certain *Indenture*, dated as of December 6, 2022 (as amended from time to time, the "**2022 Subordinated Indenture**") among (i) Parent, as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Prepetition Subordinated Convertible Notes Agent**"). Pursuant to the 2022 Subordinated Indenture, Parent issued Subordinated Secured Convertible Notes due April 6, 2026 (the "**Subordinated Secured Convertible Notes**") to certain investors (the "**Subordinated Convertible Noteholders**") in the original aggregate principal amount of $17,453,141.00. The Subordinated Secured Convertible Notes accrue interest at the Prime Rate (as defined in the 2022 Subordinated Indenture) plus 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Subordinated Secured Convertible Notes including accrued but unpaid interest thereunder was approximately $7,700.000.

6.     Subordinated Secured Convertible Exchange Notes.

Each of the Debtors is party to that certain *Indenture*, dated as of October 11, 2023 (as amended from time to time, the "**2023 Subordinated Indenture**" and together with the 2022 Subordinated Indenture, the "**Subordinated Indentures**") among (i) Parent. as the issuer, (ii) Holdings and OpCo, as guarantors party thereto, and (iii) Wilmington Trust, National Association, as trustee and collateral agent (the "**Prepetition Subordinated Convertible Exchange Notes**

35

**Agent**" and together with the Prepetition Subordinated Convertible Notes Agent, the "**Prepetition Subordinated Agents**"). Pursuant to the 2023 Subordinated Indenture, Parent issued Subordinated Secured Convertible Exchange Notes due April 6, 2026 (the "**Subordinated Secured Convertible Exchange Notes**" and together with the Subordinated Secured Convertible Notes, the "**Subordinated Secured Notes**") to certain investors (the "**Subordinated Exchange Noteholders**" and together with the Subordinated Convertible Noteholders, the "**Subordinated Noteholders**") in the original aggregate principal amount of $12,137,889 in exchange for $12,137,889 principal amount of Subordinated Secured Convertible Notes. The Subordinated Secured Convertible Exchange Notes accrue interest at the Prime Rate (as defined in the 2022 Subordinated Indenture) plus 9.00% per annum. As of the Petition Date, the aggregate amount outstanding under the Subordinated Exchange Notes including accrued but unpaid interest thereunder was approximately $13,400,000.

       7.    <u>The Subordinated Liens on the Subordinated Collateral and the Intercreditor Agreement.</u>

In connection with the issuance of the Subordinated Secured Notes, the Debtors, as issuers and guarantors under the Subordinated Indentures, granted the Prepetition Subordinated Agents, for the benefit of the Subordinated Noteholders, valid, binding, non-avoidable, properly-perfected and enforceable second priority continuing liens on and security interests in (the "**Subordinated Liens**") substantially all of their assets (the "**Subordinated Collateral**" and together with the Senior Collateral, the "**Prepetition Collateral**").

The Debtors, Senior Noteholders, Subordinated Noteholders, and Prepetition Agents are parties to that certain Amended and Restated Intercreditor Agreement, dated as of October 11, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**") that sets forth the relative priority of such parties' respective liens in the Prepetition Collateral.

**D.    Equipment Lease Obligations.**

In the ordinary course of business, the Debtors are parties to certain equipment leases. The Debtors are substantially current on their obligations thereunder, and no amounts were due and owing on account of such obligations as of the Petition Date.

**E.    Trade Payables and Ordinary Course Obligations.**

In addition to ProSomnus' funded debt obligations, as of the Petition Date, ProSomnus owed an estimated $3.5 million to third party suppliers, vendors, and other ordinary course unsecured creditors. The Plan provides that all such creditors will be unimpaired and paid in the ordinary course of business.

## V.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    The Debtors' Business is Overleveraged and has Suffered Significant Capital Shortfalls.

Notwithstanding the continued growth of the Debtors' business, the Debtors' public listing via de-SPAC in which the funding raised was predominantly debt, resulting in a balance sheet overleveraged with debt structures inconducive to securing additional capital, paired with a challenging capital markets environment, has led to the Debtors' ongoing and current inability to raise additional capital to fund the company's business plan and/or refinance their current debt structure. In light of the foregoing, the Debtors' management determined that without additional funding and liquidity, the Debtors' business would be unable to continue as a going concern and began pursuing marketing and restructuring efforts. Consequently, the Debtors began taking steps to effect a strategic realignment of their balance sheet in order to optimize their financial position while preserving the continued growth of their operations.

### B.    Prepetition Marketing and Restructuring Efforts.

In May of 2023, the Debtors engaged Oppenheimer and Co., Inc. ("**Oppenheimer**") to assist with raising capital. After extensive marketing to over 70 institutional investors, of which over two-thirds agreed to be "wall crossed" and receive material non-public information, a limited number of investors (5) agreed to have initial meetings with management. However, no substantive follow-up discussions developed, and the Debtors were unable to any find interested parties due to the structure and magnitude of the Company's indebtedness.

The Debtors subsequently went to extensive lengths to consummate a $10.4 million PIPE financing in September and October 2024 through the issuance of the Series A Convertible Preferred Stock, warrants to purchase common stock and, as applicable, the issuance of the Senior Exchange Notes and Subordinated Exchange Notes. Following such financing, the Debtors engaged Piper Sandler & Co. ("**Piper Sandler**") to advise the Company on further strategic and financing options. With the assistance of Piper Sandler, the Company ran a robust strategic evaluation process involving outreach to over 70 institutional investors and approximately a dozen strategic acquirers over five (5) months.

Similar to the earlier process run by Oppenheimer, initial interest was strong with over 50% of contacted financial and strategic investors agreeing to be wall crossed and receive material non-public information. Unlike the previous process, when wall crossing investors, the expressed intention of the Piper Sandler process was to restructure the balance sheet through a financial or strategic acquisition. Several parties scheduled multiple, in-depth meetings with management, including business overview, financial modeling, and new product development meetings, and pre-term sheet due diligence requests were submitted and fulfilled.

As the process continued two financial investors and one strategic investor emerged as leading suitors. After additional weeks of diligence, the Debtors received one offer from a third party looking to purchase the Company's assets. The Debtors' board initially assessed the offer as in the best interest of the Company and stakeholders in that, although not affording full recovery to any class of creditors, would provide some recovery to many of the various stakeholders while

providing a fully funded prospective operating plan with an institutional investor focused on the long-term success of the Company.

Notwithstanding, after consultation with the Company's senior and subordinated lenders, the third party offer was rejected on account of its short-term feasibility and inability to provide the necessary liquidity to consummate the sale. The Company did not receive any other offers other than from the Sponsoring Noteholders, which ultimately led to the execution of the Restructuring Support Agreement, described in Article V.C of this Disclosure Statement.

## C.      The Restructuring Support Agreement.

After extensive arms-length negotiation between and among the Debtors and the Sponsoring Noteholders, the Debtors entered into the Restructuring Support Agreement on May 7, 2024, embodying the terms of a comprehensive restructuring transaction to be implemented through a pre-negotiated plan of reorganization. As described below, the Restructuring Support Agreement and the restructuring transactions contemplated thereby will allow the Company to substantially deleverage the balance sheet while posing minimal disruptions to the business operations.

The Restructuring Support Agreement has the unanimous support of the Senior Noteholders and the near-unanimous support of the Subordinated Noteholders—the only two classes of impaired creditors in the Chapter 11 Cases. Pursuant to the Restructuring Support Agreement, the Sponsoring Noteholders have agreed to, among other things:

- Subject to proper solicitation, vote to accept the Plan; and

- Refrain from taking any action inconsistent with the Restructuring Support Agreement, Restructuring Term Sheet, or the confirmation or consummation of the Plan.

The Restructuring Support Agreement and Plan contemplate a recapitalization transaction that will allow for substantial deleveraging and a new capital infusion to right-size the Company's balance sheet for the benefit of all stakeholders. As detailed in the Plan and in this Disclosure Statement, the Plan and Restructuring Support Agreement provide for:

- The full equitization of the Company's indebtedness under the Subordinated Secured Notes;

- The provision of the New Notes in exchange of the Senior Secured Notes that are not equitized under the terms of the DIP Facility, which New Notes have an extended maturity date, a reduced interest rate, a PIK debt service obligation, and are no longer convertible to equity;

- The equitization of the Company's indebtedness under the DIP Facility;

- The infusion of $9 million by the Sponsoring Noteholders and other third party investors through the purchase of equity in the Reorganized Debtors upon emergence from these Chapter 11 Cases; and

- Payment in full in the ordinary course of business of all General Unsecured Claims.

## VI.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    First Day Relief

On and shortly after the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Petitions**"), the Debtors filed several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/prosomnus.

1. First Day Motions and Orders (other than the DIP Motion and Interim DIP Order)

- Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases [Docket No. 2]

  - Approved on a final basis May 9, 2024 [Docket No. 41]

- Application of Debtors Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date [Docket No. 3]

  - Approved on a final basis May 9, 2024 [Docket No. 51]

- Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to File Consolidated Top 20 Creditors List, (II) Modifying Requirements to File a List of, and Provide Notice to, All Equity Holders, (III) Authorizing Redaction of Certain Personally Identifiable Information, and (IV) Granting Related Relief [Docket No. 4]

  - Approved on an interim basis May 9, 2024 [Docket No. 42] and a final basis June 3, 2024 [Docket No. 109]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing (I) Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, and (II) Continuation of Existing Deposit Practices [Docket No. 5]

- ▪ Approved on an interim basis May 9, 2024 [Docket No. 43] and a final basis June 5, 2024 [Docket No. 127]

- Motion of Debtors for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service, (II) Approving the Debtors' Proposed Adequate Assurance of Payment for Postpetition Services, and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance of Payment [Docket No. 6]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 44] and a final basis June 3, 2024 [Docket No. 108]

- Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Various Insurance Policies, (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto, (III) Preventing Insurance Companies from Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief from the Automatic Stay, and (IV) Authorizing the Debtors to Continue Installment Payments and Brokerage Obligations [Docket No. 7]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 45] and a final basis on June 3, 2024 [Docket No. 107]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Taxes and Fees [Docket No. 8]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 46] and a final basis June 4, 2024 [Docket No. 117]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain and Administer Customer Programs, Promotions, and Practices and (II) Pay and Honor Related Prepetition Obligations [Docket No. 9]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 47] and a final basis June 3, 2024 [Docket No. 106]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of (I) Certain Prepetition Employee Claims, Including Wages, Salaries, and Other Compensation, (II) Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Reimbursement to Employees for Prepetition Expenses, (IV) Withholding and Payroll-Related Taxes, (V) Workers' Compensation Obligations, and (VI) Prepetition Claims Owing to Administrators and Third-Party Providers [Docket No. 10]

  - ▪ Approved on an interim basis May 9, 2024 [Docket No. 48] and a final basis June 4, 2024 [Docket No. 116]

- Motion of Debtors for Entry of Interim and Final Orders Authorizing Payment of Prepetition Obligations Owed to Critical Vendors [Docket No. 11]

  - Approved on an interim basis May 9, 2024 [Docket No. 49] and a final basis June 13, 2024 [Docket No. 156]

- Motion of Debtors for Entry of Interim and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of, or Worthlessness Deductions with Respect to, Stock of the Debtors and (II) Granting Related Relief [Docket No. 15] (the "**NOL Motion**")

  - Approved on an interim basis May 9, 2024 [Docket No. 50] and a final basis June 20, 2024 [Docket No. 170]

    2.    <u>DIP Motion and Interim DIP Order</u>

On the Petition Date, the Debtor filed a motion [Docket No. 12] (the "**DIP Motion**") seeking interim and final approval of senior subordinate secured post-petition financing (the "**DIP Facility**") to be provided by certain of the Sponsoring Noteholders (in such capacity, the "**DIP Lenders**") consisting of (1) a new money multi-draw term loan facility consisting of $7 million, of which $2.5 million was made available upon entry of the Interim DIP Order, and (2) a "roll-in" of obligations under (i) the Bridge Notes in the aggregate principal amount of $4 million plus all accrued interest through the date of entry of the Interim DIP Order, and (ii) the Senior Secured Notes in the aggregate principal amount of $2 million. The Debtors' obligations under the DIP Facility are secured by a lien on substantially all of the Debtors' assets that is senior to the Subordinated Liens, and junior to the Senior Liens. Upon emergence from the Chapter 11 Cases, in accordance with the terms of Restructuring Support Agreement, all claims under the DIP Facility (including interest and fees) will convert into New Common Equity.

On May 9, 2024, the Bankruptcy Court approved the Debtors' entry into the DIP Facility and granted the DIP Motion on an interim basis [Docket No. 54] (the "**Interim DIP Order**"). The Court entered a final order approving the DIP Motion on June 5, 2024 [Docket No. 128] (the "**Final DIP Order**").

    **B.    Case Milestones**

As part of the Restructuring Support Agreement, the Debtors agreed to the following case milestones to ensure that the Chapter 11 Cases proceed in a structured and expeditious manner towards confirmation:[6]

- the Petition Date shall be on or before May 17, 2024;

---

[6] The milestones below may be extended or waived by the Sponsoring Noteholders in accordance with the Restructuring Support Agreement.

41

- no later than 5 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- no later than 40 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

- no later than 15 Business Days following the Petition Date, the Debtors shall have filed the Plan, the Disclosure Statement, and a motion seeking approval of the Disclosure Statement

- no later than 50 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement;

- no later than 90 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

- no later than 105 calendar days following the Petition Date, the Effective Date shall have occurred.

In connection with the foregoing, the Debtors have proposed the following schedule of proposed dates (the "**Proposed Confirmation Schedule**" subject to the Bankruptcy Court's availability and approval thereof:

| Proposed Confirmation Schedule | |
|---|---|
| Disclosure Statement Objection Deadline | June 20, 2024 at 4:00 p.m. (prevailing Eastern Time) |
| Disclosure Statement Hearing | June 26, 2024 at 10:00 a.m. (prevailing Eastern Time) |
| Voting Record Date | June 24, 2024 |
| Solicitation Commencement | No later than June 28, 2024 |
| Voting Deadline | July 19, 2024 at 4:00 p.m. (prevailing Eastern Time) |
| Deadline to file Plan Supplement | July 19, 2024 |
| Confirmation Objection Deadline | July 22, 2024 at 4:00 p.m. (prevailing Eastern Time) |
| Confirmation Hearing | July 30, 2024 at 10:00 a.m. (prevailing Eastern Time) |

## VII.   RISK FACTORS

BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE

STATEMENT MAY APPLY EQUALLY TO THE DEBTORS OR THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.

### A.      Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan and may affect the validity of the vote of the Impaired Classes to accept or reject the Plan and may require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

### 1.      There is a Risk of Termination of the Restructuring Support Agreement.

To the extent that events giving rise to termination of the Restructuring Support Agreement occur, the Restructuring Support Agreement may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important stakeholder constituencies and could result in the loss of the Debtors' use of cash collateral and/or the proceeds of the DIP Facility under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan. If the Plan is not consummated, there can be no assurance that the Chapter 11 Cases would not be converted to chapter 7 liquidation cases or that any new chapter 11 plan would be as favorable to holders of Claims or Interests as the current Plan.

### 2.      The Debtors May Exhaust Their Use of Cash Collateral Under the DIP Facility.

On the Petition Date, the Debtors filed the DIP Motion, which requested authorization to enter into the DIP Facility and use cash collateral to fund the Chapter 11 Cases in accordance with the terms of the Restructuring Support Agreement. Such access to postpetition financing and cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. While the Bankruptcy Court has entered the Final DIP Order, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral and postpetition financing. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

### 3.      Parties in Interest May Object to the Plan's Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with

43

the Debtors' classification. If the Bankruptcy Court concludes that the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan (subject to the terms of the Restructuring Support Agreement). The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

4.      The Conditions Precedent to the Effective Date of the Plan May Not Occur.

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent. These conditions precedent include, among other things, (i) that the aggregate amount of Allowed General Unsecured Claims and Other Priority Claims to be paid under the Plan shall be no more than $2,500,000, (ii) that the amount of Allowed Professional Fee Administrative Expenses to be paid under the Plan shall be no more than $3,000,000, and (iii) that the Backstop Commitment Documentation shall not have been terminated, and shall be in full force and effect. If all conditions precedent are not satisfied or waived, the Confirmation Date or the Effective Date will not take place. In the event that the Effective Date does not occur, the Debtors may seek Confirmation of a new plan (if available). If the Debtors do not secure sufficient working capital to continue their operations and/or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

5.      The Debtors May Fail to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

6.      The Debtors May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code and/or Bankruptcy Rules. Even if

44

the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

7.      The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

8.      Even if the Restructuring Transactions are Successful, the Debtors Will Face Continued Risk Upon Confirmation.

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in demand for the services the Debtors provide, and increasing expenses. *See* Article VII.B of this Disclosure Statement, entitled "Risks Related to Recoveries under the Plan and the Debtors' and the Reorganized Debtors' Businesses." Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period

expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

9.     The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code.

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing the business in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) a materially longer case timeline and agreed to in the Restructuring Support Agreement; and (d) as a result of a longer case timeline, additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

10.     The Debtors May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims and Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ

from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

<div align="center">12.    <u>Releases, Injunctions, and Exculpation Provisions May Not Be Approved.</u></div>

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of Liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are critical to the success of the Plan (including, but not limited to, funding the Bridge Notes and the DIP Facility), but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Restructuring Support Agreement and Plan and the significant deleveraging and financial benefits that they embody.

<div align="center">13.    <u>The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy, and Time Spent in Bankruptcy Could Disrupt the Debtors' Business.</u></div>

The Debtors estimate that the process of obtaining Confirmation and Consummation of the Plan by the Bankruptcy Court could last approximately 90 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation, including obtaining any required regulatory approvals, are not satisfied or waived.

Although the Plan is designed to minimize the length of the bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' future, such that, among other things:

    (i)    employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

    (ii)    suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects. A lengthy bankruptcy proceeding also would

<div align="center">47</div>

involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan in accordance with the milestones, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

**B.      Risks Related to Recoveries Under the Plan and the Debtors' and the Reorganized Debtors' Businesses.**

  1.      <u>The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results.</u>

The Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections (as defined herein) set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, the value of the New Common Equity may be negatively affected and the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

  2.      <u>Estimated Valuations of the Debtors and the New Common Equity, and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.</u>

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities. The estimated recoveries on account of New Common Equity are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; (f) the Debtors' ability to maintain critical existing customer relationships, including customer relationships with key customers; and (g) an indicative pre-money total enterprise value of the Reorganized Debtors of $25,700,000.

3.      <u>The Terms of the New Organizational Documents Are Not Yet Final.</u>

The terms of the New Organizational Documents are not yet final, and are still being negotiated between the Debtors and the Sponsoring Noteholders, subject to the terms and conditions of the Plan and the Restructuring Support Agreement. Holders of Claims that are not the Sponsoring Noteholders will not participate in these negotiations, and the results of such negotiations may affect the rights of equity holders in the Reorganized Debtors following the Effective Date.

4.      <u>The Support of the Supporting Noteholders is Subject to the Terms of the Restructuring Support Agreement, which is Subject to Termination in Certain Circumstances.</u>

Pursuant to the Restructuring Support Agreement, the Sponsoring Noteholders have agreed to support the Reorganization Transactions set forth in the Plan. Nevertheless, the Restructuring Support Agreement is subject to termination upon the occurrence of certain termination events (including the failure of the Debtors to satisfy the milestones set forth therein). Accordingly, the Restructuring Support Agreement may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of the Sponsoring Noteholders.

5.      <u>The Debtors May Not Be Able to Accurately Report Their Financial Results.</u>

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

6.      <u>The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness.</u>

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may be unable to maintain a level of cash flow from operating

activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest and/or fees on their indebtedness.

### 7. Certain Tax Implications of the Plan.

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement entitled "Certain U.S. Federal Income Tax Consequences of the Plan" to determine how the federal income tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized Debtors, and Holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

### 8. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases.

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Reorganization Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 9. Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses.

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort

dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the chapter 11 proceedings last longer than anticipated, the Debtors may require additional debtor-in-possession financing to fund the Debtors' operations. If the Debtors are unable obtain such financing in those circumstances, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

<p style="text-align:center">10.    <u>Financial Results May Be Volatile and May Not Reflect Historical Trends.</u></p>

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

11.  <u>The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases.</u>

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

12.  <u>Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations.</u>

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

## VIII.  SOLICITATION AND VOTING

This Disclosure Statement is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.  Holders of Claims Entitled to Vote on the Plan.

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article II.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 1 and 2 (collectively, the "**Voting Classes**"). The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 3-7.

B.      **Voting Record Date.**

The voting record date is June 24, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "**Voting Record Date**"), which is the date for determining which Holders of Claims in Classes 1 and 2 are entitled to vote on the Plan.

C.      **Voting on the Plan.**

The deadline for voting on the Plan is July 19, 2024 (the "**Voting Deadline**"). In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Voting Agent on or before the Voting Deadline. Ballots or master ballots returned by facsimile will not be counted.

> IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT YOU RECEIVED OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY TELEPHONE AT (888) 647-1744 (TOLL FREE IN THE U.S. OR CANADA) OR AT (310) 751-2628 (INTERNATIONAL).

D.      **Ballots Not Counted.**

**The following Ballots will NOT be counted:** (i) any Ballot received after the Voting Deadline, unless the Debtors shall have granted, or the Court shall have ordered, an extension of the Voting Deadline in writing with respect to such Ballot;(ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant or interest holder;(iii) any Ballot cast by a person or entity that does not hold a Claim or Interest in a Class that is entitled to vote to accept or reject the Plan;(iv) any Ballot cast by a person who is not entitled to vote, even if such individual holds a Claim or Interest in a Voting Class;(v) any unsigned Ballot, provided, however, that any Ballot cast via the E-Ballot Portal will be deemed to contain an electronic signature; (vi) any Ballot which the Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or (vii) any Ballot transmitted to KCC by means not specifically approved herein.

## IX.     CONFIRMATION OF THE PLAN

A.      **The Confirmation Hearing.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization. The Debtors have requested that the Bankruptcy Court set a hearing to confirm the Plan (the "**Confirmation Hearing**") for July 30, 2024 at 10:00 a.m. (prevailing Eastern Time). The Confirmation Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code and the Restructuring Support Agreement, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, have requested that the Bankruptcy Court set the date and time for parties in interest to file objections to Confirmation of the Plan as 4:00 p.m. (prevailing Eastern Time) on July 22, 2024. An objection to Confirmation of the Plan must be Filed with the Bankruptcy Court and served.

**B.      Requirements for Confirmation of the Plan.**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

**C.      Best Interests of Creditors/Liquidation Analysis.**

Often referred to as the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that each holder of a claim or interest in each impaired class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the confirmed plan, that is not less than the amount such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

Based on this Liquidation Analysis attached hereto as **Exhibit D,** the Debtors, with the assistance of their advisors, believe the Plan satisfies the best interests test and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such Holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Liquidation Analysis and the conclusions set forth therein are fair and represent the Debtors' best judgment regarding the results of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis represents an estimate of cash distributions and recovery percentages based on a hypothetical chapter 7 liquidation of the Debtors' assets. It is, therefore, a hypothetical analysis based on certain assumptions discussed therein and in this Disclosure Statement. As such, asset values and claims discussed therein may differ materially from amounts referred to in the Plan and this Disclosure Statement. The Liquidation Analysis should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan in their entirety, as well as the notes and assumptions set forth in the Liquidation Analysis.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case involves the use of estimates and assumptions that, although

considered reasonable by the Debtors based on their business judgment and input from their advisors, are subject to significant business, economic, competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended, and should not be used, for any other purpose.

### D.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of the Debtors' advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared their projected consolidated balance sheet, income statement, and statement of cash flows (collectively, the "**Financial Projections**"). Creditors and other interested parties should review VII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections, along with the assumptions upon which they are based, are attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.    Acceptance by Impaired Classes and Interests.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[7]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

---

[7] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Pursuant to Section 3.05 of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

### F.    Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, subject to the Restructuring Support Agreement, to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.    No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.,* classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.,* secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Allowed Interests in that Class. The Debtors believe that the Plan and the

treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## X.    CERTAIN SECURITIES LAW MATTERS

The offering, issuance, and Distribution of any securities pursuant to the Plan, including the New Notes and New Common Equity issuable pursuant to the Plan, will be issued without registration under the Securities Act, or any similar federal, state, provincial, or local law in reliance upon section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code). The following discussion of the issuance and transferability of the New Notes and New Common Equity relates solely to matters arising under federal and state securities laws. The rights of Holders of New Notes and New Common Equity, including the right to transfer such interests, will also be governed by the New Organizational Documents. The Debtors currently contemplate that the New Organizational Documents will prohibit trading of the New Common Equity for a period of two years.

### A.    New Notes and New Common Equity

As discussed herein, the Plan provides for the offer, issuance, sale, and Distribution of the New Notes and New Common Equity under section 1145 of the Bankruptcy Code. Section 1145 of the Bankruptcy Code provides that section 5 of the Securities Act and any state law requirements for the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a Claim against, an interest in, or Claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a Claim against or interest in a debtor or are issued principally in such exchange or partly for Cash and property. The Debtors believe that the issuance of the New Notes and the New Common Equity in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code (except with respect to an underwriter as described below).

Accordingly, no registration statement is expected to be filed under the Securities Act or any state securities laws with respect to the offer, issuance, sale and distribution of the New Common Equity.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES TO THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan. Thus, the following summary applies only to certain U.S. Holders of Senior Notes Claims and Subordinated Notes Claims. The following summary also does not address the federal income tax consequences to a Holder of a Relevant Claim that is not treated as debt for U.S. federal income tax purposes.

This summary is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published

administrative positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims that are not U.S. Holders (as defined below) or to U.S. Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax exempt organizations, small business investment companies, persons who are non-U.S. persons, controlled foreign corporations, passive foreign investment companies, Persons who are related to the Debtors within the meaning of the IRC,  Persons liable for alternative minimum tax, U.S. Holders (as defined herein) whose functional currency is not the U.S. dollar, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the Common Stock, or any other consideration to be received under the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary does not address any special arrangements or contractual rights that are not being received or entered into in respect of an underlying Claim, including the tax treatment of any backstop fees or similar arrangements (including any ramifications such arrangements may have on the treatment of a Holder under the Plan) nor does it address provisions of the IRC commonly referred to as "FATCA.". This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

For purposes of this discussion, a "**U.S. Holder**" is a Holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons has authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other

beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY, IS NOT BINDING, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN INTEREST OR A CLAIM. ALL HOLDERS OF INTERESTS AND CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

A.      **Certain Tax Consequences to the Debtors**

1.      Cancellation of Indebtedness Income

a.      In General

In general, absent an exception, a debtor will realize and recognize COD Income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the IRC, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Section 163(j) Carryforwards are not subject to reduction under these rules. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

b.      Limitation of NOL Carryforwards and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income and the effect of any allowed worthless stock deductions on the Debtor's net operating losses, Debtors' ability to use any remaining tax attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the IRC.

(a)      General Section 382 Annual Limitation

Under sections 382 and 383 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and, if the corporation has an overall "net unrealized built in loss" in its assets, and certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "**Pre Change Losses**") that may be utilized to offset future taxable income generally are subject to an annual limitation. This discussion refers to the limitation determined under section 382 of the IRC in the case of an "ownership change" as the "**Section 382 Limitation**."

If the transactions trigger the Section 382 Limitation and if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000, or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

In general, the annual Section 382 Limitation on the use of Pre Change Losses in any "post-change year" is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs). If the corporation has an overall "net unrealized built-in gain" as determined pursuant to IRS Notice 2003-65 (as modified by Notice 2018-30), the Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change (or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65). Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

(b)      Special Bankruptcy Exception

An exception to the foregoing annual limitation rules generally applies when so called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, together with existing shareholders with respect to their stock, at least 50 percent of the vote and value of the stock of the Debtors (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). Under the 382(l)(5) Exception, the Debtors' Pre Change Losses are not limited on an annual basis but, instead, the Debtors' NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the Effective Date, and during the part of the taxable year prior to and including the Effective Date, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another

ownership change within two years after consummation, then the Debtors' Pre Change Losses are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule may apply (the "**382(l)(6) Exception**"). When the 382(l)(6) Exception applies, the annual limitation will be calculated by reference to the lesser of (a) the value of the Common Stock (with certain adjustments) immediately after the ownership change or (b) the value of the Debtors' assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre Change Losses.

In addition, the Debtors currently contemplate that the New Organizational Documents will prohibit trading of the New Common Equity, which will substantially reduce the likeliness of an ownership change under section 382 after the Effective Date.

**B.      Holders**

   1.      <u>Consequences to U.S. Holders</u>

     a.      Consequences of Exchange to U.S. Holders of Subordinated Notes Claims:

Each Holder of an Allowed Subordinated Notes Claim that is not an Excluded Party is expected to receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of 22.48% of New Common Equity, subject to dilution on account of the MIP. The U.S. federal income tax consequences to a U.S. Holder of a Subordinated Notes Claim of receiving its distribution under the Plan will depend on whether (a) the Subordinated Notes Claims are treated as securities for purposes of the reorganization provisions of the Tax Code and (b) the transactions contemplated hereby are structured as a Tax-Free Transaction.

Whether a debt instrument constitutes a security is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of 10 years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including, among others, whether the debt instrument is secured, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

It is unclear whether the Subordinated Notes are properly treated as securities and U.S. Holders of Subordinated Notes Claims should consult their tax advisors as to whether such claims are properly treated as securities.

<div align="center">(a)    Tax-Free Reorganization</div>

If the Subordinated Notes Claims are treated as securities and the transactions contemplated hereby are structured as a Tax-Free Transaction, then Debtors expect that the exchange of the Subordinated Notes Claims for New Common Equity should be treated as a tax-free reorganization, other than with respect to amounts attributable to accrued but unpaid interest (including OID).

Such a U.S. Holder's aggregate tax basis in the New Common Equity received in satisfaction of its Subordinated Note Claim generally is expected to equal the U.S. Holder's aggregate adjusted tax basis in its Subordinated Notes Claim decreased by the fair market value of any other assets received in respect of such Claim and increased by any gain recognized by such U.S. Holder in the exchange. In general, the U.S. Holder's holding period for the New Equity Interests received in the exchange is expected to include the U.S. Holder's holding period for the Subordinated Notes Claim.

<div align="center">(b)    Taxable Exchange</div>

If the Subordinated Notes Claims are not treated as securities or the transactions contemplated hereby are structured as a Taxable Transaction, a U.S. Holder of a Subordinated Notes Claim generally is expected to be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than any consideration attributable to a Subordinated Notes Claim for accrued but unpaid interest or OID, a U.S. Holder generally is expected to recognize gain or loss equal to the difference between (i) the sum of the fair market value of any New Common Equity received in the exchange and (ii) the U.S. Holder's adjusted basis, if any, in the Subordinated Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Subordinated Notes Claim in such U.S. Holder's hands, and whether the Subordinated Notes were purchased at a discount. If any recognized gain is capital gain, it generally would be long¬ term capital gain if the U.S. Holder held its Subordinated Notes for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations.

Any New Common Equity received by a U.S. Holder of such a Subordinated Notes Claim is generally expected to have a basis equal to the fair market value of the New Common Equity as of the applicable Distribution Date and a holding period starting on the day following the applicable Distribution Date.

For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, OID, or market discount, see the sections entitled "Accrued Interest and OID" and "Market Discount" below.

<div align="center">62</div>

(c)      Accrued Interest and OID

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest (or OID) on the Claim, the receipt of such amount is generally expected to be recognized by the U.S. Holder as ordinary interest income (to the extent not already included in income by the U.S. Holder). Conversely, a U.S. Holder may be able to recognize a deductible loss to the extent that any accrued interest previously was recognized by the U.S. Holder but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point. The tax basis of any New Common Equity treated as received in satisfaction of accrued but unpaid interest (or OID) is generally expected to equal the amount of such accrued but unpaid interest (or OID). The holding period for such New Common Equity is generally expected to begin on the day following the receipt of such consideration.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all the principal and interest on a Claim, the extent to which such consideration will be attributable to accrued interest (or OID) is unclear. Under the Plan, the aggregate consideration received in respect of a relevant Claim will be allocated first to the principal amount of such relevant Claim, with any excess allocated to unpaid interest, if any, that accrued on such Claim before the Petition Date, or such other allocation in accordance with the Indentures or other applicable documents. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain U.S. Treasury Regulations treat payments under a debt instrument as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of relevant Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(d)      Market Discount

U.S. Holders of Claims may be affected by the market discount provisions of sections 1276 through 1278 of the Tax Code. Under these rules, some or all of any gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain) to the extent of the amount of market discount on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with market discount as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a market discount obligation if such excess is less than a statutory de minimis amount (equal to 0.25% of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with OID, multiplied by the number of complete years remaining to maturity as of the time the holder acquired the debt obligation).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim (determined as described above) that was acquired with market discount is generally expected to be treated as

ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). If a Subordinated Notes Claim that was acquired with market discount is exchanged in a Tax-Free Transaction (as described above) for New Common Equity, any market discount that accrued on the Subordinated Notes Claim (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the New Common Equity received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of such New Common Equity is treated as ordinary income to the extent of such accrued market discount.

b.      Consequences of Exchange to U.S. Holders of Senior Notes Claims:

Each Holder of an Allowed Senior Notes Claim that is not an Excluded Party is expected to receive, in full satisfaction of its Senior Notes Claim its Pro Rata share of the New Notes. Whether this transaction is treated as a physical exchange of Senior Notes for New Notes or a significant modification of a debt instrument, the transaction is expected to be treated as an exchange of debt instruments. Under applicable Treasury Regulations, the modification of the terms of a debt instrument (including pursuant to an exchange of a new debt instrument for the existing debt instrument) generally is a significant modification if, based on all of the facts and circumstances and taking into account all modifications of the debt instrument, the legal rights or obligations that are altered and the degree to which they are altered is "economically significant." A modification that changes the timing of payments due under a debt instrument is a significant modification if it results in a material deferral of scheduled payments. However, a deferral of one or more scheduled payments is not a material deferral if it is within a safe-harbor period beginning on the original due date of the first scheduled payment that is deferred and extending for a period equal to the lesser of five years and fifty percent of the original term of the instrument. A change in the yield of a debt instrument is a significant modification if the yield of the modified instrument (as computed under the applicable Treasury Regulations) varies from the annual yield of the unmodified instrument (determined as of the date of the modification) by more than the greater of (i) 0.25% or (ii) 5% of the annual yield of the unmodified instrument.

Based on such applicable Treasury Regulations, the Debtors expect, and the remainder of this discussion assumes, that an exchange of the Senior Notes for the New Notes pursuant to the Plan should be treated for U.S. federal income tax purposes as an "exchange" of such Claims.

The U.S. federal income tax consequences to a U.S. Holder of an Allowed Senior Notes Claim of receiving the New Notes under the Plan will depend on whether (a) the Senior Notes Claims are treated as securities for purposes of the reorganization provisions of the Tax Code, (b) the New Notes are treated as securities for purposes of the reorganization provisions of the Tax Code and (c) the transactions contemplated hereby are structured as a Tax-Free Transaction.

As discussed in more detail above, whether a debt instrument constitutes a security is determined based on all the facts and circumstances. Please refer to the discussion of the definition of a security in Section XI(C)(1)(a), above. It is unclear whether either the Senior Notes or the New Notes are properly treated as securities and U.S. Holders of such notes should consult their tax advisors as to whether such claims are properly treated as securities.

64

(a)     Tax-Free Reorganization

If the exchange of Senior Notes Claims for New Notes constitutes a tax-free reorganization to a U.S. Holder, such U.S. Holder generally would not recognize any gain or loss (other than with respect to amounts attributable to accrued but unpaid interest, including OID) and would have a tax basis in the New Notes equal to the adjusted tax basis in the Senior Notes exchanged therefor. The U.S. Holder's holding period in the New Notes received in the exchange generally would include the period the U.S. Holder held its Senior Notes. However, to the extent that a U.S. holder receives any cash or property other than stock or a security of the Debtor ("Boot"), gain should be recognized. Gain should also be recognized on any excess principal amount of the New Notes over the principal amount of the Senior Notes.

In a case where any gain is recognized in the exchange, the amount of the tax basis of the New Notes will be reduced by the fair market value of the Boot and increased by any gain recognized on the exchange. The Boot will obtain a basis equal to its fair market value and will have a new holding period. For the treatment of the exchange to the extent a portion of the consideration received is allocable to accrued but unpaid interest, original issue discount ("OID"), or market discount, see the sections entitled "Payments of Interest", "Original Issue Discount" and "Market Discount," below.

(b)     Taxable Exchange

If either the Senior Notes or the New Notes do not constitute a security, the tax-free recapitalization exchange provisions will not apply. The consequences of an exchange of Senior Notes for New Notes in these circumstances should be as follows: Such U.S. Holder should recognize all realized gain or loss (equal to the difference between its amount realized and its adjusted basis in the Senior Notes) and should have a tax basis in the New Notes equal to the issue price of such instruments for U.S. federal income tax purposes. The holding period in the New Notes should commence on the day following the Effective Date.

## C.     Consequences of Ownership of New Common Equity

### 1.     Distributions

The gross amount of any distribution on New Common Equity that is made out of current or accumulated earnings and profits (as determined for U.S. federal income tax purposes) generally is expected to be taxable to a U.S. Holder as ordinary dividend income on the date such distribution is actually or constructively received. Any such dividends generally would be expected to be eligible for the dividends received deduction allowed to corporations in respect of dividends received from U.S. corporations. To the extent that the amount of the distribution exceeds current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such excess amount is generally expected to be treated first as a nontaxable return of capital to the extent of the U.S. Holder's tax basis in its New Common Equity, and thereafter as capital gain recognized on a sale or exchange. U.S. Holders should consult their own tax advisors with respect to the appropriate U.S. federal income tax treatment of any distribution received.

Dividends paid to non-corporate U.S. Holders who meet certain requirements are generally expected to be eligible to be treated as "qualified dividend income" and therefore taxable at rates applicable to long-term capital gains. U.S. Holders should consult their own tax advisors regarding the availability of these favorable tax rates on dividends in their particular circumstances.

 2. <u>Sale, Exchange, Redemption, or Other Taxable Disposition of New Common Equity</u>

Subject to the market discount rules discussed above, a U.S. Holder generally is expected to recognize gain or loss on any sale, exchange, redemption, or other taxable disposition of New Common Equity in an amount equal to the difference between (a) the amount realized on the disposition and (b) such U.S. Holder's adjusted tax basis in such New Common Equity. Any gain or loss recognized by a U.S. Holder on a taxable disposition of New Common Equity generally is expected to be capital gain or loss and is expected to be long-term capital gain or loss if the U.S. Holder's holding period in such New Common Equity exceeds one year at the time of the disposition. Preferential tax rates may apply to long-term capital gains of non-corporate U.S. Holders (including individuals). The deductibility of capital losses is subject to limitations.

**D. Consequences of Ownership of New Notes**

 1. <u>Payments of Interest.</u>

Payments of interest on the New Notes generally will be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the U.S. Holder's regular method of tax accounting), provided such interest is qualified stated interest.

 2. <u>Original Issue Discount.</u>

Original issue discount will arise for U.S. federal income tax purposes in respect of any New Notes if the stated redemption price at maturity exceeds its issue price by more than a de minimis amount (as determined for tax purposes). For New Notes issued with original discount, the excess of the stated redemption price at maturity of the New Notes over their issue price will constitute original issue discount for U.S. federal income tax purposes. The stated redemption price at maturity of the New Notes is the sum of all scheduled amounts payable on such New Notes other than qualified stated interest. U.S. Holders of New Notes generally will be required to include any original issue discount in income for U.S. federal income tax purposes as it accrues, in accordance with a constant yield to maturity method based on compounding interest. Accordingly, U.S. Holders may be required to recognize original issue discount income before they receive any cash payments attributable to such income. The amount of original issue discount as accrued in a particular accrual period will be considered to be received ratably on each day of the accrual period and will increase the U.S. Holder's tax basis in such New Notes.

 3. <u>Market Discount</u>.

If a U.S. Holder purchases New Notes, other an original issue discount New Notes ("**OID Notes**"), for an amount that is less than their issue price (or, in the case of a subsequent purchaser, its stated redemption price at maturity) or, in the case of an OID Note, for an amount that is less

than its adjusted issue price as of the purchase date, such U.S. Holder will be treated as having purchased such New Notes at a "market discount," unless the amount of such market discount is less than the specified de minimis amount. See the discussion above, entitled Market Discount in Section XI(C)(1)(a)(4).

4.   Premium.

If a U.S. Holder purchases New Notes for an amount that is greater than the sum of all amounts payable on the New Notes after the purchase date, other than payments of qualified stated interest, such U.S. Holder will be considered to have purchased the New Notes with "amortizable bond premium" equal in amount to such excess. A U.S. Holder may elect to amortize such premium using a constant yield method over the remaining term of the New Notes and may offset interest otherwise required to be included in respect of the New Notes during any taxable year by the amortized amount of the amortized premium for the taxable year. A U.S. Holder of a New Notes is required to reduce such U.S. Holder's basis in such New Notes by the amount of amortizable bond premium attributable to each taxable year. This will result in an increase in the gain (or decrease in the loss) to be recognized for federal income tax purposes on the sale or disposition of the New Notes prior to maturity. Any election to amortize bond premium applies to all taxable debt instruments held by the U.S. Holder on or after the first day of the first taxable year to which such election applies and may be revoked only with the consent of the IRS. A U.S. Holder that does not make the election to amortize New Notes premium will decrease the amount of the amount of gain (or increase the amount of loss) otherwise recognized on the disposition of such New Notes by the amount of the New Notes premium.

If the New Notes may be optionally redeemed after the U.S. Holder acquires it at a price in excess of its stated redemption price at maturity, special rules apply which could result in deferral of the amortization of some bond premium until later in the term of the New Notes. Prospective purchasers are urged to consult with, and must rely upon, their own tax advisors regarding the application of the amortizable bond premium rules to their particular situation.

5.   Disposition of New Notes.

Unless a nonrecognition provision of the Code applies, upon the sale, exchange or retirement of New Notes, a U.S. Holder generally will recognize taxable gain or loss equal to the difference between the amount realized on the sale, exchange or retirement (other than amounts representing accrued and unpaid interest) and such U.S. Holder's adjusted tax basis in the New Notes. A U.S. Holder's adjusted tax basis in a New Notes generally will equal such U.S. Holder's initial investment in the New Notes increased by any original issue discount included in income (and accrued market discount, if any, if the U.S. Holder has included market discount in income) and decreased by the amount of payments, other than qualified stated interest payments, received and amortizable bond premium taken with respect to such New Notes. Such gain or loss generally will be long-term capital gain or loss if the New Notes have been held by the U.S. Holder at the time of disposition for more than one year. If the U.S. Holder is an individual, long-term capital gain will generally be subject to reduced rates of taxation. The deductibility of capital losses is subject to certain limitations.

6.     <u>Medicare Tax.</u>

For taxable years beginning after December 31, 2012, an additional 3.8% tax is imposed on the net investment income (which includes interest, original issue discount and gains from the sale or other disposition of a New Notes) of certain individuals, trust and estates. Prospective investors in the New Notes should consult with, and must rely upon, their tax advisors regarding the possible applicability of this tax to an investment in the New Notes.

**E.      Withholding on Distributions, Interest Payments and Information Reporting**

All distributions to Holders of Relevant Claims under the Plan are subject to any applicable tax withholding. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable withholding rate (currently 24%). Backup withholding generally applies if the Holder (1) fails to furnish its social security number or other taxpayer identification number, (2) furnishes an incorrect taxpayer identification number, (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Relevant Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

**F.      Importance of Obtaining Professional Advice**

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY NON-U.S. OR U.S. STATE OR LOCAL TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

68

## XII.    RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders. Accordingly, the debtors recommend that Holders of Claims in Classes 1 and 2 accept the Plan and support Confirmation of the Plan.

Dated: June 24, 2024                    **PROSOMNUS, INC.**
**PROSOMNUS HOLDINGS, INC.**
**PROSOMNUS SLEEP TECHNOLOGIES, INC.**


*/s/ Brian Dow*
Name:  Brian Dow
Title:  Chief Financial Officer

**<u>Exhibit A</u>**
The Plan

Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | |
| PROSOMNUS, INC., *et al.*,[1] | Chapter 11 |
| Debtors. | Case No. 24-10972 (JTD) |
| | (Jointly Administered) |

## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
## PROSOMNUS, INC. AND ITS DEBTOR AFFILIATES

**POLSINELLI PC**
Shanti M. Katona (Del. Bar No. 5352)
Katherine M. Devanney (Del. Bar No. 6356)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
kdevanney@polsinelli.com
mdipietro@polsinelli.com

-and-

Mark B. Joachim (Admitted *Pro Hac Vice*)
1401 Eye Street, N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 783-3300
Facsimile: (202) 783-3535
mjoachim@polsinelli.com

*Counsel to the Debtors*
*and Debtors in Possession*

Dated: June 24, 2024

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: ProSomnus, Inc. (8216), ProSomnus Holdings, Inc. (3855), and ProSomnus Sleep Technologies, Inc. (0766). The location of the Debtors' principal place of business and the Debtors' mailing address is 5675 Gibraltar Dr., Pleasanton, California 94588.

## <u>TABLE OF CONTENTS</u>

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW ................................................ 1

    Section 1.01    Defined Terms. ...................................................... 1

    Section 1.02    Rules of Interpretation. ......................................... 15

    Section 1.03    Computation of Time. ........................................... 16

    Section 1.04    Governing Law. .................................................... 16

    Section 1.05    Reference to Monetary Figures. .............................. 16

    Section 1.06    Reference to the Debtors or the Reorganized Debtors........................... 16

    Section 1.07    Controlling Document. .......................................... 16

    Section 1.08    Consultation, Information, Notice, and Consent Rights. ...................... 17

ARTICLE II. ADMINISTRATIVE EXPENSES, DIP ADMINISTRATIVE EXPENSES, PRIORITY  CLAIMS, AND RESTRUCTURING EXPENSES .................................... 17

    Section 2.01    Administrative Expenses. ...................................... 17

    Section 2.02    DIP Administrative Expenses. ................................ 18

    Section 2.03    Professional Fee Administrative Expenses. .............. 18

    Section 2.04    Priority Tax Claims. .............................................. 19

    Section 2.05    Payment of Restructuring Expenses. ..................... 19

    Section 2.06    Payment of Statutory Fees. .................................... 20

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................................................................................... 20

    Section 3.01    Classification of Claims and Interests...................... 20

    Section 3.02    Treatment of Claims and Interests. ......................... 21

    Section 3.03    Special Provision Governing Unimpaired Claims................................ 23

    Section 3.04    Elimination of Vacant Classes. .............................. 23

    Section 3.05    Voting Classes, Presumed Acceptance by Non-Voting Classes............ 24

    Section 3.06    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.......................................................... 24

    Section 3.07    Controversy Concerning Impairment. ..................... 24

    Section 3.08    Subordinated Claims and Interests........................... 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................ 24

    Section 4.01    General Settlement of Claims and Interests............... 24

    Section 4.02    Restructuring Transactions. .................................... 25

    Section 4.03    Substantive Consolidation .................................... 25

    Section 4.04    Corporate Existence. ............................................. 26

i

Section 4.05    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims......................................................................................27

Section 4.06    Cancellation of Existing Securities and Agreements.............................27

Section 4.07    Cancellation of Certain Existing Security Interests. ..............................28

Section 4.08    Sources of Consideration for Plan Distributions. ..................................29

Section 4.09    Issuance of New Common Equity and Deregistration..........................29

Section 4.10    New Money Common Equity Investment. ..............................................30

Section 4.11    The New Notes ......................................................................................31

Section 4.12    Corporate Actions. ................................................................................32

Section 4.13    New Organizational Documents. ..........................................................32

Section 4.14    Management Incentive Plan...................................................................33

Section 4.15    Preservation of Causes of Action..........................................................34

Section 4.16    Certain Securities Law Matters..............................................................34

Section 4.17    1146 Exemption. ....................................................................................36

Section 4.18    Governmental Regulatory Applications. ................................................36

Section 4.19    Director and Officer Liability Insurance.................................................37

Section 4.20    Indemnification Obligations. ..................................................................37

Section 4.21    No Change in Control. ...........................................................................37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................................................................................................................38

Section 5.01    Assumption and Rejection of Executory Contracts and Unexpired Leases..................................................................................38

Section 5.02    Claims Based on Rejection of Executory Contracts or Unexpired Leases..................................................................................39

Section 5.03    Cure Defaults for Assumed Executory Contracts and Unexpired Leases..................................................................................39

Section 5.04    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases..............................................................40

Section 5.05    Insurance Policies. .................................................................................40

Section 5.06    Reservation of Rights..............................................................................41

Section 5.07    Nonoccurrence of Effective Date............................................................41

Section 5.08    Contracts and Leases Entered Into After the Petition Date. ..................41

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..............................................41

Section 6.01    Distributions on Account of Claims Allowed as of the Effective Date..................................................................................41

Section 6.02    Disbursing Agent. ..................................................................................42

Section 6.03     Rights and Powers of Disbursing Agent. ................................. 42

Section 6.04     Delivery of Distributions and Undeliverable or Unclaimed
                 Distributions. .......................................................................... 43

Section 6.05     Manner of Payment. ................................................................ 44

Section 6.06     Compliance with Tax Requirements. ....................................... 44

Section 6.07     Allocations. ............................................................................. 45

Section 6.08     No Postpetition Interest on Claims. ......................................... 45

Section 6.09     Foreign Currency Exchange Rate. ........................................... 45

Section 6.10     Setoffs and Recoupment. ........................................................ 45

Section 6.11     Claims Paid or Payable by Third Parties. ............................... 46

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED, AND DISPUTED CLAIMS ........................................................... 46

Section 7.01     Disputed Claims Process.......................................................... 46

Section 7.02     Allowance of Claims................................................................ 47

Section 7.03     Claims Administration Responsibilities. ................................. 47

Section 7.04     Adjustment to Claims or Interests without Objection............... 48

Section 7.05     Disallowance of Claims or Interests. ....................................... 48

Section 7.06     No Distributions Pending Allowance. ...................................... 48

Section 7.07     Distributions After Allowance. ................................................ 48

Section 7.08     No Interest................................................................................ 48

Section 7.09     Accrual of Dividends and Other Rights.................................... 49

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED
PROVISIONS ............................................................................................................... 49

Section 8.01     Discharge of Claims and Termination of Interests. ................. 49

Section 8.02     **Release of Liens.** ................................................................... 49

Section 8.03     **Releases by the Debtors.** ....................................................... 50

Section 8.04     **Releases by the Releasing Parties.** ....................................... 52

Section 8.05     **Exculpation.** .......................................................................... 53

Section 8.06     **Injunction.**............................................................................. 53

Section 8.07     Protections Against Discriminatory Treatment. ...................... 54

Section 8.08     Document Retention. ............................................................... 54

Section 8.09     Reimbursement or Contribution. ............................................. 54

Section 8.10     Subordination Agreements....................................................... 55

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........... 55

Section 9.01     Conditions Precedent to the Effective Date. ............................ 55

iii

Section 9.02    Waiver of Conditions. ................................................................................ 57

Section 9.03    Effect of Failure of Conditions. .............................................................. 57

Section 9.04    Substantial Consummation. ...................................................................... 57

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........ 57

Section 10.01    Modification and Amendments ................................................................ 57

Section 10.02    Effect of Confirmation on Modifications. .............................................. 58

Section 10.03    Revocation or Withdrawal of Plan .......................................................... 58

ARTICLE XI. RETENTION OF JURISDICTION ........................................................................ 58

ARTICLE XII. MISCELLANEOUS PROVISIONS .................................................................... 61

Section 12.01    Immediate Binding Effect. ........................................................................ 61

Section 12.02    Additional Documents. .............................................................................. 61

Section 12.03    Reservation of Rights. ................................................................................ 61

Section 12.04    Successors and Assigns. ............................................................................ 61

Section 12.05    Notices. .......................................................................................................... 62

Section 12.06    Term of Injunctions or Stays. ................................................................... 62

Section 12.07    Entire Agreement. ........................................................................................ 63

Section 12.08    Plan Supplement. ......................................................................................... 63

Section 12.09    Severability of Plan Provisions. ................................................................ 63

Section 12.10    Votes Solicited in Good Faith. ................................................................... 63

Section 12.11    Closing of Chapter 11 Cases. .................................................................... 64

Section 12.12    Waiver or Estoppel. ..................................................................................... 64

iv

## INTRODUCTION

ProSomnus, Inc. and the other above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), propose this joint chapter 11 plan of reorganization (as modified, amended, or supplemented from time to time, the "**Plan**") for the resolution of the outstanding claims against, and equity interests in, the Debtors. Holders of Claims against, or Interests in, the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, projections of future operations, risk factors, a summary and analysis of this Plan, the restructuring transactions contemplated hereby, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*Section 1.01    Defined Terms.*

1.    "*2022 Senior Indenture*" means that certain Indenture, dated as of December 6, 2022, by and among Parent, as issuer, Holdings and OpCo, as guarantors, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time, related to the Senior Secured Convertible Notes Due December 6, 2025.

2.    "*2022 Subordinated Indenture*" means that certain Indenture, dated as of December 6, 2022, by and among Parent, as issuer, Holdings and OpCo, as guarantors, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time, related to the Subordinated Secured Convertible Notes Due April 6, 2026.

3.    "*2023 Senior Indenture*" means that certain Indenture, dated as of October 11, 2023, by and among Parent, as issuer, Holdings and OpCo, as guarantors, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time, related to the Senior Secured Convertible Exchange Notes Due December 6, 2025.

4.    "*2023 Subordinated Indenture*" means that certain Indenture, dated as of October 11, 2023, by and among Parent, as issuer, Holdings and OpCo, as guarantors, and Wilmington Trust, National Association, as trustee and collateral agent, as may be amended from time to time, related to the Subordinated Secured Convertible Exchange Notes Due April 6, 2026.

5.    "*Administrative Expense*" means a claim against any of the Debtors arising on or after the Petition Date and before the Effective Date for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 327, 328, 330, 365, 503(b), 507(a), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and

through the Effective Date; (b) Allowed Professional Fee Administrative Expenses; (c) all fees and charges assessed against the Estates under chapter 123 of the Judicial Code.

6.  "*Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code as if the reference Entity was a debtor in a case under the Bankruptcy Code.

7.  "*Affiliate Debtors*" means Holdings and OpCo.

8.  "*Allowed*" means, with respect to a Claim or Interest, any Claim or Interest (or portion thereof) against any Debtor that: (a) is deemed allowed under the Bankruptcy Code; (b) is allowed, compromised, settled, or otherwise resolved pursuant to the terms of the Plan, in any stipulation that is approved by a Final Order of the Bankruptcy Court, or pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (c) has been allowed by a Final Order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise Unimpaired pursuant to the Plan.  For the avoidance of doubt, any Claim or Interest (or portion thereof), that has been disallowed pursuant to a Final Order shall not be an "Allowed" Claim. Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest or other charges on such Claim from and after the Petition Date.

9.  "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination (except as limited by Section 3.08), or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or the Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer Laws.

10.  "*Backstop Commitment Documentation*" means that certain binding, valid, and enforceable agreement or other documentation, dated as of June 24, 2024, entered into by and among the Backstop Parties and the Debtors, pursuant to which certain parties therein have agreed to backstop 100% of the New Money Common Equity Investment in accordance with the terms thereof, which shall be reasonably acceptable in form and substance to the Debtors and the Sponsoring Noteholders. The Backstop Commitment Documentation is attached to the Disclosure Statement as **Exhibit F**.

11.  "*Backstop Parties*" means at any time and from time to time, one or more of the Sponsoring Noteholders or other third-party investors that have committed to backstop the New Money Common Equity Investment and are signatories to the Backstop Commitment Documentation.

12.  "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

13.  "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

94957745.21

14.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

15.    "*Bridge Notes*" means the "Senior Secured Convertible Notes due December 6, 2025" issued under the 2022 Senior Indenture on April 19, 2024 and April 29, 2024 in the original aggregate principal amount of $4,000,000.00.

16.    "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of New York.

17.    "*Cash*" or "*$*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

18.    "*Cash Collateral*" has the meaning ascribed to such term in section 363(a) of the Bankruptcy Code.

19.    "*Cause of Action*" or "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, judgments, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, and guaranties, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by Law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state, provincial, or federal Law or breach of any duty imposed by Law or in equity, including securities Laws, negligence, and gross negligence; (c) the right to object to or otherwise contest Claims or Interests; (d) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any other Avoidance Action.

20.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

21.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

22.    "*Claims and Noticing Agent*" means Kurtzman Carson Consultants LLC, the claims and noticing agent retained by the Debtors in the Chapter 11 Cases.

23.    "*Claims Register*" means the official register of Claims and Interests maintained by the Claims and Noticing Agent.

24.     "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

25.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

26.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.     "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court on confirmation of the Plan, as such hearing may be continued from time to time.

29.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to, *inter alia,* section 1129 of the Bankruptcy Code, which order shall be consistent with the terms of the Restructuring Support Agreement, including the consent rights contained therein.

30.     "*Consummation*" means the occurrence of the Effective Date.

31.     "*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

32.     "*D&O Liability Insurance Policies*" means all insurance policies of any of the Debtors for directors', managers', and officers' liability existing as of the Petition Date (including any "tail policy") and all agreements, documents, or instruments relating thereto.

33.     "*Debtor Release*" means the release set forth in Section 8.03 of the Plan.

34.     "*Debtors*" has the meaning set forth in the Introduction.

35.     "*Definitive Documents*" means the documents listed in Paragraph 6 of the Restructuring Support Agreement and the New Note Documents.

36.     "*DIP Agent*" means the administrative agent, collateral agent, or similar Entity under the DIP Facility.

37.     "*DIP Administrative Expenses*" means any and all claims arising under, derived from, or based upon the DIP Facility Documents including all amounts outstanding in respect of principal, interest, fees, expenses costs, penalties and other charges arising under the DIP Facility Documents, which DIP Administrative Expenses shall (i) have the priorities set forth in the DIP

Credit Agreement and the DIP Orders (as applicable); and (ii) convert to New Common Equity on the Effective Date at the New Money Equity Price.

38. "*DIP Credit Agreement*" means that certain Senior Subordinate Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of May 13, 2024 that governs the DIP Facility, as may be amended, amended and restated, supplemented, or modified from time to time.

39. "*DIP Facility*" means the senior subordinate superpriority debtor-in-possession term loan facility for the DIP Loans, in the aggregate principal amount of $13 million, entered into on the terms and conditions set forth in the DIP Facility Documents.

40. "*DIP Facility Documents*" means any documents governing the DIP Facility that are entered into in accordance with the DIP Credit Agreement, and the DIP Orders, and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, securities agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

41. "*DIP Lenders*" means the lenders providing the DIP Facility under the DIP Facility Documents.

42. "*DIP Loans*" means the loans provided under the DIP Facility.

43. "*DIP Orders*" means, together, the Interim DIP Order and the Final DIP Order.

44. "*Disbursing Agent*" means the Reorganized Debtors, or, as applicable, such other Entity or Entities selected by the Debtors or the Reorganized Debtors, in each case, in consultation with the Sponsoring Noteholders to make or facilitate distributions pursuant to the Plan.

45. "*Disclosure Statement*" means the disclosure statement for this Plan, including all exhibits and schedules thereto, as amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with section 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

46. "*Disputed*" means, as to a Claim or an Interest, any Claim or Interest: (a) that is not Allowed; (b) that is not disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy Law; (d) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has Filed a Proof of Claim or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Bankruptcy Court.

47. "*Distribution*" means the distributions to be made by the Disbursing Agent in accordance with the Plan of, as the case may be: (a) Cash, (b) New Common Equity, (c) New Notes or (d) any other consideration or residual value distributed to Holders of Allowed Claims under the terms and provisions of the Plan.

48.     "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Debtors or the Reorganized Debtors, on or after the Effective Date, with the first such date occurring on or as soon as is reasonably practicable after the Effective Date, upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

49.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Interests except with respect to public securities, which date shall be on or as soon as is reasonably practicable after the Effective Date, subject to the consent of the Sponsoring Noteholders.

50.     "*DTC*" means the Depository Trust Company.

51.     "*Effective Date*" means the date that is the first Business Day on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Section 9.01 of the Plan have been satisfied or waived in accordance with Section 9.02 of the Plan.

52.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code, including "person" (as defined in section 101(41) of the Bankruptcy Code) and "governmental unit" (as defined in section 101(27) of the Bankruptcy Code).

53.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code upon the commencement of such Debtor's Chapter 11 Case.

54.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.,* as amended from time to time.

55.     "*Excluded Parties*" means, collectively, any Sponsoring Noteholder that (i) votes to reject the Plan, objects to the Plan, or supports an objection to the Plan or (ii) opts out of any Debtor releases sought in connection with the Plan.

56.     "*Exculpated Parties*" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) the directors, managers, and officers of the Debtors who served in such capacity between the Petition Date and the Effective Date; and (c) the Professionals retained by the Debtors in the Chapter 11 Cases.

57.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

58.     "*Existing Equity Interests*" means any Interests in Parent, including (a) shares of the class of common stock and public warrants of Parent, which previously traded on Nasdaq under the symbols "OSA" and "OSAAW," respectively, that existed immediately prior to the Effective Date; (b) warrants for the purchase of common stock of Parent; (c) any restricted stock units of Parent, whether vested or unvested and those that vest upon a "change of control" transaction; (d)

the exercise of any stock options in Parent in accordance with their terms prior to the Effective Date; and (e) the Series A Convertible Preferred Stock.

59.      "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date.

60.      "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

61.      "*Final DIP Order*" means any order approving the DIP Facility and authorizing the Debtors' use of Cash Collateral on a final basis, which shall be in all respects acceptable in form and substance to the Sponsoring Noteholders.

62.      "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, or amended, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

63.      "*General Unsecured Claim*" means any Claim against any of the Debtors that is not (a) paid in full prior to the Effective Date pursuant to an order of the Bankruptcy Court; (b) an Administrative Expense; (c) a DIP Administrative Expense; (d) a Senior Notes Claim; (e) a Subordinated Notes Claim; (f) an Other Secured Claim; (g) a Priority Tax Claim; (h) an Other Priority Claim; (i) an Intercompany Claim; or (j) a Section 510(b) Claim.

64.      "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

65.      "*Holder*" means an Entity holding a Claim against or an Interest in a Debtor, as applicable.

66.      "*Holdings*" means ProSomnus Holdings, Inc.

67.      "*Impaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

68.      "*Indentures*" means, collectively, the Senior Indentures and the Subordinated Indentures.

94957745.21

69.    "*Intercompany Claim*" means any Claim against a Debtor or an Affiliate of a Debtor held by another Debtor or an Affiliate of a Debtor.

70.    "*Intercompany Interest*" means an Interest in a Debtor held by another Debtor.

71.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, performance shares, performance units, redemption rights, repurchase rights, convertible, exercisable or exchangeable Securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor. For the avoidance of doubt "Interests" include the Existing Equity Interests and Intercompany Interests.

72.    "*Interim DIP Order*" means one or more orders entered on an interim basis approving the DIP Facility and the DIP Facility Documents and authorizing the Debtors' use of Cash Collateral.

73.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time.

74.    "*Law*" means any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

75.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

76.    "*MIP*" means the management incentive plan to be adopted by the Reorganized Board on or after the Effective Date on terms consistent with the Restructuring Support Agreement, Restructuring Term Sheet, and the consent rights contained therein.

77.    "*Nasdaq*" means the Nasdaq Stock Market LLC.

78.    "*New Board*" means the boards of directors of the applicable Reorganized Debtors, as set forth in the Plan Supplement.

79.    "*New Common Equity*" means shares of the Reorganized Debtors' new common equity to be issued on the Effective Date or as otherwise permitted pursuant to the New Organizational Documents, as applicable.

80.    "*New Money Common Equity*" means the shares of New Common Equity issued in connection with the New Money Common Equity Investment.

81.    "*New Money Common Equity Investment*" means the new money equity capital raise to be consummated by one or more of the Reorganized Debtors on the Effective Date in accordance with the New Money Common Equity Investment Documents and/or the Restructuring Term Sheet, as applicable.

82.     "*New Money Common Equity Investment Documents*" means any and all other agreements, documents, and instruments delivered or entered into in connection with, or otherwise governing, the New Money Common Equity Investment, including the new money equity capital raise procedures, subscription forms, and any other materials distributed in connection with the New Money Common Equity Investment, which shall all be included in the Plan Supplement and shall be in form and substance acceptable to the Sponsoring Noteholders and the third-party investors, as applicable.

83.     "*New Note Documents*" means, collectively, the New Note Purchase Agreement and all other agreements, documents, and instruments to be delivered or entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case, on terms and conditions determined by, and in form and substance acceptable solely to the Holders of the Senior Secured Notes.

84.     "*New Note Purchase Agreement*" means the note purchase or subscription agreement, as applicable, governing the Reorganized Debtors' issuance of New Notes, which shall be on terms and conditions determined by and acceptable in form and substance solely to the Holders of the Senior Secured Notes.

85.     "*New Notes*" means those senior secured notes issued pursuant to the New Note Purchase Agreement and in connection with the other New Note Documents in the aggregate principal amount of approximately $15,800,000.

86.     "*New Organizational Documents*" means the documents providing for corporate governance of the Reorganized Debtors, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, which (a) shall be consistent with the terms of the Restructuring Support Agreement and the consent rights contained therein and (b) will be filed with the Plan Supplement.

87.     "*Non-Debtor Subsidiaries*" means all of the subsidiaries of the Debtors, other than the Debtors.

88.     "*OpCo*" means ProSomnus Sleep Technologies, Inc.

89.     "*Other Priority Claim*" means any unsecured Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

90.     "*Other Secured Claim*" means any Secured Claim other than a DIP Administrative Expense, a Senior Notes Claim, or a Subordinated Notes Claim.

91.     "*Parent*" means ProSomnus, Inc.

92.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

93.     "*Petition Date*" means the date on which the Debtors commenced the Chapter 11 Cases.

94.    "*Plan*" means this joint chapter 11 plan of reorganization, the Plan Supplement, and all exhibits and schedules annexed hereto or referenced herein, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the Bankruptcy Code, the Restructuring Support Agreement, the Restructuring Term Sheet, and the terms hereof.

95.    "*Plan Supplement*" means the compilation of documents and forms of documents, term sheets, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented up to and through the Effective Date in accordance with the terms hereof and the Restructuring Support Agreement, including the consent rights contained therein, and this Plan) to be Filed prior to the Confirmation Hearing, and any additional documents Filed prior to the Effective Date as amendments to the Plan Supplement, including the following, as applicable: (a) the New Organizational Documents; (b) the identities of the members of the New Board; (c) the New Note Documents; (d) the Rejected Executory Contracts and Unexpired Leases Schedule; (e) the Schedule of Retained Causes of Action; and (f) the New Money Common Equity Investment Documents. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

96.    "*Prepetition Agents*" means, collectively, the Prepetition Senior Agents and the Prepetition Subordinated Agents.

97.    "*Prepetition Agents Expenses*" means the reasonable and documented compensation, fees, expenses, disbursements, and claims for indemnity, subrogation and contribution incurred or owed to the Prepetition Agents and its professionals, whether prior to or after the Petition Date and whether prior to or after the Effective Date, and reasonable fees and expenses incurred in connection with distributions made pursuant to the Plan or the cancellation and discharge of the indentures, in each case to the extent payable or reimbursable under the Senior Indentures and/or the Subordinated Indentures, as applicable.

98.    "*Prepetition Organizational Documents*" means the formation documents and governance documents for the Debtors as of the Petition Date.

99.    "*Prepetition Senior Agents*" means, collectively, the Prepetition Senior Convertible Notes Agent and the Prepetition Senior Convertible Exchange Notes Agent.

100.    "*Prepetition Senior Convertible Exchange Notes Agent*" means the trustee and collateral agent under the 2023 Senior Indenture.

101.    "*Prepetition Senior Convertible Notes Agent*" means the trustee and collateral agent under the 2022 Senior Indenture.

102.    "*Prepetition Subordinated Agents*" means, collectively, the Prepetition Subordinated Convertible Notes Agent and the Prepetition Subordinated Convertible Exchange Notes Agent.

103.    "*Prepetition Subordinated Convertible Exchange Notes Agent*" means the trustee and collateral agent under the 2023 Subordinated Indenture.

104.    "*Prepetition Subordinated Convertible Notes Agent*" means the trustee and collateral agent under the 2022 Subordinated Indenture.

105.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

106.    "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

107.    "*Professional*" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 328, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

108.    "*Professional Fee Account*" means an account to be funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Amount.

109.    "*Professional Fee Amount*" means the aggregate amount of Professional Fee Administrative Expenses and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Section 2.03 of the Plan, provided, however, that in no event shall the Professional Fee Amount with respect to the post-petition Professional Fee Administrative Expenses shall not exceed $3,000,000.

110.    "*Professional Fee Administrative Expense*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date and through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Administrative Expense.

111.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

112.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall not be discharged hereunder and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by Consummation in accordance with section 1124(1) of the Bankruptcy Code.

113.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means, to the extent applicable, a schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule (if any) shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time; *provided* that such schedule shall be in form and substance acceptable to the Sponsoring Noteholders.

11

114. "*Related Party*" means, collectively, current and former directors, managers, officers, affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns, subsidiaries, affiliates, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

115. "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Subsidiary; (d) the Sponsoring Noteholders; (e) each DIP Lender; (f) the Prepetition Agents; (g) the DIP Agent; (h) each Holder of Senior Notes Claims; (i) each Holder of Subordinated Notes Claims who is party to or has otherwise signed the Restructuring Support Agreement; (j) each current and former Affiliate of each Entity in the foregoing clauses (a) through (i); and (k) each Related Party of each Entity in clauses (a) through (i); *provided* that any Holder of a Claim or Interest that is an Excluded Party or that affirmatively opts out of the releases provided by the Plan by checking the appropriate box on the applicable ballot or Notice of Non-Voting Status indicating that they opt not to grant the releases provided in the Plan shall not be a "Released Party."

116. "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) each Non-Debtor Subsidiary; (d) the Sponsoring Noteholders; (e) each DIP Lender; (f) the Prepetition Agents; (g) the DIP Agent; (h) each Holder of Senior Notes Claims; (i) each Holder of Subordinated Notes Claims who is party to or has otherwise signed the Restructuring Support Agreement; (j) all Holders of Claims or Interests that (i) vote to accept the Plan or are deemed to accept the Plan and (ii) do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (m) each Related Party of each Entity in clause (a) through (l).

117. "*Reorganized Debtors*" means, collectively, Reorganized Parent and each other Debtor, or any successor or assign thereto, by merger, consolidation, transfer of all or substantially all assets or otherwise, on and after the Effective Date.

118. "*Reorganized Parent*" means either (a) Parent, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, issue the New Common Equity to be distributed in accordance with the Plan.

119. "*Restructuring Expenses*" means all fees and expenses incurred by the Sponsoring Noteholders and DIP Agent in connection with the Restructuring Transactions, including attorneys' fees and expenses.

120.    "*Restructuring Support Agreement*" means that certain restructuring support agreement to which the Debtors are a party, a copy of which is attached to the Disclosure Statement as Exhibit B.

121.    "*Restructuring Term Sheet*" means that certain Restructuring Term Sheet attached to the Restructuring Support Agreement as Exhibit A.

122.    "*Restructuring Transactions*" means any transactions or actions as may be necessary or appropriate to effect a restructuring of the Debtors' businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in this Plan and the Restructuring Support Agreement, the issuance of all securities, notes, warrants, instruments, agreements, certificates, and other documents required to be issued or executed pursuant to the Plan, one or more inter-company mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions, as described in Section 4.02 of the Plan, in each case, in form and substance consistent with the terms of the Restructuring Support Agreement and the consent rights contained therein.

123.    "*Schedule of Retained Causes of Action*" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time, in each case, in form and substance consistent with the terms of the Restructuring Support Agreement and the consent rights contained therein.

124.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, including any amendments or supplements thereto, in each case.

125.    "*Section 510(b) Claims*" means any Claim against a Debtor subject to subordination under section 510(b) of the Bankruptcy Code, whether by operation of Law or contract.

126.    "*Secured Claim*" means a Claim: (a) secured by a valid, perfected, and enforceable Lien on collateral to the extent of the value of such collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (b) subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff.

127.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, or any similar Law, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

128.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act or section 101(49) of the Bankruptcy Code.

129.    "*Senior Indentures*" means, collectively, the 2022 Senior Indenture and the 2023 Senior Indenture.

130. "*Senior Notes Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Senior Secured Notes, whether secured or unsecured, except for (i) Claims held by the Prepetition Senior Agents, which will be treated in accordance with Section 2.05 hereof, (ii) Claims derived from, based upon, or arising under the Bridge Notes, which shall be treated for all purposes as DIP Administrative Expenses and not as Senior Notes Claims, and (iii) the aggregate $2,000,000 of principal obligations under the Senior Secured Notes that was rolled into the DIP Facility pursuant to the Interim DIP Order, which shall be treated for all purposes as a DIP Administrative Expense and not as a Senior Notes Claim.

131. "*Senior Secured Convertible Exchange Notes*" means those certain Senior Secured Convertible Exchange Notes due December 6, 2025 issued pursuant to the 2023 Senior Indenture.

132. "*Senior Secured Convertible Notes*" means those certain Senior Secured Convertible Notes due December 6, 2025 issued pursuant to the 2022 Senior Indenture.

133. "*Senior Secured Notes*" means, collectively, the Senior Secured Convertible Notes and the Senior Secured Convertible Exchange Notes.

134. "*Sponsoring Noteholders*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

135. "*Subordinated Indentures*" means, collectively, the 2022 Subordinated Indenture and the 2023 Subordinated Indenture.

136. "*Subordinated Notes Claims*" means any Claim against any Debtor derived from, based upon, or arising under the Subordinated Secured Notes, whether secured or unsecured, except for Claims held by the Prepetition Subordinated Agents, which will be treated in accordance with Section 2.05 hereof.

137. "*Subordinated Secured Convertible Exchange Notes*" means those certain Subordinated Secured Convertible Exchange Notes due April 6, 2026 issued pursuant to the 2023 Subordinated Indenture.

138. "*Subordinated Secured Convertible Notes*" means those certain Subordinated Secured Convertible Notes due April 6, 2026 issued pursuant to the 2022 Subordinated Indenture.

139. "*Subordinated Secured Notes*" means, collective, the Subordinated Secured Convertible Notes and the Subordinated Secured Convertible Exchange Notes.

140. "*Substantive Consolidation Order*" means the order of the Bankruptcy Court, which may be the Confirmation Order, authorizing substantive consolidation of the Estates pursuant to Section 4.03.

141. "*Third Party Release*" means the release set forth in Section 8.04 of the Plan.

142. "*U.S. Trustee*" means the United States Trustee for the District of Delaware.

14

143.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

144.    "*Unimpaired*" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

145.    "*Voting Deadline*" means July 19, 2024 at 4:00 p.m. (prevailing Eastern Time).

146.    "*Voting Record Date*" means June 24, 2024.

*Section 1.02    Rules of Interpretation.*

For purposes of this Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; *provided* that nothing in this clause (2) shall affect any parties' consent rights over any of the Definitive Documents or any amendments thereto, as provided for in the Restructuring Support Agreement; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal Law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (15) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (16) any immaterial effectuating provisions may be interpreted by the Reorganized

Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (17) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

*Section 1.03    Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

*Section 1.04    Governing Law.*

Unless a rule of law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the Laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing Law of such agreement shall control), and corporate governance matters; *provided* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Delaware (if any) shall be governed by the Laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtors.

*Section 1.05    Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

*Section 1.06    Reference to the Debtors or the Reorganized Debtors.*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

*Section 1.07    Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order and the Plan (including the Plan Supplement), the Confirmation Order shall control.

*Section 1.08    Consultation, Information, Notice, and Consent Rights.*

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (including the exhibits thereto) with respect to the form and substance of this Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section 1.01 hereof) and fully enforceable as if stated in full herein.

Failure to reference such rights shall not impair such rights and obligations.

Solely with respect to any consultation, information, notice, or consent rights in the Plan, in the event of any inconsistency between the Plan and the Restructuring Support Agreement, the terms of the Restructuring Support Agreement shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES, DIP ADMINISTRATIVE EXPENSES, PRIORITY CLAIMS, AND RESTRUCTURING EXPENSES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, Professional Fee Administrative Expenses, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

*Section 2.01    Administrative Expenses.*

Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, and unless the Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment or such Holder has been paid by any Debtor on account of such Allowed Administrative Expense prior to the Effective Date, each Holder of an Allowed Administrative Expense (other than holders of Professional Fee Administrative Expenses and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Expense an amount of Cash equal to the amount of such Allowed Administrative Expense in accordance with the following: (1) if an Administrative Expense is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Expense is due or as soon as reasonably practicable thereafter); (2) if such Administrative Expense is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Administrative Expense becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Expense is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense without any further action by the holders of such Allowed Administrative Expense; (4) at such time and upon such terms as may be agreed upon by such holder and the Debtors or the Reorganized Debtors, as applicable, and in each case, with the consent of the Sponsoring

Noteholders; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

*Section 2.02    DIP Administrative Expenses.*

On the Effective Date, each holder of an Allowed DIP Administrative Expense, shall receive, in full satisfaction of such DIP Administrative Expense, its Pro Rata share of 48.19% of New Common Equity at the New Money Equity Price.

*Section 2.03    Professional Fee Administrative Expenses.*

(a)    Final Fee Applications and Payment of Professional Fee Administrative Expenses.

All requests for payment of Professional Fee Administrative Expenses for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Administrative Expenses after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtors shall pay Professional Fee Administrative Expenses in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Account.

(b)    Professional Fee Account.

On the Effective Date, the Reorganized Debtors shall, in consultation with the Sponsoring Noteholders, establish and fund the Professional Fee Account with Cash equal to the Professional Fee Amount, which shall be funded by the Reorganized Debtors. The Professional Fee Account shall be established in trust for the Professionals and maintained solely for Allowed Professional Fee Administrative Expenses. The amount of Allowed Professional Fee Administrative Expenses shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Account as soon as reasonably practicable after such Professional Fee Administrative Expenses are Allowed. When such Allowed Professional Fee Administrative Expenses have been paid in full, any remaining amount in the Professional Fee Account shall promptly be transferred to the Reorganized Debtors without any further action or order of the Bankruptcy Court.

(c)    Professional Fee Amount.

Professionals shall reasonably estimate their unpaid Professional Fee Administrative Expenses and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors and the Sponsoring Noteholders no later than five (5) days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional in consultation with the Sponsoring Noteholders.Post-Confirmation Fees and Expenses.

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for

services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## Section 2.04    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## Section 2.05    Payment of Restructuring Expenses.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, any applicable engagement letter(s), and any DIP Orders, as applicable, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors or the Reorganized Debtors, as applicable. In addition, the Debtors and/or the Reorganized Debtors, as applicable, shall continue to pay pre- and post-Effective Date Restructuring Expenses related to implementation, consummation, and defense of the Plan, whether incurred before, on, or after the Effective Date, without any requirement for Bankruptcy Court review or approval.

Without limiting the foregoing, on the Effective Date, the Disbursing Agent shall pay in full in Cash the Prepetition Agents Expenses without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval. In addition, the Disbursing Agent shall continue to pay the Prepetition Agents Expenses, as necessary, after the Effective Date when due and payable in the ordinary course solely to the extent related to implementation, consummation and defense of the Plan, whether incurred before, on or after the Effective Date, without any requirement for further notice or Bankruptcy Court review or approval.

Notwithstanding anything to the contrary contained herein, any unpaid Claim payable on account of the reasonable and documented fees and expenses of the Restructuring Expenses that the Debtors are obligated to pay under the Restructuring Support Agreement, and for which the Debtors have received an invoice, shall constitute an Allowed Administrative Expense and shall be paid on a current basis in full in Cash on the Effective Date or as reasonably practicable thereafter, or to the extent accrued after the Effective Date, on a current basis in full in Cash as

19

invoiced. Nothing herein shall require the Sponsoring Noteholders or their professionals to file applications, a Proof of Claim or otherwise seek approval of the Bankruptcy Court as a condition to payment of such Allowed Administrative Expenses.

*Section 2.06    Payment of Statutory Fees.*

Payment of United States Trustee Quarterly Fees. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("**Quarterly Fees**") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, each of the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*Section 3.01    Classification of Claims and Interests.*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Type of Claim or Interest | Impairment | Voting |
|-------|---------------------------|------------|--------|
| Class 1 | Senior Notes Claims | Impaired | Yes |
| Class 2 | Subordinated Notes Claims | Impaired | Yes |
| Class 3 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 4 | Other Priority Claims | Unimpaired | No (Deemed to accept) |
| Class 5 | General Unsecured Claims | Unimpaired | No (Deemed to accept) |
| Class 6 | Section 510(b) Claims | Impaired | No (Deemed to reject) |
| Class 7 | Interests | Impaired | No (Deemed to reject) |

20

**Section 3.02    *Treatment of Claims and Interests.***

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, the Sponsoring Noteholders, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

(a)    Class 1 – Senior Notes Claims

(i)    *Classification*: Class 1 consists of all Senior Notes Claims.

(ii)    *Treatment*: Each Holder of an Allowed Senior Notes Claim shall receive, in full satisfaction of its Allowed Senior Notes Claim: its Pro Rata share of the New Notes; *provided, however*, that Holders of Senior Notes Claims that are Excluded Parties shall receive no distribution under the Plan.

(iii)    *Voting:* Class 1 is Impaired under the Plan. Holders of Senior Notes Claims are entitled to vote to accept or reject the Plan.

(b)    Class 2 – Subordinated Notes Claims

(i)    *Classification*: Class 2 consists of all Subordinated Notes Claims.

(ii)    *Treatment:* Each Holder of an Allowed Subordinated Notes Claim shall receive, in full satisfaction of such Subordinated Notes Claim, its Pro Rata share of 22.48% of New Common Equity, subject to dilution on account of the MIP; *provided, however*, that Holders of Subordinated Notes Claims that are Excluded Parties shall receive no distribution under the Plan.

(iii)    *Voting:* Class 2 is Impaired under the Plan. Holders of Subordinated Notes Claims are entitled to vote to accept or reject the Plan.

(c)    Class 3 – Other Secured Claims

(i)    *Classification*: Class 3 consists of all Other Secured Claims.

(ii)    *Treatment*: Except to the extent less favorable treatment is agreed to by the Debtors or the Reorganized Debtors, as applicable, and a Holder of an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Allowed Other Secured Claim, at the option of

21

the applicable Debtor, with the consent of the Sponsoring Noteholders: (i) payment in full in Cash of its Allowed Other Secured Claim; (ii) the collateral securing its Allowed Other Secured Claim; (iii) Reinstatement of its Allowed Other Secured Claim; or (iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii) *Voting*: Class 3 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(d)    Class 4– Other Priority Claims

(i) *Classification*: Class 4 consists of all Other Priority Claims.

(ii) *Treatment*: Each Holder of an Allowed Other Priority Claim shall receive payment in full, in cash, on the Effective Date.

(iii) *Voting*: Class 4 is Unimpaired under the Plan. Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(e)    Class 5 – General Unsecured Claims

(i) *Classification*: Class 6 consists of all General Unsecured Claims.

(ii) *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to different treatment, on and after the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall continue to pay or dispute each General Unsecured Claim in the ordinary course of business as if the Chapter 11 Cases had never been commenced.

(iii) *Voting*: Class 5 is Unimpaired under the Plan. Holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(f)    Class 6 – Section 510(b) Claims

(i) *Classification*: Class 6 consists of all Section 510(b) Claims.

(ii) *Treatment:* On the Effective Date, Section 510(b) Claims will be cancelled, released, and extinguished and will be of no further force and effect and shall receive no recovery.

22

(iii) *Voting*: Class 6 is Impaired and conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(g) Class 7 –Interests

(i) *Classification*: Class 7 consists of all Interests.

(ii) *Treatment:* On the Effective Date, Interests will be cancelled, released, and extinguished and will be of no further force and effect and shall receive no recovery.

(iii) *Voting:* Class 7 is Impaired and conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**Section 3.03    Special Provision Governing Unimpaired Claims.**

Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, until a prepetition Unimpaired Claim has been (1) paid in full in accordance with applicable law, or on terms agreed to between the Holder of such Claim and the Reorganized Debtors, or in accordance with the terms and conditions of the particular transaction giving rise to such Claim; or (2) otherwise satisfied or disposed of as determined by a court of competent jurisdiction (the occurrence of (1) or (2), an "**Unimpaired Claim Resolution**"): (a) the provisions of Sections 8.01 through 8.06 of the Plan shall not apply or take effect with respect to such Claim; (b) such Claim shall not be deemed settled, satisfied, resolved, released, discharged, barred, or enjoined; (c) the property of each of the Debtors' Estates that vests in the applicable Reorganized Debtor(s) pursuant to the Plan shall not be free and clear of such Claim; and (d) any Liens of securing such Claim shall not be deemed released (subclauses (a) through (d), collectively, the "**Unimpaired Claim Carve Out**"). Upon the occurrence of an Unimpaired Claim Resolution with respect to a prepetition Unimpaired Claim, the Unimpaired Claim Carve Out shall cease to apply to such Claim. Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including, all rights regarding legal and equitable defenses and counterclaims to, or setoffs or recoupments against, any such Unimpaired Claim.

Holders of Unimpaired Claims shall not be subject to any claims resolution process in Bankruptcy Court in connection with their Claims, and shall retain all their rights under applicable non-bankruptcy law to pursue their Claims against the Debtors or Reorganized Debtors or other Entity in any forum with jurisdiction over the parties. If the Debtors or the Reorganized Debtors dispute any Unimpaired Claim, such dispute shall be determined, resolved or adjudicated in the manner as if the Chapter 11 Cases had not been commenced, except with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, which shall be determined, resolved or adjudicated as set forth in Section 5.02 of the Plan.

**Section 3.04    Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

*Section 3.05    Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

*Section 3.06    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Section 3.02 of the Plan. The Debtors reserve the right, subject to the prior written consent of the Sponsoring Noteholders, to modify the Plan in accordance with Article X hereof and the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

*Section 3.07    Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*Section 3.08    Subordinated Claims and Interests.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Any such contractual, legal, or equitable subordination rights shall be settled, compromised, and released pursuant to the Plan.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*Section 4.01    General Settlement of Claims and Interests.*

In consideration for the classification, distributions, releases, and other benefits provided under this Plan, on the Effective Date, the provisions of this Plan shall constitute a set of integrated, good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies resolved pursuant to this Plan. This Plan shall be deemed a motion by the Debtors to approve such compromises and settlements pursuant to Bankruptcy Rule 9019 and section 1123

24

of the Bankruptcy Code, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, as well as a finding by the Bankruptcy Court that such integrated compromises or settlements are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and are fair, equitable, and within the range of reasonableness. Subject to Article VI, distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final and indefeasible and shall not be subject to avoidance, turnover, or recovery by any other Person.

Section 4.02    *Restructuring Transactions.*

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Restructuring Support Agreement, the Restructuring Term Sheet, and Definitive Documents and any consents or approvals required thereunder, the entry of the Confirmation Order shall constitute authorization for the Debtors and Reorganized Debtors, as applicable, to take, or to cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of this Plan before, on, and after the Effective Date, including such actions as may be necessary or appropriate to effectuate a corporate restructuring of their respective businesses and to otherwise simplify the overall corporate structure of the Reorganized Debtors. Such restructuring may include (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of this Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty, or obligation on terms consistent with the terms of this Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and having such other terms to which the applicable Entities may agree; (3) the filing of appropriate certificates or articles of merger, consolidation, or dissolution pursuant to applicable state law; (4) the issuance of New Common Equity; (5) the execution and delivery of the New Note Documents; (6) the execution and delivery of the New Organizational Documents, and any certificates or articles of incorporation, bylaws, or such applicable formation documents (if any) of each Reorganized Debtor; and (7) all other actions that the Debtors, Reorganized Debtors and/or the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law or foreign law in connection with such transactions, but in all cases subject to the terms and conditions of this Plan, the Restructuring Support Agreement, the Restructuring Term Sheet, and the other Definitive Documents and any consents or approvals required thereunder.

The Confirmation Order shall be deemed to, pursuant to both section 1123 and section 363 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions (including any other transaction described in, approved by, contemplated by, or necessary to effectuate this Plan).

Section 4.03    *Substantive Consolidation*

(a)      Consolidation of the Chapter 11 Estates

The Plan contemplates and is predicated upon entry of an order (which may be the Confirmation Order) substantively consolidating the Debtors' Estates and Chapter 11 Cases for all purposes, including voting, Distribution, and Confirmation. On the Effective Date, (a) all Intercompany Claims between the Debtors shall be eliminated; (b) all assets and liabilities of the Affiliate Debtors shall be merged or treated as if they were merged with the assets and liabilities of Parent; (c) any obligation of a Debtor and any guarantee thereof by another Debtor shall be deemed to be one obligation of Parent, and any such guarantee shall be eliminated; (d) each Claim Filed or to be Filed against any Debtor shall be deemed Filed only against Parent and shall be deemed a single Claim against and a single obligation of Parent; and (e) any joint or several liability of the Debtors shall be deemed one obligation of Parent. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment, or performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

The substantive consolidation effected pursuant to this Section 4.03 shall not, and shall not be deemed to, prejudice the Retained Causes of Action and the Avoidance Actions (subject to the releases set forth in Article VIII), which shall survive entry of the Substantive Consolidation Order, as if there had been no substantive consolidation.

(b)      Substantive Consolidation Order

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' Chapter 11 Cases. If no objection to substantive consolidation is timely Filed and served by any Holder of an Impaired Claim affected by the Plan as provided herein on or before the deadline to object to Confirmation of the Plan, or such other date as may be fixed by the Court, the Substantive Consolidation Order (which may be the Confirmation Order) may be approved by the Court. If any such objections are timely Filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

*Section 4.04    Corporate Existence.*

Except as otherwise provided in this Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each Debtor is incorporated or formed and pursuant to the respective memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) in effect before the Effective Date, except to the extent such memorandum and articles of association, certificate of incorporation and bylaws (or other formation documents) are amended by this Plan, by the Debtors, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to this Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, one or more of the Reorganized Debtors, or Parent, may be disposed of, dissolved,

26

wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*Section 4.05    Vesting of Assets in the Reorganized Debtors Free and Clear of Liens and Claims.*

Except as otherwise expressly provided in this Plan, the Confirmation Order, or any agreement, instrument, or other document incorporated herein pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c), and other applicable provisions of the Bankruptcy Code, on and after the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, the Reorganized Debtors may (1) operate their respective businesses, (2) use, acquire, and dispose of their respective property, and (3) compromise or settle any Claims, Interests, or Causes of Action, in each case without notice to, supervision of, or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. For the avoidance of doubt, no Reorganized Debtor (including any Reorganized Debtor ultimately being wound-down and liquidated in connection with the Restructuring Transactions) shall be treated as being liable on any Claim that is discharged pursuant to the Plan.

*Section 4.06    Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan, the Confirmation Order, or any other Definitive Document, all notes, bonds, indentures, certificates, securities, purchase rights, options, warrants, collateral agreements, subordination agreements, or other instruments or documents directly or indirectly evidencing, creating, or relating to any existing indebtedness or obligations of the Debtors or giving rise to any rights or obligations relating to Claims against or Interests in the Debtors shall be deemed canceled and surrendered, and null, void and worthless, and the obligations of the Debtors or the Reorganized Debtors, as applicable, and any Non-Debtor Affiliates thereunder or in any way related thereto shall be deemed satisfied in full, released, and discharged; provided, that, notwithstanding such cancellation, satisfaction, release, and discharge, anything to the contrary contained in the Plan or the Confirmation Order, any such document or instrument that governs the rights, claims, or remedies of the Holder of a Claim or Interest shall continue in effect solely for purposes of: (1) enabling the Holder of such Claim or Interest to receive distributions on account of such Claim or Interest under this Plan as provided herein; (2) allowing and preserving the rights of the Prepetition Agents and DIP Agent, as applicable, to make distributions as specified under this Plan on account of Allowed Claims, including allowing the Prepetition Agents and DIP Agent to submit invoices for any amount and enforce any obligation owed to them under this Plan to the extent authorized or allowed by the applicable documents; (3) permitting the Reorganized Debtors and any other Disbursing Agent, as applicable, to make distributions on account of applicable Claims and Interests, as applicable; (4) preserving the Prepetition Agents' and DIP Agent's rights, if any, to compensation and indemnification as against any money or property distributable to the Holders of Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses, as applicable, including permitting the Prepetition Agents and DIP Agent, as applicable, to maintain, enforce, and exercise any priority of payment or charging liens against such distributions each pursuant and subject to the terms of the Indentures, and DIP Credit Agreement, as applicable, as in effect on or immediately before the Effective Date, (5) preserving all rights, remedies,

indemnities, powers, and protections, including rights of enforcement, of the Prepetition Agents and DIP Agent, as applicable, against any person other than a Released Party (which Released Parties include the Debtors, Reorganized Debtors, Non-Debtor Affiliates, and Sponsoring Noteholders), and any exculpations of the Prepetition Agents and DIP Agent, as applicable; *provided,* that the Prepetition Agents and DIP Agent shall remain entitled to indemnification or contribution from the Holders of Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses, to the extent provided in the respective Indentures and DIP Credit Agreement, as applicable, as in effect on the Effective Date, (6) permitting the Prepetition Agents and DIP Agent, as applicable, to enforce any obligation (if any) owed to them under this Plan, (7) permitting the Prepetition Agents and DIP Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, and (8) permitting the Prepetition Agents and DIP Agent to perform any functions that are necessary to effectuate the foregoing; *provided, however,* that nothing in this Section 4.06 shall affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan, or (except as set forth in (5) above) the releases of the Released Parties pursuant to Article IX of this Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in this Plan. In furtherance of the foregoing, as of the Effective Date, Holders of Senior Notes Claim, Subordinated Notes Claims, and DIP Administrative Expenses shall be deemed to have released any such Claims against the Reorganized Debtors under the Indentures and DIP Facility Documents and are enjoined from pursuing any such claims against any of the Reorganized Debtors in respect of such Senior Notes Claims, Subordinated Notes Claims, and DIP Administrative Expenses.

On the Effective Date, the Prepetition Agents, the DIP Agent, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall (i) be automatically and fully released and discharged from any further responsibility under the Indentures and DIP Credit Agreement, as applicable; and (ii) have no further obligation or liability except as provided in this Plan and the Confirmation Order, and after the performance by the Prepetition Agents, DIP Agent, and their representatives and professionals of any obligations and duties required under or related to this Plan or the Confirmation Order, the Prepetition Agents, DIP Agent, and each of their respective directors, officers, employees, agents, affiliates, controlling persons, and legal and financial advisors shall be relieved of and released from any obligations and duties arising thereunder. The commitments and obligations of the Holders of the Senior Notes Claims and the Subordinated Notes Claims to extend any further or future credit or financial accommodations to the Debtors, its subsidiaries or assigns under the Indentures, respectively, shall fully terminate and be of no further force or effect on the Effective Date, *provided*, *however*, that such termination shall not apply to the New Notes. The reasonable and documented fees, expenses, and costs of the Prepetition Agents and the DIP Agent, including fees, expenses, and costs of each of their respective professionals incurred after the Effective Date in connection with the Indentures or DIP Credit Agreement, as applicable, and reasonable and documented fees, costs, and expenses associated with effectuating distributions pursuant to this Plan, including the fees and expenses of counsel, if any, shall be paid in accordance with the terms of this Plan and the applicable Definitive Documents.

*Section 4.07    Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Secured Claim (including Allowed DIP Administrative Expenses), or promptly thereafter, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of an Allowed Secured Claim (including an Allowed DIP Administrative Expense) that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Allowed Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

To the extent that any Holder of a Secured Claim, or any agent for such Holder, has filed or recorded publicly any Lien and/or security interests against the property of the Non-Debtor Subsidiaries, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Non-Debtor Subsidiaries that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Non-Debtor Subsidiaries shall be entitled to make any such filings or recordings on such Holder's behalf.

*Section 4.08    Sources of Consideration for Plan Distributions.*

The Debtors or the Reorganized Debtors, as applicable, shall fund distributions under the Plan with the (i) Debtors' Cash on hand, (ii) Cash generated from operations; (iii) funds from the DIP Facility, and (iv) funds generated through issuance of the New Money Common Equity Investment.

*Section 4.09    Issuance of New Common Equity and Deregistration.*

On the Effective Date, the Reorganized Debtors issue or reserve for issuance all of the New Common Equity in accordance with the terms of this Plan and the New Organizational Documents without the need for further corporate or other action. All of the New Common Equity issuable

under this Plan and the Confirmation Order shall, when so issued be duly authorized, validly issued, fully paid, and nonassessable.

Reorganized Parent intends to exist and operate as a private company after the Effective Date. As promptly as reasonably practicable following the Effective Date, Reorganized Parent expects to take all necessary steps to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its Existing Equity Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by filing a Form 15 with the SEC under the Exchange Act.

(a)    Absence of Listing/Transfer of New Common Equity

On the Effective Date, Reorganized Debtors shall issue the New Common Equity pursuant to this Plan and the New Organizational Documents. The Reorganized Debtors shall not be obligated to effect or maintain any listing of the New Common Equity for trading on any national securities exchange (within the meaning of the Exchange Act) and it has no current intention of maintaining or obtaining such listing. Unless otherwise provided herein, distributions of the New Common Equity are expected to be made by delivery or book-entry transfer thereof by the Disbursing Agent in accordance with this Plan and the New Organizational Documents, rather than through the facilities of DTC. Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Common Equity shall be that number of shares or membership interests as may be designated in the New Organizational Documents.

On and after the Effective Date, transfers of New Common Equity shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Stockholders Agreement (if applicable), including the payment of stamp duty tax and completion of registration with the Disbursing Agent.

(b)    New Stockholders Agreement

On the Effective Date, to the extent applicable, one or more of the Reorganized Debtors shall enter into the New Stockholders Agreement with the Holders of the New Common Equity, which shall become effective and binding in accordance with its terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Stockholders Agreement). On and as of the Effective Date, all of the Holders of New Common Equity shall be deemed to be parties to the New Stockholders Agreement (if applicable), without the need for execution by such Holder.

If applicable, the New Stockholders Agreement shall be binding on all Persons or Entities receiving, and all Holders of, the New Common Equity (and their respective successors and assigns), whether such New Common Equity is received or to be received on or after the Effective Date and regardless of whether such Person or Entity executes or delivers a signature page to the New Stockholders Agreement.

*Section 4.10    New Money Common Equity Investment.*

On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall consummate the New Money Common Equity Investment pursuant to which participants shall subscribe to purchase New Money Common Equity in an amount of at least $9,000,000 in the aggregate. The New Money Common Equity shall be offered in the form of a rights offering or other subscription process. The price per share of New Money Common Equity shall be based on an indicative pre-money enterprise value of the Reorganized Debtors of $25,700,000, (a) prior to taking into account the funding of the DIP Facility and the Bridge Notes, and the funding of New Money Common Equity, and (b) assuming an Effective Date of July 31, 2024, or as soon thereafter as is practicable (the "**New Money Equity Price**"). The New Money Common Equity shall be offered for ratable participation by the Sponsoring Noteholders and other third-party purchasers. [The New Money Common Equity Investment has been fully backstopped the Backstop Parties on the terms set forth in the Backstop Commitment Documentation.]

Confirmation of the Plan shall be deemed approval of the New Money Common Equity Investment and the New Money Common Equity Investment Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization for the Reorganized Debtors to enter into and execute the New Money Common Equity Investment Documents as may be required to effectuate the treatment afforded by the New Money Common Equity. All New Money Common Equity issued pursuant to the Plan shall be duly authorized, validly issued and non-assessable.

For the avoidance of doubt, the issuance of the New Money Common Equity shall be exempt from the registration requirements of the Securities Act as a result of Bankruptcy Code section 1145 to the maximum extent permitted by law.

Section 4.11    The New Notes

On the Plan Effective Date, the Reorganized Debtors shall enter into the New Note Documents. The Confirmation Order shall approve the New Notes and the New Note Documents (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and all Claims, Liens, and security interests to be granted in accordance with the terms of the New Note Documents, if any, (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Claims and Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Note Documents, (c) shall be deemed automatically attached and perfected on the Plan Effective Date, subject only to the Liens and security interests as may be permitted under the New Note Documents, and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors and the Reorganized Debtors, as applicable, and the Persons granting such Liens and security interests are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order with

respect to the Plan, and any such filings, recordings, approvals, and consents shall not be required) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

*Section 4.12    Corporate Actions.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including, as applicable: (a) the issuance and distribution of the New Common Equity; (b) the offering and implementation of the New Money Common Equity Investment; (c) the issuance and distribution of the New Notes; (d) implementation of the Restructuring Transactions, (e) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (f) adoption of the New Organizational Documents; (g) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases (as applicable); and (h) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtor, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, members, directors, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Equity, the New Money Common Equity Investment, the New Organizational Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section 4.12 shall be effective notwithstanding any requirements under non-bankruptcy Law.

*Section 4.13    New Organizational Documents.*

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Reorganized Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

(a)      Directors and Officers of the Reorganized Debtors

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire and the existing officers of the Debtors shall be automatically removed as officers, and the New Board and new officers of each of the Reorganized Debtors shall be appointed consistent with the terms of the Restructuring Support Agreement and Restructuring Term Sheet. Specifically, the New Board shall consist of five members, including three directors appointed by the Sponsoring Noteholders. For subsequent terms, following the Effective Date, members of the New Boards and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity and affiliation of any Person proposed to serve on the New Boards will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, as well as those Persons that will serve as officers of the Reorganized Debtors. Provisions regarding the removal, appointment, and replacement of members of the New Boards, to the extent applicable, will be disclosed in the New Organizational Documents.

(b)      Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

*Section 4.14    Management Incentive Plan.*

Unless otherwise agreed, the Reorganized Debtors shall be authorized to adopt the MIP, enact and enter into related policies and agreements, and grant awards under the MIP to participants on the terms and conditions determined by the board of the directors of the Reorganized Parent, in all respects consistent with this Plan and the Restructuring Support Agreement.

94957745.21

**Section 4.15    Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof, each Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII hereof, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date. The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII hereof.** Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including Article VIII hereof. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**Section 4.16    Certain Securities Law Matters.**

The offering, issuance (or entry into), and distribution of the New Common Equity and all other Securities entered into and/or issued in connection with the Plan, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities to the maximum extent permitted by Law, in accordance with, and pursuant to section 1145 of the Bankruptcy Code or any other available exemption from registration, as applicable.

In addition, the New Common Equity issued under section 1145 of the Bankruptcy Code (1) will not be "restricted securities" as defined in rule 144(a)(3) under the Securities Act and (2) will be freely tradable and transferable in the United States by a recipient thereof that (i) is an entity that is not an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code, (ii) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (iii) has not been such an "affiliate" within 90 days of the time of the transfer, and (iv) has not acquired such securities from an "affiliate" within one year of the time of transfer, subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the New Organizational Documents.

To the extent issuance under section 1145(a) of the Bankruptcy Code is unavailable, the New Common Equity will be issued without registration under the Securities Act in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act and/or Regulation S under the Securities Act, and similar registration exemptions under state or local securities Laws, in each case to the maximum extent permitted thereunder. Any securities issued in reliance on section 4(a)(2) and/or Regulation S under the Securities Act, will be "restricted securities" under the Securities Act and/or subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable Law and subject in each case to compliance with applicable securities Laws and any rules and regulations of the SEC or state or local securities Laws, if any, applicable at the time of any future transfer of such Securities, and subject to any restrictions in the New Money Common Equity Investment Documents and New Organizational Documents, as applicable.

Neither the issuance of the New Common Equity or the New Money Common Equity Investment shall constitute an invitation or solicitation of an invitation or offer to sell or buy, any securities in contravention of any applicable Law in any jurisdiction. No action has been taken, nor will be taken, in any jurisdiction that would permit a public offering of any of the New Common Equity in any jurisdiction where such action for that purpose is required.

Except as otherwise provided in the New Organizational Documents or otherwise elected by the Debtors (with the consent of the Sponsoring Noteholders), the initial ownership of the New Common Equity will be recorded in a register maintained by a transfer agent. To the extent provided in the New Organizational Documents or as elected by the Debtors (with the consent of the Sponsoring Noteholders), some or all Holders entitled to receive distributions of New Common Equity (which may be determined based on the percentage of New Common Equity issued on the Effective Date to which such Holder is entitled) may receive and hold such New Common Equity through the facilities of DTC. Upon the Effective Date, each Holder that receives New Common Equity pursuant to the terms hereof will be deemed to be a party to the New Organizational Documents, as applicable (even if such holder of New Common Equity does not execute a signature page to the New Organizational Documents); *provided,* that, without in any way reducing the force and effect of the foregoing, the Debtors may, in their discretion and as a means of further assurance (and with the consent of the Sponsoring Noteholders) require that such Holders become party to the New Organizational Documents, either as a condition to distribution of the New Common Equity, or at a later date. The Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common

Equity under applicable securities Laws. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC and any transfer agent) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. DTC and any transfer agent shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement and depository services.

*Section 4.17    1146 Exemption.*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or Reorganized Debtors, including the New Common Equity and the New Notes; (2) the restructuring transactions contemplated under the Plan; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment in the United States, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

*Section 4.18    Governmental Regulatory Applications.*

The Debtors or the Reorganized Debtors, as applicable, shall use best efforts to obtain any and all required governmental, regulatory, and/or third-party approvals, and shall promptly provide such additional documents or information requested by any governmental regulatory authority in connection with the review of the foregoing. Any agreements with or commitments to any governmental regulatory authorities by the Debtors, including any decision to accept and/or not to oppose any proposed material conditions or limitations on any such required approvals, shall require the prior approval of the Sponsoring Noteholders. Any other person required or reasonably requested by the Debtors (in each case with the consent of the Sponsoring Noteholders) shall use

commercially reasonable efforts to make or assist in submissions necessary or appropriate for the consummation of the Restructuring Transactions.

*Section 4.19    Director and Officer Liability Insurance.*

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors and officers remain in such positions after the Effective Date.

*Section 4.20    Indemnification Obligations.*

Consistent with applicable Law, all indemnification provisions in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Effective Date.

*Section 4.21    No Change in Control.*

For the avoidance of doubt, except as provided in (x) the cancellation of any Interests pursuant to the Plan, (y) any issuance, transfer or acquisition of New Common Equity or other Securities pursuant to the Plan or in connection with the Debtors' restructuring, and (z) the revesting of assets in the Reorganized Debtors as of the Effective Date pursuant to the Plan, shall not, and shall not be deemed to, result in a "change in control" or "change of control" under any contract or other document to which any Debtor or Reorganized Debtor is a party.

# ARTICLE V.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*Section 5.01     Assumption and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided in Section 5.08 and elsewhere herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that are: (a) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (b) previously expired or terminated pursuant to their own terms; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (d) are the subject of a motion to reject that is pending on the Effective Date; or (e) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor or Non-Debtor Subsidiary party thereto in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. No Affiliate of a Debtor that is party to such agreement may terminate such agreement or exercise any other default-related rights with respect thereto. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable (and with the prior consent of the Sponsoring Noteholders), reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to forty-five (45) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is consistent with the Restructuring Support Agreement. To the extent the Debtors or the Reorganized Debtors, as applicable, seek to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule to add Executory Contracts or Unexpired Leases not previously included in such

38

schedule, the Debtors or the Reorganized Debtors, as applicable, shall serve notice of such alteration, amendment, modification, or supplement to any affected counter-parties which notice shall advise of the effective date of the rejection of subject Executory Contracts or Unexpired Leases ("**Notice of Amended Rejection Schedule**").

*Section 5.02    Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, (3) the Effective Date, or (4) date of service of the Notice of Amended Rejection Schedule. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Section 3.02(e) of this Plan.

*Section 5.03    Cure Defaults for Assumed Executory Contracts and Unexpired Leases.*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; *provided* that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing, or such other setting as requested by the Debtors or Reorganized Debtors, for which such objection is timely Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code section 365, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to this Section 5.03 shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section 5.03, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.**

*Section 5.04    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan, in connection with the Restructuring Transactions or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy Law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

*Section 5.05    Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, shall be treated as Executory Contracts hereunder. Unless otherwise provided in the Plan, on the Effective Date, in connection with all contemplated transactions under this Plan, (1) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims, including all D&O Liability Insurance Policies, and (2) such insurance policies and any agreements, documents, or instruments relating thereto, including all D&O Liability Insurance Policies, shall revest in the applicable Reorganized Debtors.

Nothing in this Plan, Restructuring Support Agreement, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other Final Order (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2)

alters or modifies the duty, if any, that the insurers or third party administrators have to pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors or draw on any collateral or security therefor. For the avoidance of doubt, insurers and third-party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing Cure amounts or Claims.

*Section 5.06    Reservation of Rights.*

Nothing contained in the Plan, the Restructuring Support Agreement, or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*Section 5.07    Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

*Section 5.08    Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*Section 6.01    Distributions on Account of Claims Allowed as of the Effective Date.*

Except as otherwise provided herein, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution Date, the applicable Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed on or before the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Expenses with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice, (2) Allowed Priority Tax Claims shall be paid in accordance with Section 2.04 of the Plan, and (3) Allowed General Unsecured Claims shall be paid in accordance with Section 3.02(e) of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim

41

shall be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy Law or in the ordinary course of business.

*Section 6.02    Disbursing Agent.*

The Debtors or the Reorganized Debtors, as applicable, shall have the authority (with the consent of the Sponsoring Noteholders) to enter into agreements with one or more Disbursing Agents to facilitate the Distributions required hereunder. All Distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Senior Notes Claims and Subordinated Notes Claims may be made to or at the direction of the Prepetition Agents, which may act as Disbursing Agent (or direct the Disbursing Agent) for distributions to the Holders of Senior Notes Claims and Subordinated Notes Claims, respectively, in accordance with the Plan and the applicable Indentures.  As applicable, the Prepetition Agents may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the respective Holders of such Claims to the extent consistent with the customary practices of DTC.  Notwithstanding anything to the contrary herein, such distributions shall be subject in all respect to any rights of the Prepetition Agents to assert a charging lien against such distributions.  All distributions to be made to Holders of Senior Notes Claims and Subordinated Notes Claims through DTC shall be made eligible for distributions through the facilities of DTC and, for the avoidance of doubt, under no circumstances will the Prepetition Agents be responsible for making or required to make any distribution under the Plan to Holders of Senior Notes Claims and Subordinated Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC.

*Section 6.03    Rights and Powers of Disbursing Agent.*

(a)        Powers of Disbursing Agent.

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all Distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)        Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable

attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

*Section 6.04    Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

(a)    Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making Distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make Distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such holder as indicated on the Debtors' records as of the date of any such Distribution; *provided* that the manner of such Distributions shall be determined at the discretion of the Reorganized Debtors.

(c)    Undeliverable Distributions and Unclaimed Property.

In the event that any Distribution to any Holder of an Allowed Claim is returned as undeliverable, no Distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time all currently-due, missed Distributions shall be made to such Holder without interest. Undeliverable Distributions shall remain in the possession of the Reorganized Debtors until such time as the Distribution either (i) becomes deliverable or (ii) reverts to the Reorganized Debtors or is cancelled pursuant to this Article VI, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an unclaimed Distribution or remains undeliverable (as reasonably deemed unclaimed or undeliverable by the Reorganized Debtors or the Disbursing Agent) for a period of ninety (90) days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such unclaimed distribution or undeliverable distribution shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such unclaimed distribution is comprised of (i) New Common Equity, then such New Common Equity shall be cancelled; or (ii) Cash, then such Cash shall revest with the Reorganized Debtors. Upon such revesting, the Claim of the Holder or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an unclaimed distribution, to the contrary, and the Claim of any Holder of Claims to such property or Interest in property shall be discharged and forever barred. The

43

Disbursing Agent shall adjust the distributions of the New Common Equity to reflect any such cancellation; however, for the avoidance of doubt, additional Securities shall not be issued to other Holders of Claims due to any such cancellations.

(d)    Surrender of Canceled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Section 4.06 hereof shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Reinstated under the Plan.

*Section 6.05    Manner of Payment.*

(a)    All distributions of the New Common Equity to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable.

(b)    All distributions of the New Notes to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable.

(c)    All distributions of Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

(d)    At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

*Section 6.06    Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, collecting an executed Form W-9, applicable Form W-8 or other appropriate tax form or documentation, or establishing any other mechanisms

they believe are reasonable and appropriate. All Holders of Allowed Claims, as a condition to receiving any Distribution, shall provide the Disbursing Agent with a completed and executed Form W-8 or Form W-9, or similar form within sixty (60) days of a written request by the Disbursing Agent or be forever barred from receiving a Distribution.  The Debtors and the Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and similar spousal awards, Liens, and encumbrances.

Section 6.07    *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

Section 6.08    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

Section 6.09    *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal (National Edition),* on the Effective Date.

Section 6.10    *Setoffs and Recoupment.*

Except as expressly provided in this Plan, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Section 12.07 hereof on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

45

**Section 6.11    Claims Paid or Payable by Third Parties.**

(a)    Claims Paid by Third Parties/Insurers.

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b)    Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**Section 7.01    Disputed Claims Process.**

There is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Section 5.02 of the Plan. On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the Reorganized Debtors

46

in accordance with the books and records of the Debtors. The Debtors (with the consent of the Sponsoring Noteholders) and the Reorganized Debtors, as applicable, shall have the exclusive authority to (1) determine, without the need for notice to or action, order, or approval of the Bankruptcy Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (2) file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. If the Debtors or Reorganized Debtors dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; provided that the Debtors (with the consent of the Sponsoring Noteholders) or the Reorganized Debtors may elect to object to any Claim and to have the validity or amount of any Claim adjudicated by the Bankruptcy Court; provided, further, that Holders of Claims may elect to resolve the validity or amount of any Claim in the Bankruptcy Court by providing the Reorganized Debtors with written notice no later than thirty (30) days after receiving a Distribution on account of its Claim. If a Holder makes such an election, the Bankruptcy Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed. All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

*Section 7.02    Allowance of Claims.*

After the Effective Date, except as otherwise expressly set forth herein, each of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date. The Debtors or the Reorganized Debtors, as applicable, may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy Law, without further notice or order from the Bankruptcy Court.

*Section 7.03    Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors, in consultation with the Sponsoring Noteholders, shall have the exclusive authority: (1) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Section 4.15 of the Plan.

Any objections to Proofs of Claims (other than Administrative Expenses) shall be served and Filed (a) on or before the date that is one hundred and eighty days following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is Filed or amended or a Claim is otherwise

47

asserted or amended in writing by or on behalf of a Holder of a Claim or (b) such later date as ordered by the Bankruptcy Court.

Section 7.04   *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Section 7.05   *Disallowance of Claims or Interests.*

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order. No payment or distribution shall be made on account of such Claim or Interest unless the transferee has paid or turned over such property.

Section 7.06   *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

Section 7.07   *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim or Interest.

Section 7.08   *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be

entitled to interest accruing on or after the Petition Date. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

*Section 7.09    Accrual of Dividends and Other Rights.*

For purposes of determining the accrual of distributions or other rights after the Effective Date, the New Common Equity shall be deemed distributed as of the Effective Date regardless of the date on which they are actually distributed; *provided,* however, that the relevant Reorganized Debtors shall not pay any such distributions or distribute such other rights, if any, until after distribution of the applicable New Common Equity actually takes place.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

*Section 8.01    Discharge of Claims and Termination of Interests.*

Pursuant to and to the fullest extent permitted by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

*Section 8.02    **Release of Liens.***

**Except as otherwise provided in the Plan, the Restructuring Support Agreement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured**

49

Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Reorganized Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

Section 8.03    *Releases by the Debtors.*

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent permitted by applicable Law, for good and valuable consideration, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released by each and all of the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims (other than Reinstated Claims), Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of any of the Debtors or their Estates, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether

individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Plan (including the Plan Supplement), the solicitation of votes on the Plan, the Disclosure Statement, the New Organizational Documents, the pursuit of Confirmation and Consummation, the DIP Facility, the DIP Facility Documents, the New Money Common Equity Investment Documents, the New Note Documents, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (but not, for the avoidance of doubt, any Cause of Action included in the Schedule of Retained Causes of Action, any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the indemnification provisions as set forth in the Plan; (b) any Cause of Action included on the Schedule of Retained Causes of Action; (c) the rights of any Holder of an Allowed Claim to receive distributions under the Plan; or (d) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action of any kind whatsoever released pursuant to the Debtor Release.

Section 8.04    *Releases by the Releasing Parties.*

Effective as of the Effective Date, to the fullest extent permissible under applicable Law, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Claim, Cause of Action, directly or derivatively, by, through, for, or because of a Releasing Party, is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and each other Released Party from any and all Claims (other than Reinstated Claims), interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, the Estates or their Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert (whether individually or collectively), based on or relating to (including the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable), or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof) or their Estates or the Non-Debtor Subsidiaries, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or Non-Debtor Subsidiaries, the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or Non-Debtor Subsidiaries and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the decision to file the Chapter 11 Cases, any intercompany transactions, the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Restructuring Transactions, the Plan (including the Plan Supplement), the solicitation of votes on the Plan, the Disclosure Statement, the New Organizational Documents, the pursuit of Confirmation and Consummation, the DIP Facility, the DIP Facility Documents, the New Money Common Equity Investment Documents, the New Note Documents, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan or the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the indemnification provisions as set forth in the Plan; (b) any Cause of Action included on the Schedule of Retained Causes of Action; (c) the rights of any Holder of an Allowed Claim to receive distributions under the Plan; or (d) the liability of any Released Party that otherwise would result from any act or omission to the extent that act or omission subsequently is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

Section 8.05    **Exculpation.**

**Effective as of the Effective Date, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action or any claim arising from the Petition Date through the Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable the Chapter 11 Cases, the Restructuring Support Agreement, the Disclosure Statement, the Plan (including the Plan Supplement), the DIP Facility, the DIP Facility Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (excluding, for the avoidance of doubt, providing any legal opinion effective as of the Effective Date requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan), except for claims or Causes of Action related to any act or omission constituting actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the exculpation shall not release any obligation or liability of any Entity for any post-Effective Date obligation under the Plan or any document, instrument or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

Section 8.06    **Injunction.**

**Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims (other than Reinstated Claims), Interests, or Causes of Action that have been released, discharged, or are subject to exculpation are permanently enjoined,**

**from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Cause of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.**

*Section 8.07    Protections Against Discriminatory Treatment.*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because each Reorganized Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*Section 8.08    Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

*Section 8.09    Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final

Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

Section 8.10    *Subordination Agreements.*

Notwithstanding anything to the contrary in this Plan, nothing in this Article VIII shall release or discharge the Subordination Agreement or any rights of the senior creditor parties thereto.

<div align="center">

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**

</div>

Section 9.01    *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 9.02 hereof:

(a)    The Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Restructuring Support Agreement (including any consent rights thereunder) and otherwise in form and substance acceptable to the Debtors and the Sponsoring Noteholders, and which shall:

(i)    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)    authorize the Debtors, as applicable/necessary, to: (a) implement the Restructuring Transactions, (b) distribute the New Common Equity pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or Regulation S under the Securities Act, as applicable; (c) make all distributions and issuances as required under the Plan, including Cash and the New Common Equity; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent with the terms of the Restructuring Support Agreement and subject to the consent rights set forth therein;

(iv)    authorize the implementation of the Plan in accordance with its terms; and

(v)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of

<div align="center">55</div>

any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax; and

(b)     all material governmental, regulatory and/or third-party approvals or authorizations for the Restructuring Transactions and other transactions contemplated under the Plan shall have been obtained and not subject to unfulfilled conditions and be in full force and effect, and all applicable waiting or review periods shall have expired or been terminated without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on the Debtors' restructuring under the Plan, the financial benefits of the restructuring to the Sponsoring Noteholders or the ability of the Sponsoring Noteholders to participate in the governance of the Reorganized Debtors;

(c)     the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein shall have been executed or Filed, as applicable in form and substance consistent in all respects with the Restructuring Support Agreement, the Plan, and comply with the applicable consent rights set forth in the Restructuring Support Agreement and/or the Plan for such documents and shall not have been modified in a manner inconsistent with the Restructuring Support Agreement;

(d)     the Restructuring Support Agreement shall not have been terminated, shall be in full force and effect, and the Debtors and the other parties thereto shall be in compliance therewith;

(e)     the Backstop Commitment Documentation shall not have been terminated, shall be in full force and effect, and the Debtors and Backstop Commitment Parties shall be in compliance therewith;

(f)     all Professional Fee Amounts that require the approval of the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been funded into the Professional Fee Account pending the approval of such fees and expenses by the Bankruptcy Court;

(g)     all outstanding Restructuring Expenses have been paid in full in Cash;

(h)     all outstanding Prepetition Agents Expenses have been paid in full in Cash;

(i)     the consummation of the New Money Common Equity Investment shall have occurred;

(j)     the aggregate amount of Allowed General Unsecured Claims and Other Priority Claims to be paid under the Plan shall be no more than $2,500,000.

(k)     the amount of Allowed Professional Fee Administrative Expenses to be paid under the Plan shall be no more than $3,000,000.

(l)     no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Plan; and

(m)     the Debtors shall have implemented all transactions contemplated in the Plan in a manner consistent with the Restructuring Support Agreement (and subject to, and in accordance with, the consent rights set forth therein).

*Section 9.02    Waiver of Conditions.*

Except as otherwise specified in the Restructuring Support Agreement, any one or more of the conditions to Consummation (or component thereof) set forth in this Article IX (other than entry of the Confirmation Order) may be waived by the Debtors with the prior written consent of the Sponsoring Noteholders, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

*Section 9.03    Effect of Failure of Conditions.*

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan, the Disclosure Statement or Restructuring Support Agreement as to such Debtor shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests or any other Entity; (2) prejudice in any manner the rights of the Debtors, any holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity.

*Section 9.04    Substantial Consummation.*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*Section 10.01   Modification and Amendments.*

Except as otherwise specifically provided in this Plan and subject to the consent of the Sponsoring Noteholders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable,

sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

*Section 10.02  Effect of Confirmation on Modifications.*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*Section 10.03  Revocation or Withdrawal of Plan.*

To the extent permitted by the Restructuring Support Agreement and subject to the consent of the Sponsoring Noteholders, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and to the fullest extent permissible by 28 U.S.C. § 1334 to hear, and by 28 U.S.C. § 157 to determine, all proceedings in respect thereof, including, without limitation, for the following purposes:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests, including any dispute over the application to any Claim of any limitation on its allowance set forth in sections 502 or 503 of the

Bankruptcy Code or asserted under non-bankruptcy Law pursuant to section 502(b)(1) of the Bankruptcy Code;

(c)    resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

(d)    resolve disputes concerning Disputed Claims;

(e)    ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(f)    adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(g)    adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(h)    enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

(i)    enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

(j)    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

(k)    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

(l)    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

(m)     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Section 7.06 hereof;

(n)     enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(o)     determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement, including the Restructuring Support Agreement;

(p)     enter an order concluding or closing the Chapter 11 Cases;

(q)     adjudicate any and all disputes arising from or relating to distributions under the Plan;

(r)     consider any modifications of the Plan in accordance with section 1127 of the Bankruptcy Code, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

(s)     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

(t)     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

(u)     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(v)     recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(w)     hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VIII hereof;

(x)     enforce all orders previously entered by the Bankruptcy Court; and

(y)     hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Organizational Documents, the New Common Equity, the New Notes, and any documents

related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

*Section 12.01  Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, all Non-Debtor Subsidiaries, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests have, or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

*Section 12.02  Additional Documents.*

On or before the Effective Date, and consistent in all respects with the terms of the Restructuring Support Agreement, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement. The Debtors, the Reorganized Debtors, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

*Section 12.03  Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

*Section 12.04  Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

*Section 12.05  Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| Debtors | Counsel to the Debtors |
|---|---|
| ProSomnus, Inc.<br>5675 Gibraltar Dr.,<br>Pleasanton, California 94588<br>Attn: Brian B. Dow | Polsinelli PC<br>222 Delaware Ave., Suite 1101<br>Wilmington, Delaware 19808<br>Attn:   Mark B. Joachim (mjoachim@polsinelli.com)<br>         Shanti M. Katona (skatona@polsinelli.com)<br>         Katherine M. Devanney (kdevanney@posinelli.com) |
| | **Counsel to the Sponsoring Noteholders** |
| | Lowenstein Sandler LLP<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Attn:   David M. Posner (dposner@lowenstein.com)<br>         Gianfranco Finizio (gfinizio@lowenstein.com)<br><br>and<br><br>Morris James LLP<br>500 Delaware Ave., Suite 1500<br>Wilmington, Delaware 19801<br>Attn:   Eric J. Monzo (emonzo@morrisjames.com)<br>         Brya M. Keilson (bkeilson@morrisjames.com) |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002 stating that such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

*Section 12.06  Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**Section 12.07  Entire Agreement.**

Except as otherwise indicated, and without limiting the effectiveness of the Restructuring Support Agreement, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**Section 12.08  Plan Supplement.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://www.kccllc.net/prosomnus or the Bankruptcy Court's website at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**Section 12.09  Severability of Plan Provisions.**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

**Section 12.10  Votes Solicited in Good Faith.**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, stockholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

*Section 12.11  Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*Section 12.12  Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

[*Signature Page Follows*]

Dated: June 24, 2024    **PROSOMNUS, INC.**
            **PROSOMNUS HOLDINGS, INC.**
            **PROSOMNUS SLEEP TECHNOLOGIES, INC.**

            */s/ Brian Dow*
            Name: Brian Dow
            Title:   Chief Financial Officer

94957745.21

**<u>Exhibit B</u>**
The Restructuring Support Agreement

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY RESTRUCTURING SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "**Agreement**") is entered into as of May 7, 2024, by and among (i) ProSomnus, Inc., ProSomnus Holdings, Inc., and ProSomnus Sleep Technologies, Inc. (collectively, the "**Company**"), and (ii) (a) CrossingBridge Low Duration High Yield Fund, (b) Destinations Low Duration Fixed Income Fund, (c) Intrepid Income Fund, (d) Cohanzick Absolute Return Master Fund, Ltd., (e) Leaffilter North Holdings Inc., (f) Destinations Global Fixed Income Opportunities Fund (g) RiverPark Strategic Income Fund, (h) Cedarview Opportunities Master Fund, LP, (i) SMC Holdings II, LP, and (j) Cetus Capital VI, L.P. (collectively (ii)(a) – (j), the "**Initial Sponsoring Noteholders**"), and (iii) other holders of the Notes who may become signatories hereto as set forth on the signature page(s) to this Agreement (collectively with the Initial Sponsoring Noteholders, the "**Sponsoring Noteholders**"). The Company and the Sponsoring Noteholders are each referred to as a "**Party**" and collectively referred to as the "**Parties**."  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Term Sheet (as defined below).

## RECITALS

WHEREAS, prior to the date hereof, the Parties have discussed consummating a financial restructuring of the Company's indebtedness and other obligations as set forth in this Agreement and the accompanying Restructuring Term Sheet (as defined herein) (the "**Restructuring**").

WHEREAS, as of the date hereof, the Initial Sponsoring Noteholders collectively hold approximately 100% of the issued and outstanding 2022 Senior Convertible Notes, 100% of the issued and outstanding 2023 Senior Convertible Exchange Notes, 94.95% of the issued and outstanding 2022 Subordinated Convertible Notes, 100% of the issued and outstanding 2023 Subordinated Convertible Exchange Notes, and 100% of the issued and outstanding 2024 Senior Bridge Notes.

WHEREAS, the Parties desire to implement the Restructuring through Chapter 11 bankruptcy filings of the Company, which chapter 11 cases the Company will seek to have jointly administered by no later than May 17, 2024 (the "**Outside Petition Date**").

WHEREAS, the Parties will undertake to effect the Restructuring through a plan of reorganization under Chapter 11 of the Bankruptcy Code (the "**Plan**"), which plan shall be consistent in all material respects with the terms and conditions set forth in the Restructuring Term Sheet (defined below) and otherwise in form and substance reasonably acceptable to the Company and the Sponsoring Noteholders.

WHEREAS, this Agreement and the Restructuring Term Sheet, which is incorporated herein by reference and is made part of this Agreement, set forth the agreement among the Parties concerning their commitment, subject to the terms and conditions hereof and thereof, to implement the Restructuring. In the event the terms and conditions as set forth in the Restructuring Term Sheet and this Agreement are inconsistent, the terms and conditions in this Agreement shall govern and control, except to the extent the inconsistency concerns the economics of the Restructuring, in which case the terms and conditions of the Restructuring Term Sheet shall govern and control.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party agrees as follows:

## STATEMENT OF AGREEMENT

1.    Definitions. The following terms shall have the following definitions:

"**2022 Senior Convertible Notes**" means the "Senior Secured Convertible Notes due 2025" issued under the 2022 Senior Indenture in the original aggregate amount of $16,959,807.

"**2022 Senior Indenture**" means that certain *Senior Secured Convertible Notes Due December 6, 2025 Indenture*, dated as of December 6, 2022.

"**2022 Subordinated Convertible Notes**" means the "Subordinated Secured Convertible Notes due 2026" issued under the 2022 Subordinated Indenture in the original aggregate principal amount of $17,453,141.

"**2022 Subordinated Indenture**" means that certain *Subordinated Secured Convertible Notes Due April 6, 2026 Indenture*, dated as of December 6, 2022.

"**2023 Senior Convertible Exchange Notes**" means the "Senior Secured Convertible Exchange Notes due 2025" issued under the 2023 Senior Indenture.in the original aggregate principal amount of $3,391,961.

"**2023 Senior Indenture**" means that certain *Senior Secured Convertible Exchange Notes Due December 6, 2025 Indenture*, dated as of October 11, 2023.

"**2023 Subordinated Convertible Exchange Notes**" means the "Subordinated Secured Convertible Exchange Notes due 2026" issued under the

2023 Subordinated Indenture in the original aggregate principal amount of $12,137,889.

"**2023 Subordinated Indenture**" means that certain *Subordinated Secured Convertible Exchange Notes Due April 6, 2026 Indenture*, dated as of October 11, 2023.

"**2024 Senior Bridge Notes**" means the "Senior Secured Convertible Notes due December 6, 2025" issued under the 2022 Senior Indenture in the original aggregate principal amount of up to $5,000,000.00.

"**Agreement**" has the meaning set forth in the preamble hereto.

"**Alternative Transaction**" has the meaning set forth in Section 2(e) hereto.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or governmental action to close.

"**Chapter 11 Cases**" means any voluntary chapter 11 case(s) commenced by the Company.

"**Confirmation Order**" means an order entered by the Bankruptcy Court confirming the Plan, including all exhibits, appendices and related documents, each consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Company and the Sponsoring Noteholders.

"**Definitive Documents**" means the documents listed in Section 6.

"**DIP Claims**" has the meaning set forth in the Restructuring Term Sheet.

"**DIP Financing**" means debtor-in-possession financing to be provided by the Sponsoring Noteholders pursuant to the terms set forth on the Restructuring Term Sheet.

"**DIP Financing Orders**" means the interim and final orders entered by the Bankruptcy Court approving the debtor-in-possession financing to be provided by the Sponsoring Noteholders pursuant to the terms set forth in the Restructuring Term Sheet.

"**Disclosure Statement**" means the disclosure statement in respect of the Plan which shall be consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Company and the Sponsoring Noteholders.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement and authorizing the solicitation of votes on the Plan, which shall be consistent in all material respects with the Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Company and the Sponsoring Noteholders.

"**Effective Date**" means the date on which all conditions to consummation of the Plan have been satisfied (or waived) and the Plan becomes effective.

"**Indentures**" means, collectively, (i) the Senior Indentures, and (ii) the Subordinated Indentures.

"**Initial Sponsoring Noteholders**" has the meaning set forth in the preamble hereto.

"**Noteholder Claims**" means all claims arising under or relating to the Notes and/or the Indentures and all agreements and instruments relating to the foregoing that remain unpaid and outstanding as of the Effective Date.

"**Notes**" means, collectively, (i) the Senior Secured Notes, and (ii) the Subordinated Secured Notes.

"**Outside Date**" has the meaning set forth in Section 5 herein.

"**Outside Petition Date**" has the meaning set forth in the Recitals herein.

"**Person**" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"**Petition Date**" means the date the Chapter 11 Cases of the Company are commenced.

"**Plan**" has the meaning set forth in the Recitals herein.

"**Plan Related Documents**" means the Plan, the Disclosure Statement, the Solicitation Materials, the Confirmation Order, any Plan supplement documents, any required security documents, along with any other documents or agreements, whether or not filed with the Bankruptcy Court by the Company, that are necessary to implement the Plan, the Restructuring and the Restructuring Term Sheet pursuant to an out-of-court restructuring or the Chapter 11 Cases; provided that each of the foregoing documents shall be consistent in all material respects with the

4

Restructuring Term Sheet and otherwise in form and substance reasonably acceptable to the Company and the Sponsoring Noteholders.

"**Restructuring**" has the meaning set forth in the Recitals hereto.

"**Restructuring Term Sheet**" means that certain term sheet containing the material terms and provisions of the Restructuring agreed upon by the Parties hereto that are to be incorporated into the Plan and Plan Related Documents, a copy of which is attached hereto as Exhibit A.

"**Senior Indentures**" means, collectively (i) the 2022 Senior Indenture, and (ii) the 2023 Senior Indenture.

"**Senior Secured Notes**" means, collectively (i) the 2022 Senior Convertible Notes, (ii) the 2023 Senior Convertible Exchange Notes, and (iii) the 2024 Senior Bridge Notes.

"**Solicitation Materials**" means the Disclosure Statement and other solicitation materials in respect of the Plan as approved by the Bankruptcy Court pursuant to Section 1125(b) of the Bankruptcy Code.

"**Sponsoring Noteholders**" has the meaning set forth in the preamble hereto.

"**Subordinated Indentures**" means, collectively, (i) the 2022 Subordinated Indenture, and (ii) the 2023 Subordinated Indenture.

"**Subordinated Secured Notes**" means, collectively, (i) the 2022 Subordinated Convertible Notes, and (ii) the 2023 Subordinated Convertible Exchange Notes.

"**Transfer**" has the meaning set forth in Section 7 hereto.

"**Termination Date**" has the meaning set forth in Section 4 hereto.

"**Termination Event**" has the meaning set forth in Section 4 hereto.

2.      Commitment of Sponsoring Noteholders. Subject to the terms and conditions of this Agreement and the terms and conditions set forth in the Restructuring Term Sheet and for so long as no Termination Event has occurred, each Sponsoring Noteholder (severally and not jointly), on its behalf and on behalf of its controlled affiliates, agrees that:

a)      So long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, each Sponsoring Noteholder shall vote all Noteholder Claims, now or hereafter beneficially owned by such Sponsoring Noteholder or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, in favor of the Plan in accordance with the applicable procedures set forth in

the Solicitation Materials, and timely return a duly executed ballot in connection therewith;

b) Each Sponsoring Noteholder shall not withdraw or revoke its tender, consent or vote with respect to the Plan, except as otherwise expressly permitted pursuant to this Agreement;

c) Each Sponsoring Noteholder shall negotiate in good faith the Definitive Documents contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, including, but not limited to the Plan, Disclosure Statement and Plan Related Documents, which shall be in form and substance reasonably acceptable to the Sponsoring Noteholders and the Company, on the terms and subject to the conditions as substantially set forth in this Agreement;

d) Each Sponsoring Noteholder shall not take any action inconsistent with this Agreement, the Restructuring Term Sheet, or the confirmation and consummation of the Plan; and

e) Following the commencement of the Chapter 11 Cases, each Sponsoring Noteholder shall not (i) object to the Plan, Disclosure Statement or the consummation of the Restructuring Term Sheet or Plan, or any efforts to obtain acceptance of, and to confirm and implement, the Plan; (ii) initiate any legal proceedings that are inconsistent with or that would delay, prevent, frustrate or impede the approval, confirmation or consummation of the Restructuring, the Disclosure Statement or the Plan or the transactions outlined therein or in the Restructuring Term Sheet or otherwise commence any proceedings to oppose any of the Plan Related Documents, or take any other action that is barred by this Agreement; (iii) vote for, consent to, support or participate in the formulation of any other restructuring or settlement of the Company's claims, any other transaction involving the Company or its assets, or any plan of reorganization (with the sole exception of the Plan) or liquidation under applicable bankruptcy or insolvency laws, whether domestic or foreign, in respect of the Company; (iv) directly or indirectly seek, solicit, support, formulate, entertain, encourage or engage in discussions, or enter into any agreements relating to, any restructuring, plan of reorganization, proposal or offer of dissolution, winding up, liquidation, reorganization, merger, transaction, sale, disposition or restructuring of the Company (or any of its assets or stock) other than the Plan or as otherwise set forth in the Restructuring Term Sheet (collectively, (iii) and (iv), an "**Alternative Transaction**"); (v) engage in or otherwise participate in any negotiations regarding any Alternative Transaction, enter into any letter of intent, memorandum of understanding, agreement in principle or other agreement relating to any Alternative Transaction; (vi) solicit, encourage, or direct any Person, including, without limitation any indenture trustee of the Indentures, to undertake any action set forth in clauses (i) through (v) of this subsection (e); or (vii) permit any of its, or its controlled affiliates', officers, directors, managers, employees, partners,

representatives and agents to undertake any action set forth in clauses (i) through (vi) of this subsection (e).

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Sponsoring Noteholder from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and otherwise in furtherance of the Restructuring and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring.

3.    <u>Commitment of the Company</u>. Subject to Section 14 herein and for so long as no Termination Event has occurred, the Company agrees to:

(i)    support and complete the Restructuring and all transactions contemplated under this Agreement, the Restructuring Term Sheet, the Plan and all other Plan Related Documents;

(ii)    negotiate in good faith the Definitive Documents contemplated by this Agreement or otherwise necessary to effectuate the Restructuring, including, but not limited to the Plan, Disclosure Statement and Plan Related Documents, which shall be in form and substance reasonably acceptable to the Sponsoring Noteholders and the Company, on the terms and subject to the conditions as substantially set forth in this Agreement;

(iii)    take any and all necessary and appropriate actions in furtherance of the Restructuring and the transactions contemplated under the Restructuring Term Sheet, the Plan and all other Plan Related Documents, including objecting to any pleadings filed with the Bankruptcy Court in opposition to the Restructuring (or that would frustrate or impede the Restructuring), the Plan Related Documents, or the Definitive Documents;

(iv)    file a formal objection or other opposition, on a timely basis in accordance with applicable law, to any motion, pleading, application, adversary proceeding or cause of action filed with the Bankruptcy Court by a third party seeking the entry of an order (a) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (b) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (c) dismissing the Chapter 11 Cases, or (d) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(v)    complete the Restructuring and all transactions contemplated under the Restructuring Term Sheet, the Plan and all other Plan Related Documents within the Case Milestones set forth in this Agreement,

(vi)    obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring;

7

(vii)   take no actions inconsistent with this Agreement, the Restructuring Term Sheet, or the confirmation and consummation of the Plan;

(viii)  comply with each Case Milestone set forth in Section 5 herein;

(ix)    not commence or support any avoidance action or other legal proceeding (or consent to any other Person obtaining standing to commence any such avoidance action or other legal proceeding) that challenges the validity, enforceability, or priority of the liens and claims of the Sponsoring Noteholders;

(x)     not directly or indirectly solicit, seek, formulate, propose, or enter into any agreements relating to, an Alternative Transaction; and

(xi)    pay in full and in cash all fees, costs, and expenses in accordance with Section 18 of this Agreement and the DIP Financing Orders.

4.      <u>Termination</u>. This Agreement may be terminated by (a) the mutual consent of the Company and the Sponsoring Noteholders, or (b) either the Company or the Sponsoring Noteholders upon the occurrence of any of the following events (each a "**Termination Event**"); <u>provided</u>, <u>however</u> that the Company may not terminate this Agreement upon the occurrence of a Termination Event pursuant to clause (d)(I) below and the Sponsoring Noteholders may not terminate this Agreement upon the occurrence of a Termination Event pursuant to clause (d)(II) below; <u>provided further that</u>, in the event the Company or the Sponsoring Noteholders provide written notice of a Termination Event, the Company and the Sponsoring Noteholders, as applicable shall have five (5) Business Days to seek a Bankruptcy Court determination that no Termination Event has occurred or that such Termination Event has been cured:

a)      the Company shall have (1) announced, in writing or in open court, its intention not to pursue the Restructuring, or (2) proposed or accepted an Alternative Transaction;

b)      any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing or prohibiting the Restructuring in a manner that cannot reasonably be remedied by the Company or the Sponsoring Noteholders;

c)      the occurrence of any event, fact or circumstance which would (individually or in the aggregate) (i) have a material adverse effect on the business, assets, financial condition, liabilities or results of operations of the Company taken as a whole; or (ii) materially impair the ability of the Company to consummate the transactions contemplated by, or to perform its obligations under, this Agreement or the Restructuring Term Sheet;

d)      the occurrence of a material breach by any of the Parties of any of its obligations, covenants or commitments set forth in this Agreement, and any such breach is either unable to be cured or is not cured by five (5) Business Days after receipt of written notice (I) from the Sponsoring

Noteholders, in the case of a breach by the Company, or (II) from the Company, in the case of a breach by a Sponsoring Noteholder;

e)    the DIP Facility is not approved by the Bankruptcy Court or is terminated in accordance with the terms of the DIP Credit Agreement and the interim or final DIP orders;

f)    the Company fails to operate in the ordinary course of business consistent with past practice in all material respects (other than any changes in operations (I) resulting from or relating to the Plan or the proposed or actual filing of the Chapter 11 Cases, or (II) imposed by the Bankruptcy Court); provided, however, any written notice of termination based on this provision shall specify what actions the Company or its advisors would need to take to cure such failure and that taking such actions within five (5) Business Days would be deemed to cure this Termination Event;

g)    the commencement of an involuntary case against the Company under the Bankruptcy Code if such involuntary case is not dismissed within 60 days of it having been commenced (so long as no order for relief is theretofore entered), unless such involuntary case has been converted to a chapter 11 case with the consent of the Company and no other Termination Event has occurred;

h)    holders of at least 66% in principal amount of each class of outstanding Noteholder Claims fail to execute and deliver to the Company counterpart signature pages of this Agreement by the Outside Petition Date;

i)    the Company fails to adhere to any of the Case Milestones set forth in Section 5 of this Agreement;

j)    the Definitive Documents, Plan Related Documents, and any amendments, modifications, supplements, or other documents related to the foregoing, including motions, notices, exhibits, appendices, and orders, are inconsistent with this Agreement and the Restructuring Term Sheet, or not reasonably acceptable to the Sponsoring Noteholders;

k)    the appointment of a trustee, receiver, examiner with expanded powers, responsible person or responsible officer in the Chapter 11 Cases;

l)    any class of creditors in which the Noteholder Claims are classified votes to rejects the Plan;

m)    the Bankruptcy Court enters an order modifying or terminating the Company's exclusive right to file and solicit acceptances of a plan of reorganization (including the Plan);

n)    the Bankruptcy Court enters a final order disallowing, invalidating, subordinating, recharacterizing, avoiding, or declaring unenforceable the claims, liens or interests, in any material respect, held by any Sponsoring Noteholders or the Agent or Indenture Trustee under the Indentures; or

o)    the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

The date on which this Agreement is terminated in accordance with the provisions of this Section 4 shall be referred to as the "**Termination Date**" and the provisions of this Agreement and the Restructuring Term Sheet shall terminate, except as otherwise provided in this Agreement, unless, in the case of this Section 4, within five (5) Business Days the Company and/or the Sponsoring Noteholders (as applicable) waive, in writing, the occurrence of or amend or modify any of the events set forth in this Section 4. In the event of the termination of this Agreement pursuant to this Section 4, written notice thereof shall forthwith be given to the other Party specifying the provision hereof pursuant to which such termination is made, and this Agreement shall be terminated and become void and have no effect and there shall be no liability hereunder on the part of any Party, except that Sections 14, 18, and 22–29 shall survive any termination of this Agreement. Nothing in this Section 4 shall relieve any Party of liability for any breach of this Agreement that occurred prior to the occurrence of the Termination Date.

The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company Parties hereby waive, to the greatest extent legally possible, the applicability of the automatic stay to the giving of such notice); provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

5.    Case Milestones.  The Sponsoring Noteholders' support for the Restructuring shall be subject to the timely satisfaction of the following milestones (the "**Case Milestones**"), which may be waived or extended with the prior written consent of the Sponsoring Noteholders:

a)    the Petition Date shall be on or before the Outside Petition Date;

b)    no later than 5 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Financing Order;

c)    no later than 40 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Financing Order, which shall comply with all local rules of the Bankruptcy Court, including but not limited to with respect to the challenge period;

d)    no later than 15 Business Days following the Petition Date, the Debtors shall have filed (i) a plan of reorganization reasonably acceptable to the Sponsoring Noteholders; (ii) a disclosure statement in connection therewith (the "**Acceptable Disclosure Statement**") and (iii) a motion seeking entry of an order approving the Acceptable Disclosure Statement;

e)    no later than 50 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Acceptable Disclosure Statement in form and substance reasonably acceptable to the Supporting Noteholders;

10

f)  no later than 90 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

g)  no later than 105 calendar days following the Petition Date, the Plan Effective Date shall have occurred (the "**Outside Date**").

6.    <u>Definitive Documents</u>.  The Definitive Documents governing the Restructuring shall include, as applicable, this Agreement and all other agreements, instruments, pleadings, filings, notices, letters, affidavits, applications, orders (whether proposed or entered), forms, questionnaires and other documents (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring (including all amendments, modifications, and supplements made thereto from time to time, including each of the following:

a)  DIP Financing motion, credit agreement, and related orders;

b)  Disclosure Statement and related orders;

c)  Solicitation Materials;

d)  Plan;

e)  Plan Supplement;

f)  Confirmation Order;

g)  Exit financing documents;

h)  New organizational documents;

i)  Any and all filings with or requests for regulatory or other approvals from any governmental body; and

j)  Such other agreements, instruments, and documents as may be necessary or reasonably desirable to consummate and document the Restructuring.

Definitive Documents not executed or in a form attached to this Agreement remain subject to negotiation and completion.

7.    <u>Transfer of Noteholder Claims</u>. Notwithstanding anything to the contrary in this Agreement, each of the Sponsoring Noteholders agrees that until the occurrence of the Termination Date, it shall not sell, assign, transfer, convey, pledge, hypothecate or otherwise dispose of, directly or indirectly (each such transfer, a "**Transfer**"), all or any of its Noteholder Claims (or any right related thereto and including any voting rights associated with such Noteholder Claims) unless the transferee thereof (i) is a Sponsoring Noteholder or (ii)(a) agrees in writing by executing a joinder in the form of <u>Exhibit B</u> to assume and be bound by this Agreement and the Restructuring Term Sheet, and to assume the rights and obligations of the Sponsoring Noteholder under this Agreement and (b) promptly delivers such writing to the Company (each such transferee becoming, upon the

Transfer, a Sponsoring Noteholder hereunder). The Company shall promptly acknowledge any such Transfer in writing and provide a copy of that acknowledgement to the transferor. By its acknowledgement of the relevant Transfer, the Company shall be deemed to have acknowledged that its obligations to the Sponsoring Noteholder hereunder shall be deemed to constitute obligations in favor of the relevant transferee. Any Transfer of any Noteholder Claim by a Sponsoring Noteholder that does not comply with the procedure set forth in the first sentence of this Section 7 shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude the Sponsoring Noteholders from acquiring additional Noteholder Claims, provided that any such additional Noteholder Claims shall automatically be deemed to be subject to the terms of this Agreement, and provided further that the Sponsoring Noteholders agree to furnish to the Company prompt notice within five (5) Business Days of the acquisition of any additional Notes.

8.    <u>Transfer of DIP Claims</u>. Notwithstanding anything to the contrary in this Agreement, each of the Sponsoring Noteholders agrees that until the occurrence of the Termination Date, it shall not sell, assign, transfer, convey, pledge, hypothecate or otherwise dispose of, directly or indirectly all or any of its DIP Claims unless the transferee thereof (i) is a Sponsoring Noteholder or (ii)(a) agrees in writing by executing a joinder in the form of <u>Exhibit B</u> to assume and be bound by this Agreement and the Restructuring Term Sheet, and to assume the rights and obligations of the Sponsoring Noteholder under this Agreement, (b) promptly delivers such writing to the Company (each such transferee becoming, upon the Transfer, a Sponsoring Noteholder hereunder), and (c) the Transfer complies with Rule 3001 of the Federal Rules of Bankruptcy Procedure. Any Transfer of any DIP Claim by a Sponsoring Noteholder that does not comply with the procedure set forth in the first sentence of this Section 8 shall be deemed void *ab initio*.

9.    <u>Reporting Requirements</u>. The Company agrees that it shall (i) make its chief financial officer or its financial advisor available via teleconference on a weekly basis to provide the Sponsoring Noteholders and its professionals with regular updates regarding the operation of the Company's business and financial condition, operations, the status and progress of the Restructuring, and status of obtaining any necessary or desirable authorizations with respect to the Restructuring from each Party, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange; (ii) provide to each Sponsoring Noteholder and its professionals bi-weekly financial reports until the consummation of the Restructuring; and (iii) provide prompt and reasonable responses to all reasonable diligence requests from the Sponsoring Noteholders and its professionals.

10.    <u>No Solicitation</u>. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan (or any other plan of reorganization) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

11.    <u>Ownership of Claims</u>. Each Sponsoring Noteholder represents and warrants (severally and not jointly) that:

    a.    as of the date of this Agreement, it is the beneficial owner of the principal amount of the Noteholder Claims, or is the nominee, investment manager or advisor for beneficial holders of the Noteholder Claims, as set forth on the signature page for each Sponsoring Noteholder; provided, however, that the information contained therein shall be maintained as confidential by the Company and the Company's

financial advisors and legal counsel, except to the extent otherwise required by law or any rule or regulation of any exchange or regulatory authority, subject to the disclosure obligations set forth in Section 28 of this Agreement; and

b. other than pursuant to this Agreement, such Noteholder Claims, are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrances of any kind, that might adversely affect in any way such Sponsoring Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

12.    <u>Representations</u>.

(a) Each Party represents to each other Party that, as of the date of this Agreement:

(i) It has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations hereunder, and the execution, delivery and performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability, or similar action on its part;

(ii) The execution, delivery and performance of this Agreement by such Party does not and shall not (x) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries or (y) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party or under its organizational documents;

(iii) The execution, delivery and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, and the approval by the Bankruptcy Court of the Company's authority to enter into and implement this Agreement;

(iv) Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, it is the intent of each party that this Agreement is the legally valid and binding obligation of such Party, fully enforceable against it in accordance with its terms prior to and during the Chapter 11 Cases, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws, both foreign and domestic, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b) Each Sponsoring Noteholder represents to the Company that such Sponsoring Noteholder, in entering into this Agreement and undertaking its obligations hereunder, is acting independently and is not acting, directly or indirectly, through contract, arrangement, understanding, relationship or otherwise with any other holder of Notes.

13.    <u>Entire Agreement</u>. This Agreement, including the exhibits, schedules and annexes hereto constitutes the entire agreement of the Parties with respect to the subject matter of this

Agreement, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

14.  <u>No Waiver</u>. This Agreement and the Restructuring Term Sheet are part of a proposed settlement of a dispute among the Parties. If the transactions contemplated by this Agreement are not consummated, or following the occurrence of the Termination Date, if applicable, nothing shall be construed by this Agreement as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

15.  <u>Company Fiduciary Duties</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its subsidiaries or any of its or their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such party's fiduciary obligations under applicable law, including the Bankruptcy Code.

16.  <u>Cooperation and Support</u>. The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent possible and subject to the terms of this Agreement) in respect of (i) all matters relating to their rights hereunder in respect of the Company or otherwise in connection with their relationship with the Company, and (ii) the consummation of the Restructuring. Furthermore, subject to the terms of this Agreement, each of the Parties shall take such action as reasonably may be necessary to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims or securities of the Company in favor of the Restructuring in connection therewith, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement. In addition, the Company shall provide draft copies of all Plan Related Documents, "first day" motions, applications, and proposed orders, and other documents the Company intends to file with the Bankruptcy Court to counsel to the Sponsoring Noteholders at least three business days prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing; <u>provided</u>, <u>however</u>, the Company will not be in breach of this provision by failing to provide to the Sponsoring Noteholders drafts of motions or pleadings that seek emergency or expedited relief (other than the "first day" motions). Notwithstanding anything to the contrary herein, the form and substance of the Definitive Documents shall be reasonably acceptable to the Company and the Sponsoring Noteholders.

17.  <u>Representation by Counsel</u>. Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have

any term or provision construed against such Party solely by reason of such Party having drafted the same.

18.  <u>Independent Due Diligence and Decision-Making</u>. Each Sponsoring Noteholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the Company.

19.  <u>Fees and Expenses</u>.  The Company shall pay in full in cash all reasonable and documented fees when due of the Sponsoring Noteholders (regardless of whether such fees and expenses are incurred before or after the Petition Date), including the reasonable and documented fees and expenses of (a) Kilpatrick Townsend & Stockton LLP, as legal counsel, and (b) one local counsel, and any such other advisors and consultants as may be reasonably retained on behalf of the Sponsoring Noteholders and, in each case, seek authority to pay such fees and expenses in connection with the DIP Financing Order(s) and the Confirmation Order.

20.  <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

21.  <u>Amendments</u>. Except as otherwise provided in this Agreement, this Agreement (including the Restructuring Term Sheet) may not be modified, amended or supplemented without prior written consent of the Company and the Sponsoring Noteholders; provided that written consent by Sponsoring Noteholders holding at least 66 2/3% of the aggregate principal amount of the Noteholder Claims held by all Sponsoring Noteholders as set forth on the signature page(s) hereto shall be required to extend the Outside Date by more than fifteen (15) calendar days.

22.  <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

23.  <u>Specific Performance/Remedies</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder; <u>provided</u>, <u>however</u>, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

24.  <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of

the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

25.     <u>Trial by Jury Waiver</u>.  Each party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated thereby.

26.     <u>Notices</u>. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, courier, by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses or emails:

> If to the Company:
>
> Shanti M. Katona, Esq.
> Mark B. Joachim, Esq.
> Polsinelli PC
> 222 Delaware Ave., Suite 1101
> Wilmington, Delaware 19801
> skatona@polsinelli.com
> mjoachim@polsinelli.com
>
> If to the Sponsoring Noteholders:
>
> David M. Posner, Esq.
>
> Gianfranco Finizio, Esq.
> Kilpatrick Townsend & Stockton LLP
> The Grace Building
> 1114 Avenue of the Americas
> New York, New York 10036
> dposner@ktslaw.com
> gfinizio@ktslaw.com

27.     <u>No Third-Party Beneficiaries</u>. The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any Person.

28.     <u>Successors and Assigns</u>. Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, assigns, heirs, executors, administrators and representatives.

29.     <u>Public Disclosure</u>. The Sponsoring Noteholders hereby consent to the disclosure by the Company in the Plan, Disclosure Statement, the other Plan Related Documents and any filings

by the Company with the Bankruptcy Court or the Securities and Exchange Commission or as required by law or regulation of the execution and contents of this Agreement; provided, however, that except as required by law or any rule or regulation of any securities exchange or any governmental agency, the Company shall not, without the Sponsoring Noteholder's prior consent, (a) use the name of any Sponsoring Noteholder or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release or filing with the Securities and Exchange Commission or (b) disclose the holdings of any Sponsoring Noteholder to any person. The Company and the Sponsoring Noteholders shall (a) consult with each other before issuing any press release or otherwise making any public statement with respect to the transactions contemplated by this Agreement, (b) provide to the other for review a copy of any such press release or public statement and (c) not issue any such press release or make any such public statement prior to such consultation and review and the receipt of the prior consent of the other Party, unless required by applicable law or regulations of any applicable stock exchange or governmental authority, in which case, the Party required to issue the press release or make the public statement shall, prior to issuing such press release or making such public statement, use its commercially reasonable efforts to allow the other Party reasonable time to comment on such release or statement to the extent practicable; provided, that no Party need consult with any other Party with respect to any press release or public statement relating to the termination of this Agreement.

30.    <u>Interpretation</u>. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation of this Agreement is to be interpreted in a neutral manner; and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.

[*Remainder of page intentionally blank*]

*EXECUTION VERSION*

## **Exhibit A**

Restructuring Term Sheet

**PROSOMNUS, INC.**
**RESTRUCTURING TERM SHEET**

May 7, 2024

This term sheet (this "**Term Sheet**") summarizes the principal economic and structural terms of a financial restructuring (the "**Restructuring**") of the capital structure of ProSomnus, Inc. (the "**Company**"). This Term Sheet is offered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Federal Rule of Evidence 408 and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions. This Term Sheet is intended as an outline only of certain material terms of the proposed transactions described herein, and does not represent a commitment to lend, invest or provide financing or to negotiate to do any of these things. Furthermore, this Term Sheet does not constitute a waiver by any party, or an agreement or commitment by any party to forbear from taking any remedies to which such party may be entitled. This Term Sheet and the terms, conditions and assumptions contained herein are subject to the negotiation and execution of definitive documentation for the transactions described herein, including the Restructuring, which documentation shall be in all respects materially consistent with this Term Sheet. This Term Sheet is not an offer with respect to any securities or a solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation will only be made in compliance with all applicable laws.

| OVERVIEW | |
|---|---|
| **Company Entities:** | ProSomnus, Inc., ProSomnus Holdings, Inc. and ProSomnus Sleep Technologies, Inc. (collectively, the "**Company Entities**" or "**Debtors**") |
| **Existing Funded Indebtedness:** | The Company Entities' existing funded indebtedness consists of: <br><br> 1. The "Senior Secured Convertible Notes due 2025" (the "**2022 Senior Convertible Notes**") issued under that certain *Senior Secured Convertible Notes Due December 6, 2025 Indenture*, dated as of December 6, 2022 (the "**2022 Senior Indenture**") in the original aggregate principal amount of $16,959,807.00. <br><br> 2. The "Senior Secured Convertible Exchange Notes due 2025" (the "**2023 Senior Convertible Exchange Notes**") issued under that certain *Senior Secured Convertible Exchange Notes Due December 6, 2025 Indenture*, dated as of October 11, 2023 (the "**2023 Senior Indenture**" and together with the 2022 Senior Indenture, the "**Senior Indentures**") in the original aggregate |

|  | principal amount of $3,391,961.00 in exchange for $3,391,961.00 principal amount of the 2022 Senior Notes. |
|  | 3. The "Subordinated Secured Convertible Notes due 2026" (the **2022 Subordinated Convertible Notes**") issued under that certain *Subordinated Secured Convertible Notes Due April 6, 2026 Indenture*, dated as of December 6, 2022 (the "**2022 Subordinated Indenture**") in the original aggregate principal amount of $17,453,141.00. |
|  | 4. The "Subordinated Secured Convertible Exchange Notes due 2026" (the "**2023 Subordinated Convertible Exchange Notes,**" and, together with the 2022 Subordinated Convertible Notes, the "**Subordinated Notes**") issued under that certain *Subordinated Secured Convertible Exchange Notes Due April 6, 2026 Indenture*, dated as of October 11, 2023 (the "**2023 Subordinated Indenture**" and together with the 2022 Subordinated Indenture, the "**Subordinated Indentures**," which together with the Senior Indentures are referred to as the "**Indentures**") in the original aggregate principal amount of $12,137,889.00 in exchange for $12,079,169.00 principal amount of the 2022 Subordinated Notes.[1] |
|  | 5. The "Senior Secured Convertible Notes due December 6, 2025" (the "**2024 Senior Bridge Notes**", together with the 2023 Senior Convertible Exchange Notes and the 2022 Senior Convertible Notes, the "**Senior Notes**") in the original aggregate principal amount of up to $5,000,000.00, the proceeds of which (the "**Bridge Loan**") were used to pay payroll, key suppliers, incentives past due to critical sales outlets, legal fees associated with the issuance of the 2024 Senior Bridge Notes, and ongoing restructuring efforts of the Company.  As of the date of the RSA, the outstanding principal amount of the 2024 Senior Bridge Notes totaled $4,000,000.00. |

---

[1] The $12,137,889.00 of 2023 Subordinated Notes exchanged includes $58,720.00 of accrued and unpaid paid-in-kind interest on the 2022 Subordinated Notes exchanged.

| | |
|---|---|
| **Implementation**: | The financial restructuring and other transactions contemplated in this RSA Term Sheet will be implemented and consummated through, among other things:<br><br>1.  The funding of the Bridge Loan, as defined and further described herein, by an ad hoc group of holders of Senior Notes and Subordinated Notes that hold and control, in the aggregate, 100% of the issued and outstanding 2022 Senior Convertible Notes, 100% of the issued and outstanding 2023 Senior Convertible Exchange Notes, 94.95% of the issued and outstanding 2022 Subordinated Convertible Notes, and 100% of the issued and outstanding 2023 Subordinated Convertible Exchange Notes (the "**Sponsoring Noteholders**");<br><br>2.  The commencement of voluntary chapter 11 cases of the Company Entities (the "**Chapter 11 Cases**" and the date on which the Chapter 11 Cases are commenced, the "**Petition Date**") pursuant to chapter 11 of title 11 of the United States Code §101 et seq. (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware;<br><br>3.  The funding of the DIP Facility, as defined and further described herein, by the Sponsoring Noteholders, which DIP Facility will include a post-emergence commitment by the Sponsoring Noteholders and third-party investors to purchase equity in the Reorganized Debtors (the "**Exit Financing**") on terms sufficient to ensure feasibility of the Company Entities' chapter 11 plan that will be in form and substance acceptable to the Sponsoring Noteholders in their sole discretion (the "**Plan**"), in connection with the effective date of the Plan (the "**Effective Date**"); and<br><br>4.  A financial restructuring of the existing capital structure of the Company Entities pursuant to the Plan, which shall be consistent with the terms set forth herein (unless otherwise agreed by the Company Entities and Sponsoring Noteholders) and otherwise reasonably acceptable to the Company Entities and Sponsoring Noteholders, to |

| | be implemented through the Chapter 11 Cases in the Bankruptcy Court under chapter 11 of the Bankruptcy Code, as provided in this RSA Term Sheet and the RSA. |
|---|---|
| **Sponsoring Noteholders Consent Rights:** | Notwithstanding anything else set forth herein, the form and substance of the Definitive Documents (defined below) shall be reasonably acceptable to the Company and Sponsoring Noteholders. The Definitive Documents shall include, without limitation, all of the following: (i) the Plan (including any exhibits or supplement(s) filed with respect thereto, (ii) the Disclosure Statement (including any exhibits thereto), (iii) the RSA, (iv) the order confirming the Plan (the "**Confirmation Order**"), (v) any motion or other pleadings related to the Plan, (vi) the order of the Bankruptcy Court approving the Disclosure Statement and solicitation materials, (vii) the DIP Credit Agreement (including any amendments, modifications, or supplements thereto), (viii) any motions and related declarations filed with the Bankruptcy Court seeking approval of the DIP Credit Agreement, (ix) the interim and final DIP orders, (x) all documents related to the Exit Facility, and (xi) all "first day" motions, applications, and related orders. |
| **Restructuring:** | The Restructuring shall be consummated through, *inter alia*, the distribution of the new common equity (the "**New ProSomnus Common Equity**") of ProSomnus as reorganized under the Plan ("**Reorganized ProSomnus**") to the holders of the Subordinated Notes, either directly or indirectly through a newly-formed entity, holders of the DIP Claims, and as otherwise set forth herein. The Company Entities, as reorganized under the Plan, shall be referred to herein as the "**Reorganized Debtors**." |
| **Bridge Loan:** | The Sponsoring Noteholders provided the Company with pre-petition Bridge Loan as follows: |

1. On April 17, 2024, the Company authorized and issued the 2024 Senior Bridge Notes up to the aggregate principal amount of $5,000,000.00 pursuant to those certain Consents to New Note Issuance and Related Indenture Amendments, dated as of April 17, 2024, among the Company and the Sponsoring Noteholders and issued under the 2022 Senior Indenture.
2. Principal payments for the 2024 Senior Bridge Notes are due on January 1, April 1, July 1 and October 1 of each year, commencing with October

<table>
<tr>
<td></td>
<td>

1, 2024, until the earlier of December 6, 2025 or the 2024 Senior Bridge Notes no longer being outstanding.

3. Interest payments for the 2024 Senior Bridge Notes are due as follows: January 1, April 1, July 1 and October 1 of each year, beginning on July 1, 2024, on each Conversion Date (as to that principal amount then being converted), on each Optional Redemption Date (as to that principal amount then being redeemed) and on the Maturity Date; *provided, however,* that the interest otherwise payable on April 1, 2024 and July 1, 2024 may instead be paid on October 1, 2024. Interest will accrue from April 17, 2024.

4. The Sponsoring Noteholders hold 2024 Senior Bridge Notes as follows:

   i.   SMC HOLDINGS II, LP – Original Principal Amount of $1,323,546.00

   ii.  CETUS CAPITAL VI, L.P. – Original Principal Amount of $1,432,280.00

  iii.  DESTINATIONS GLOBAL FIXED INCOME OPPORTUNITIES FUND – Original Principal Amount of $547,108.00

  iv.  CEDARVIEW OPPORTUNITIES MASTER FUND, LP – Original Principal Amount of $429,684.00

   v.  RIVERPARK STRATEGIC INCOME FUND – Original Principal Amount of $267,382.00

</td>
</tr>
<tr>
<td>

**DIP Facility:**

</td>
<td>

The Chapter 11 Cases (and the Restructuring) shall be financed by:

1. The use of cash collateral on final terms to be reasonably acceptable to the holders of the Senior Secured Notes (the "**Senior Noteholders**") and Sponsoring Noteholders;

2. The Senior Noteholders and the Sponsoring Noteholders shall provide a postpetition senior secured debtor-in-possession term loan facility (the "**DIP Facility**" or "**DIP Loan**") on terms and conditions set forth herein; and

3. cash on hand, which shall be made available to be used for operations pursuant to the terms and conditions of the DIP Credit Agreement and the Interim and Final DIP Orders.

</td>
</tr>
</table>

| | |
|---|---|
| | **Summary of DIP Facility Terms**<br><br>1.  <u>DIP Facility</u>: Up to $13,000,000.00, which shall consist of (i) $7,000,000.00 in new money (the "**New Money**") and (ii) (a) $4,000,000.00 of the Bridge Notes and (b) $2,000,000 of the Senior Notes that are "rolled up" as set forth in 5 below, provided, that, the New Money shall be reduced on a dollar-for-dollar basis by the rolled-up principal balance of the Bridge Loan.<br>2.  <u>Interest Rate</u>: Prime + 9.00%<br>3.  <u>Exit Fee</u>: 1000 bps<br>4.  <u>Secured Position</u>: The DIP Facility will be junior to the Senior Notes and senior to the Subordinated Notes<br>5.  <u>Roll Up</u>: The DIP Loan shall include the "rolled up" Bridge Loan, including principal and interest accrued since issuance, and $2,000,000 of "rolled up" 2022 Senior Convertible Notes.<br>6.  <u>Use of Proceeds</u>: Proceeds to be used for payroll, key suppliers, incentives to critical sales outlets, and ongoing restructuring efforts, each as set forth in the Budget. Any other expense over $200,000 shall require the approval of Sponsoring Noteholders representing a majority of the aggregate principal amount outstanding.<br>7.  <u>Minimum Liquidity Requirement</u>: $1,500,000.00<br>8.  <u>Conditions Precedent</u>: Court approval of the DIP Facility and other customary terms set forth in DIP Credit Agreement.<br>9.  <u>Financial Reporting and Disclosure</u>:<br>   i.    13-week cash flow statements provided weekly<br>   ii.   Pre-approved DIP budget (the "**Budget**")<br>10. <u>DIP Facility Satisfaction</u>: DIP Facility (including all accreted interest and fees) will equitize upon the Plan Effective Date.<br>11. <u>DIP Agent</u>:  Wilmington Savings Fund Society, FSB. |
| **Exit Financing:** | On the Effective Date, the Sponsoring Noteholders and third-party investors shall provide additional capital of at least $9,000,000.00 through the purchase of New |

6

| | |
|---|---|
| | ProSomnus Common Equity at the Pre-Money Equity Value. |
| **TREATMENT OF CLAIMS AND INTERESTS** | |
| **Administrative Claims** | Claims incurred for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code (the "**Administrative Claims**"), other than Professional Fee Claims (as defined below).<br><br>*Treatment*: Paid in full, in cash, on the Effective Date<br><br>*Voting:* Unimpaired, not entitled to vote |
| **Professional Fee Claims** | Claim for professional services, including legal, financial, advisory, accounting, and other services, rendered or costs incurred on or after the Petition Date through the Effective Date by professional persons retained by the Debtors or any statutory committee under sections 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, subject to the amounts set forth in the Budget (the "**Professional Fee Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date.<br><br>*Voting:* Unimpaired, not entitled to vote |
| **DIP Claims** | Claims consisting of the aggregate outstanding principal amount of, plus unpaid fees and interest on, the DIP Loan (the "**DIP Claims**").<br><br>*Treatment*: In lieu of payment in full in cash, on the Effective Date, as would otherwise be required under Section 1129(a)(9) of the Bankruptcy Code, holders of DIP Claims consent and irrevocably agree to payment in full, in New ProSomnus Common Equity, valued at Pre-Money Equity Value.<br><br>*Voting:* Unimpaired, not entitled to vote |
| **Senior Secured Note Claims** | Claims consisting of the aggregate outstanding principal amount of and unpaid interest on the Senior Notes (the "**Senior Secured Note Claims**").<br><br>*Treatment*: |

|  | The approximately $15.3 million of non-equitized[2] Senior Secured Note Claims "ride through" the Chapter 11 Cases and will be paid in the ordinary course, subject to the following:<br><br>i. PIK debt service obligations through March 31, 2025.<br>ii. Maturity date extension of the note to December 31, 2026.<br>iii. Interest rate of 8% per annum.<br>iv. Senior Secured Note Claims shall no longer be convertible.<br>v. All reasonable unpaid fees and expenses of the Indenture Trustee to be paid in cash on the Effective Date.<br><br>*Voting:* Impaired, entitled to vote |
|---|---|
| **Subordinate Secured Note Claims** | Claims consisting of the aggregate outstanding principal amount of and unpaid interest on the Subordinate Notes (the "**Subordinate Secured Note Claims**").<br><br>*Treatment*: Each holder of a Subordinate Secured Note Claim shall receive its pro-rata share of New ProSomnus Common Equity, valued at Pre-Money Equity Value. All reasonable unpaid fees and expenses of the Indenture Trustee to be paid in cash on the Effective Date.<br><br>*Voting:* Impaired, entitled to vote<br><br>Holders of Subordinate Secured Claims that do not vote in favor of the Plan forfeit recovery rights. |
| **Other Secured Claims** | Secured claims, other than Senior Secured Note Claims and Subordinate Secured Note Claims (the "**Other Secured Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date<br><br>*Voting:* Unimpaired, not entitled to vote |
| **Priority Tax Claims** | Claims of governmental units entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (the "**Priority Tax Claims**"). |

---

[2] For the avoidance of doubt, $2M of 2022 Senior Convertible Notes and the outstanding principal amount of the Bridge Loan plus interest will be "rolled up" into the DIP Claims, which DIP Claims will convert into New ProSomnus Common Equity upon exit.

|  | *Treatment*: Paid in full, in cash, on the Effective Date, or such other treatment permissible under the Bankruptcy Code.<br><br>*Voting:* Unimpaired, not entitled to vote |
|---|---|
| **Other Non-Tax Priority Claims** | Any Claim other than an Administrative Claim, DIP Facility Claim, or Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code (the "**Other Priority Claims**").<br><br>*Treatment*: Paid in full, in cash, on the Effective Date<br><br>*Voting:* Unimpaired, not entitled to vote |
| **General Unsecured Claims** | Claims consisting of any prepetition claim against the Company Entities that is not an Administrative Claim, a DIP Claim, a Professional Fee Claim, a Senior Secured Note Claim, a Subordinate Secured Note Claim, an Other Secured Claim, a Priority Tax Claim, or an Other Priority Claim (the "**General Unsecured Claims**"). The General Unsecured Claims shall be treated as one class of claims for all purposes of the Plan.<br><br>*Treatment:* General Unsecured Claims will "ride through" and be paid in full in the ordinary course of business.<br><br>*Voting*: Unimpaired, deemed to accept, not entitled to vote. |
| **Equity Interests** | Any Interests in the Debtors represented by ownership of common or preferred stock, including, to the extent provided by applicable law, any purchase right, warrant, stock option or other equity or debt security (convertible or otherwise) evidencing or creating any right or obligation to acquire or issue any of the foregoing.<br><br>*Treatment*: Holders of Equity Interests shall not receive any distribution under the Plan, and Equity Interests shall be extinguished.<br><br>*Voting*: Impaired, deemed to reject, not entitled to vote. |
| **OTHER MATERIAL PROVISIONS** ||
| **Release, Injunction, Exculpation** | The Plan will contain standard estate and consensual third-party releases, injunction provisions, and exculpation provisions for the benefit of the Company Entities, Sponsoring Noteholders, the Senior Noteholders, and each |

9

| | |
|---|---|
| | of their related parties, as broad as practicable under Third Circuit precedent. |
| **Executory Contracts and Leases** | All executory contracts and unexpired leases shall be assumed as of the Plan Effective Date, unless determined to be rejected by the Sponsoring Noteholders (subject to the consent of the Company, which consent is not to be unreasonably withheld). |
| **Corporate Governance** | Five of seven board seats of Reorganized ProSomnus will be designated by the Sponsoring Noteholders. |
| **Indemnification** | The Plan shall provide that all indemnification obligations currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Company Entities, as applicable, shall be assumed or assumed and assigned and remain in full force and effect after the Effective Date, and shall survive unimpaired and unaffected, irrespective of when such obligation arose, as applicable. To the extent necessary, the governance documents adopted as of the Effective Date shall include provisions to give effect to the foregoing. |
| **Conditions Precedent to the Effective Date** | The following shall be conditions precedent to the Effective Date, unless waived by the Company Entities and the Sponsoring Noteholders: |
| | 1. The Bankruptcy Court shall have entered the Confirmation Order and such order shall be (A) in form and substance consistent with the RSA and the RSA Term Sheet, or otherwise reasonably acceptable to the Company Entities and Sponsoring Noteholders, and (B) shall not have been vacated and shall not be stayed pending appeal; |
| | 2. Each document or agreement constituting the applicable Definitive Documents shall (A) have been executed and effectuated and remain in full force and effect, (B) be in form and substance reasonably acceptable to the Company Entities and the Sponsoring Noteholders, and (C) be consistent with the RSA and the RSA Term Sheet, and any conditions precedent related thereto or contained therein shall have been satisfied before or |

10

| | |
|---|---|
| | contemporaneously with the occurrence of the Effective Date or otherwise waived; |
| | 3. All governmental and third-party approvals, authorizations, rulings, documents, and consents that may be necessary in connection with the Restructuring and related transactions, shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on the Restructuring and related transactions; |
| | 4. No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, or prohibiting the consummation of the Restructuring or any related transactions; |
| | 5. The RSA shall be in full force and effect, no termination event or event that would give rise to a termination event under the RSA upon the expiration of the applicable grace period shall have occurred, and the RSA shall not have been validly terminated before the Effective Date; |
| | 6. The relevant Company Entities shall have entered into the Exit Facility, if applicable, pursuant to documents in form and substance consistent with the RSA; |
| | 7. The releases and exculpation consistent with the terms of this RSA Term Sheet shall have been approved; and |
| | 8. (A) all of the Sponsoring Noteholders' reasonable and documented fees and expenses payable under the RSA shall have been paid in full, and (B) amounts sufficient to pay estate professionals in full in accordance with the Budget shall have been placed in a professional fee escrow account pending approval of payment of such fees and expenses by the Bankruptcy Court. |
| **Pre-Money Valuation** | All new money will invest at Pre-Money Equity Value of $7 million |
| **Case Milestones** | The Sponsoring Noteholders' support for the Restructuring shall be subject to the timely satisfaction of the following milestones which may be waived or |

|  | extended with the prior written consent of the Sponsoring Noteholders:<br><br>• no later than 5 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Financing Order;<br><br>• no later than 40 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Final DIP Financing Order, which shall comply with all local rules of the Bankruptcy Court, including but not limited to with respect to the challenge period;<br><br>• no later than 15 Business Days following the Petition Date, the Debtors shall have filed (i) a Plan reasonably acceptable to the Sponsoring Noteholders; (ii) a Disclosure Statement reasonably acceptable to the Sponsoring Noteholders and (iii) a motion seeking entry of an order approving a Disclosure Statement reasonably acceptable to the Sponsoring Noteholders;<br><br>• no later than 50 calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Disclosure Statement that is reasonably acceptable to the Sponsoring Noteholders;<br><br>• no later than 90 calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and<br><br>• no later than 105 calendar days following the Petition Date, the Plan Effective Date shall have occurred. |
|---|---|
| **Management Incentive Pool** | Reorganized ProSomnus Company Valuation (Equity)<br>MIP[3]<br>$0-30M                 0%<br>$30M+                7.5%<br>$60M+                2.5%<br>$90M+                2.5% |

---

[3] As an illustrative example only: if Reorganized ProSomnus equity is valued at $100M, the MIP will be entitled to $6.5M (7.5%*70 + 2.5%*40 + 2.5%*10).

| Fees and Expenses | The Company will be responsible for and pay all fees and expenses incurred by the Sponsoring Noteholders and DIP Agent in connection with the Restructuring, including attorneys' fees and expenses. |
|---|---|
| Tax Structure | To the extent practicable, the Restructuring contemplated by this RSA Term Sheet will be structured so as to obtain the most beneficial structure for the Company, as agreed to by the Company and the Sponsoring Noteholders. |
| Confidentiality | The Parties hereby acknowledge and agree that the existence of this RSA Term Sheet, and the terms and provisions hereof, are governed by mutual agreement with respect to confidentiality and subsequent oral and electronic communications. |

## **Exhibit B**

### [FORM OF JOINDER AGREEMENT]

This Joinder to the Restructuring Support Agreement, dated as of _____, by the Company and the Sponsoring Noteholders thereto (the "**Agreement**"), is executed and delivered by [              ] (the "**Joining Party**") as of [              ], 2024 in connection with the transfer from a Sponsoring Noteholder party to the Agreement to the Joining Party. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

1.    <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, which is attached to this Joinder as <u>Annex I</u> (as the same may be hereafter amended, restated, or otherwise modified from time to time) as if the Joining Party were an original signatory to the Agreement. From and after the date hereof, the Joining Party shall hereafter be deemed to be a "**Sponsoring Noteholder**" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

2.    <u>Representations and Warranties</u>. With respect to the amount of Noteholder Claims set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Claim, the Joining Party hereby makes the representations and warranties of such Sponsoring Noteholder set forth in the "Ownership of Claims" and "Representations" section of the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

[Signature Page Follows]

1

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**

By: _____

Name: _____

Title: _____

Aggregate Principal Amount Noteholder Claims:

Senior Noteholder Claims: $_____

Subordinated Noteholder Claims: $_____

**ANNEX I TO JOINDER**

Agreement

**<u>Exhibit C</u>**
ProSomnus Organizational Chart

Exhibit C

94995804.17

**Pre-combination:**



LAAA Merger Corp.

Lakeshore Acquisition I Corp.

ProSomnus Holdings, Inc.

Merger Sub Inc.

ProSomnus Sleep Technologies, Inc.

**Post-combination:**



ProSomnus, Inc. (formerly LAAA Merger Corp.)

ProSomnus Holdings, Inc.

ProSomnus Sleep Technologies, Inc.

**<u>Exhibit D</u>**
Liquidation Analysis

94995804.17

**ProSomnus, Inc., et al.**
**Plan Liquidation Analysis as of:  5/24/24**

| Chapter 11 Recovery | | |
|---|---|---|
| **Sources of Cash** | | |
| Est. Cash on Effective Date[1] | $  1,250,000 | |
| Exit Financing | 9,000,000 | |
| **Gross Proceeds** | **$ 10,250,000** | |
| | **Amount** | **Recovery %** |
| **Uses of Cash** | | |
| Class 3: Other Secured Claims[2] | - | 100% |
| Class 4: Other Priority Claims[2] | - | 100% |
| Class 5: General Unsecured Claims[3] | 2,500,000 | 100% |
| **Total Uses of Cash** | **$  2,500,000** | |
| **Proceeds to fund Reorganized Debtor** | **$  7,750,000** | |
| **Secured Claims[4]** | **Amount** | |
| Class 1: Senior Notes Claims | $ 15,811,554 | |
| Class 2: Subordinated Notes Claims | 21,000,000 | |
| DIP Administrative Expense | 12,936,102 | |
| **Total of Secured Claims** | **$ 49,747,656** | |

**The Liquidation Analysis should be reviewed with the below notes:**
[1]Estimated cash figure is net of Professional Fees (which are paid to escrow) and United States Trustee fees.
[2]Under the Chapter 11 Plan, there is sufficient cash to satisfy these classes of claims as they arise.  Secured equipment lease claims are not likely to arise under the Chapter 11 Plan.
[3]Estimate of General Unsecured Claims after payment of $1.25 million in Critical Vendor claims pursuant to the DIP Budget.
[4]Under the Chapter 11 Plan, Class 1 claims are satisfied through the issuance of new notes, Class 2, and DIP Claims are equitized.  Cash proceeds remain available for lower priority claims and going concern operations of the Reorganized Debtor.

| Chapter 7 Recovery | | |
|---|---|---|
| **Sources of Cash** | | |
| Est. Cash on Effective Date[1] | 1,250,000 | |
| Unliquidated Assets | | |
| Liquidation of Debtor's Assets | unknown | |
| Proceeds from Causes of Action | unknown | |
| Proceeds from Chapter 5 Litigation | unknown | |
| **Gross Proceeds** | **$  1,250,000** | |
| | **Amount** | **Recovery %** |
| **Uses of Cash[2]** | | |
| Repayment of DIP Loan | 12,936,102 | 10% |
| DIP Exit Fee | 1,293,610 | 0% |
| Administration Costs | 250,000 | 0% |
| Chapter 7 Trustee Fees | 60,750 | 0% |
| **Total Administration Costs** | **$ 14,540,462** | |
| **Net Proceeds for Senior Claims** | **$         -** | |
| **Senior Claims** | **Amount** | **Recovery %** |
| Class 1: Senior Notes Claims | 15,811,554 | 0% |
| Class 3: Other Secured Claims | 3,500,000 | Unknown |
| **Secured Claims** | | |
| Class 2: Subordinated Notes Claims | 21,000,000 | 0% |
| DIP Administrative Expense | 12,936,102 | 0% |
| Class 4: Other Priority Claims | - | 0% |
| **Total Senior Claims** | **$ 53,247,656** | |
| **Net Proceeds for Unsecured Claims** | **$         -** | |
| **Estimate of General Unsecured Claims** | **Amount** | **Recovery %** |
| Class 5: General Unsecured Claims[3] | 2,500,000 | 0% |

**The Liquidation Analysis should be reviewed with the below notes:**
[1]Estimated cash figure is net of Professional Fees (which are paid to escrow) and United States Trustee fees.
[2]Any recovery beyond available cash is dependent upon the successful liquidation of the Debtors at an unknown value.  In the absence of subordination and equitization, the various classes of claims would be paid according to the priority scheme.
[3]Estimate of General Unsecured Claims after payment of $1.25 million in Critical Vendor claims pursuant to the DIP Budget.

**Exhibit E**
Financial Projections

| | |
|---|---|
| MoM Revenue Growth - Cases 2024 | 5% |
| YoY Revenue Growth - Cases 2025 | 20% |
| YoY Revenue Growth - Net Price | 2% |

| | | |
|---|---|---|
| 2024 Net Revenue | $ 40,041,745 | |
| 2025 Net Revenue | $ 49,142,390 | 23% |

| | | |
|---|---|---|
| Q1-2024 OpEx | $ 5,324,785 | |
| 2024 OpEx | $ 24,017,860 | |
| 2025 OpEx | $ 27,605,443 | 15% |
| Rev / OpEx | | 1.5x |

| | | |
|---|---|---|
| 2023 Net Rev per Day | $ 108,016 | YoY |
| 2024 Net Rev per Day | $ 152,606 | 41% |
| 2025 Net Rev per Day | $ 187,362 | 23% |

| | | 22 | 20 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Actuals | Actuals | Actuals | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts |
| | | 1/31/2024 | 2/29/2024 | 3/31/2024 | 4/30/2024 | 5/31/2024 | 6/30/2024 | 7/31/2024 | 8/31/2024 | 9/30/2024 | 10/31/2024 |
| MicrO2 | | 58 | 43 | 54 | 57 | 60 | 63 | 66 | 69 | 72 | 76 |
| IA | | 127 | 108 | 141 | 148 | 155 | 163 | 171 | 180 | 189 | 198 |
| EVO | | 1,942 | 2,571 | 2,699 | 2,834 | 2,976 | 3,124 | 3,281 | 3,445 | 3,617 | 3,798 |
| EVO PH | | 517 | 657 | 698 | 733 | 770 | 808 | 848 | 891 | 935 | 982 |
| EVO Select | | 631 | 911 | 1,032 | 1,084 | 1,138 | 1,195 | 1,254 | 1,317 | 1,383 | 1,452 |
| CA | | 82 | 72 | 94 | 99 | 104 | 109 | 114 | 120 | 126 | 132 |
| PH | | 172 | 223 | 233 | 245 | 257 | 270 | 283 | 297 | 312 | 328 |
| **Cases in Month** | | **3,529** | **4,585** | **4,951** | **5,199** | **5,458** | **5,731** | **6,018** | **6,319** | **6,635** | **6,967** |
| Gross ASP | | $ 744 | $ 727 | $ 730 | $ 731 | $ 730 | $ 730 | $ 730 | $ 730 | $ 730 | $ 730 |
| **Gross ASP by Product** | | | | | | | | | | | |
| MicrO2 | | $ 551 | $ 657 | $ 598 | $ 598 | $ 598 | $ 598 | $ 598 | $ 598 | $ 598 | $ 598 |
| IA | | $ 773 | $ 775 | $ 734 | $ 734 | $ 734 | $ 734 | $ 734 | $ 734 | $ 734 | $ 734 |
| EVO | | $ 723 | $ 701 | $ 703 | $ 703 | $ 703 | $ 703 | $ 703 | $ 703 | $ 703 | $ 703 |
| EVO PH | | $ 758 | $ 740 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 |
| EVO Select | | $ 770 | $ 763 | $ 767 | $ 767 | $ 767 | $ 767 | $ 767 | $ 767 | $ 767 | $ 767 |
| CA | | $ 594 | $ 601 | $ 595 | $ 595 | $ 595 | $ 595 | $ 595 | $ 595 | $ 595 | $ 595 |
| PH | | $ 512 | $ 449 | $ 460 | $ 460 | $ 460 | $ 460 | $ 460 | $ 460 | $ 460 | $ 460 |
| **Gross Revenue per Day** | | **$ 119,406** | **$ 166,748** | **$ 172,179** | **$ 180,836** | **$ 189,845** | **$ 199,312** | **$ 209,256** | **$ 219,724** | **$ 230,737** | **$ 242,274** |
| Days in Month | | 22.0 | 20.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 |
| Gross Product Revenue Build | | | | | | | | | | | |
| MicrO2 | | 31,974 | 28,238 | 32,280 | 33,894 | 35,589 | 37,368 | 39,237 | 41,198 | 43,258 | 45,421 |
| IA | | 98,190 | 83,647 | 103,435 | 108,607 | 114,037 | 119,739 | 125,726 | 132,012 | 138,613 | 145,543 |
| EVO | | 1,404,831 | 1,802,340 | 1,898,248 | 1,993,160 | 2,092,818 | 2,197,459 | 2,307,332 | 2,422,698 | 2,543,833 | 2,671,025 |
| EVO PH | | 392,066 | 486,330 | 520,081 | 546,085 | 573,389 | 602,059 | 632,162 | 663,770 | 696,958 | 731,806 |
| EVO Select | | 485,984 | 695,318 | 791,226 | 830,787 | 872,327 | 915,943 | 961,740 | 1,009,827 | 1,060,319 | 1,113,334 |
| CA | | 48,667 | 43,237 | 55,922 | 58,718 | 61,654 | 64,737 | 67,974 | 71,372 | 74,941 | 78,688 |
| PH | | 88,107 | 100,067 | 107,212 | 112,573 | 118,201 | 124,111 | 130,317 | 136,833 | 143,674 | 150,858 |
| Compliance Revenue | | 12,901 | 13,209 | 15,020 | 16,297 | 17,111 | 17,967 | 18,865 | 19,488 | 20,637 | 21,744 |
| Misc Revenue | | 64,213 | 82,579 | 92,331 | 94,746 | 99,483 | 104,457 | 109,680 | 115,434 | 121,388 | 127,113 |
| **Gross Revenue** | | **$ 2,626,933** | **$ 3,334,965** | **$ 3,615,755** | **$ 3,797,566** | **$ 3,986,748** | **$ 4,185,557** | **$ 4,394,369** | **$ 4,614,195** | **$ 4,845,485** | **$ 5,087,763** |
| Annual Gross Revenue Run-Rate | | $ 31,523,194 | $ 40,019,576 | $ 43,389,054 | $ 45,570,794 | $ 47,840,971 | $ 50,226,686 | $ 52,732,423 | $ 55,370,339 | $ 58,145,818 | $ 61,053,158 |
| Catalog Discounts | | | | | | | | | | | |
| Catalog Disc- M02 | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Catalog Disc- IA | | -3% | -1% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% |
| Catalog Disc- EVO | | -13% | -12% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% |
| Catalog Disc- EVO PH | | -33% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% |
| Catalog Disc- EVO Select | | -15% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% |
| Catalog Disc- CA | | -7% | -10% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% |
| Catalog Disc- PH | | -6% | -4% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% |
| Catalog Disc- Compl | | -6% | -6% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Catalog Disc- Misc | | -3% | -3% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% |
| **Catalog Discounts** | | **-15%** | **-14%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** |
| Catalog Discounts | | | | | | | | | | | |
| Catalog Disc- M02 | | - | - | - | - | - | - | - | - | - | - |
| Catalog Disc- IA | | (2,565) | (1,109) | (2,655) | (2,787) | (2,927) | (3,073) | (3,227) | (3,388) | (3,557) | (3,735) |
| Catalog Disc- EVO | | (182,319) | (211,264) | (202,583) | (212,712) | (223,347) | (234,515) | (246,240) | (258,552) | (271,480) | (285,054) |
| Catalog Disc- EVO PH | | (128,631) | (137,814) | (144,953) | (152,201) | (159,811) | (167,802) | (176,192) | (185,001) | (194,251) | (203,964) |
| Catalog Disc- EVO Select | | (73,428) | (89,982) | (99,655) | (104,638) | (109,870) | (115,363) | (121,131) | (127,188) | (133,547) | (140,224) |
| Catalog Disc- CA | | (3,261) | (4,180) | (2,974) | (3,123) | (3,279) | (3,443) | (3,615) | (3,796) | (3,985) | (4,185) |
| Catalog Disc- PH | | (5,129) | (4,359) | (3,534) | (3,711) | (3,897) | (4,092) | (4,296) | (4,511) | (4,736) | (4,973) |
| Catalog Disc- Compl | | (815) | (801) | (32) | (35) | (36) | (38) | (40) | (42) | (44) | (46) |
| Catalog Disc- Misc | | (1,824) | (2,262) | (4,551) | (4,670) | (4,904) | (5,149) | (5,406) | (5,690) | (5,983) | (6,266) |
| **Catalog Discounts** | | **$ (397,972)** | **$ (451,771)** | **$ (460,937)** | **$ (484,044)** | **$ (508,193)** | **$ (533,592)** | **$ (560,231)** | **$ (588,265)** | **$ (617,701)** | **$ (648,586)** |
| **Net Revenue before Other Contra Revenue** | | **$ 2,228,960** | **$ 2,883,194** | **$ 3,154,818** | **$ 3,313,522** | **$ 3,478,555** | **$ 3,651,965** | **$ 3,834,138** | **$ 4,025,930** | **$ 4,227,784** | **$ 4,439,177** |
| Other Contra Revenue | | | | | | | | | | | |
| Remakes/Warranties | | -4.5% | -3.0% | -3.8% | -4% | -4% | -4% | -4% | -4% | -4% | -4% |
| Discounts | | -4.2% | -4.2% | -2.7% | -3% | -3% | -3% | -3% | -3% | -3% | -3% |
| Earned Discounts | | -5.3% | -5.6% | -5.7% | -6% | -6% | -6% | -6% | -6% | -6% | -6% |
| **Other Contra Revenue** | | **-14.1%** | **-12.7%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** |
| Other Contra Revenue | | | | | | | | | | | |
| Remakes/Warranties | | (119,500) | (98,970) | (138,692) | (145,666) | (152,922) | (160,548) | (168,558) | (176,990) | (185,861) | (195,155) |
| Discounts | | (111,427) | (138,454) | (97,151) | (102,036) | (107,120) | (112,461) | (118,072) | (123,978) | (130,193) | (136,703) |
| Earned Discounts | | (139,366) | (185,619) | (204,834) | (215,133) | (225,850) | (237,113) | (248,942) | (261,396) | (274,498) | (288,223) |
| **Other Contra Revenue** | | **$ (370,293)** | **$ (423,043)** | **$ (440,677)** | **$ (462,836)** | **$ (485,892)** | **$ (510,123)** | **$ (535,572)** | **$ (562,364)** | **$ (590,553)** | **$ (620,081)** |
| **Net Revenue** | | **$ 1,858,667** | **$ 2,460,151** | **$ 2,714,141** | **$ 2,850,687** | **$ 2,992,663** | **$ 3,141,842** | **$ 3,298,566** | **$ 3,463,567** | **$ 3,637,231** | **$ 3,819,096** |
| **Annual Net Revenue Run-Rate** | | **$ 22,304,008** | **$ 29,521,817** | **$ 32,569,688** | **$ 34,208,241** | **$ 35,911,952** | **$ 37,702,108** | **$ 39,582,792** | **$ 41,562,798** | **$ 43,646,773** | **$ 45,829,152** |
| **Net ASP** | | **$ 527** | **$ 537** | **$ 548** | **$ 548** | **$ 548** | **$ 548** | **$ 548** | **$ 548** | **$ 548** | **$ 548** |
| Shipping Revenue - % of Gross Revenue | | 2.8% | 3.1% | 3.2% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| **Shipping Revenue** | | **$ 73,645** | **$ 101,738** | **$ 114,523** | **$ 113,927** | **$ 119,602** | **$ 125,567** | **$ 131,831** | **$ 138,426** | **$ 145,365** | **$ 152,633** |
| Rush/COD Revenue | | $ 1,997 | $ 3,774 | $ 3,496 | $ 3,089 | $ 3,453 | $ 3,346 | $ 3,296 | $ 3,365 | $ 3,335 | $ 3,332 |
| **Net Revenue + Shipping** | | **$ 1,934,309** | **$ 2,565,663** | **$ 2,832,159** | **$ 2,967,702** | **$ 3,115,718** | **$ 3,270,755** | **$ 3,433,693** | **$ 3,605,357** | **$ 3,785,931** | **$ 3,975,061** |
| GM % | | 40% | 40% | 55% | 50% | 50% | 50% | 51% | 52% | 53% | 54% |
| **Gross Profit** | | **$ 769,614** | **$ 1,027,502** | **$ 1,559,751** | **$ 1,483,851** | **$ 1,557,859** | **$ 1,635,377** | **$ 1,747,750** | **$ 1,867,575** | **$ 1,995,186** | **$ 2,130,633** |
| *Checks* | | *TRUE* | *TRUE* | *TRUE* | | | | | | | |
| OpEx Build | | | | | | | | | | | |
| Labor | 5.0% | $ 35,241 | $ 32,663 | $ (5,583) | $ 32,500 | $ 32,500 | $ 32,500 | $ 33,583 | $ 33,583 | $ 33,583 | $ 34,125 |
| Non-Labor | 0.0% | $ 38,844 | $ 39,342 | $ 76,582 | $ 102,731 | $ 102,731 | $ 102,731 | $ 118,899 | $ 118,899 | $ 118,899 | $ 137,649 |
| **Marketing** | | **$ 74,086** | **$ 72,005** | **$ 70,999** | **$ 135,231** | **$ 135,231** | **$ 135,231** | **$ 152,483** | **$ 152,483** | **$ 152,483** | **$ 171,774** |
| Labor (excl commissions) | 7.0% | $ 130,715 | $ 100,983 | $ 93,378 | $ 201,445 | $ 201,445 | $ 201,445 | $ 216,687 | $ 216,687 | $ 216,687 | $ 250,782 |
| Commissions | 6.0% | $ 54,235 | $ 145,100 | $ (160,504) | $ 229,122 | $ 229,122 | $ 229,122 | $ 265,184 | $ 265,184 | $ 265,184 | $ 307,002 |
| Non-Labor | 7.0% | $ 29,849 | $ 46,070 | $ 43,711 | $ 65,000 | $ 65,000 | $ 65,000 | $ 72,333 | $ 72,333 | $ 72,333 | $ 78,750 |
| **Sales** | | **$ 214,799** | **$ 292,154** | **$ (23,415)** | **$ 495,567** | **$ 495,567** | **$ 495,567** | **$ 554,204** | **$ 554,204** | **$ 554,204** | **$ 636,534** |
| Labor (excl commissions) | 5.0% | $ 129,164 | $ 122,243 | $ 213,653 | $ 90,512 | $ 90,512 | $ 90,512 | $ 94,477 | $ 94,477 | $ 94,477 | $ 97,252 |

| | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts | Forecasts |
| | 11/30/2024 | 12/31/2024 | 1/31/2025 | 2/28/2025 | 3/31/2025 | 4/30/2025 | 5/31/2025 | 6/30/2025 | 7/31/2025 | 8/31/2025 | 9/30/2025 | 10/31/2025 | 11/30/2025 | 12/31/2025 |
| MicrO2 | 80 | 84 | 70 | 52 | 65 | 68 | 71 | 75 | 79 | 83 | 87 | 91 | 96 | 101 |
| IA | 208 | 219 | 152 | 130 | 169 | 178 | 187 | 196 | 206 | 216 | 227 | 238 | 250 | 262 |
| EVO | 3,988 | 4,187 | 2,330 | 3,085 | 3,239 | 3,401 | 3,571 | 3,749 | 3,937 | 4,134 | 4,340 | 4,557 | 4,785 | 5,024 |
| EVO PH | 1,031 | 1,083 | 620 | 788 | 838 | 879 | 923 | 970 | 1,018 | 1,069 | 1,122 | 1,179 | 1,238 | 1,299 |
| EVO Select | 1,525 | 1,601 | 757 | 1,093 | 1,238 | 1,300 | 1,365 | 1,434 | 1,505 | 1,581 | 1,660 | 1,743 | 1,830 | 1,921 |
| CA | 139 | 146 | 98 | 86 | 113 | 118 | 124 | 131 | 137 | 144 | 151 | 159 | 167 | 175 |
| PH | 344 | 361 | 206 | 268 | 280 | 294 | 308 | 324 | 340 | 357 | 375 | 393 | 413 | 434 |
| **Cases in Month** | **7,315** | **7,681** | **4,235** | **5,502** | **5,941** | **6,238** | **6,550** | **6,878** | **7,222** | **7,583** | **7,962** | **8,360** | **8,778** | **9,217** |
| Gross ASP | $ 730 | $ 730 | $ 742 | $ 744 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 | $ 745 |
| **Gross ASP by Product** | | | | | | | | | | | | | | |
| MicrO2 | $ 598 | $ 598 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 | $ 610 |
| IA | $ 734 | $ 734 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 | $ 748 |
| EVO | $ 703 | $ 703 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 | $ 717 |
| EVO PH | $ 745 | $ 745 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 | $ 760 |
| EVO Select | $ 767 | $ 767 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 | $ 782 |
| CA | $ 595 | $ 595 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 | $ 607 |
| PH | $ 460 | $ 460 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 | $ 469 |
| **Gross Revenue per Day** | **$ 254,379** | **$ 267,093** | **$ 149,601** | **$ 195,013** | **$ 210,742** | **$ 221,278** | **$ 232,340** | **$ 243,957** | **$ 256,155** | **$ 268,963** | **$ 282,412** | **$ 296,532** | **$ 311,358** | **$ 326,926** |
| Days in Month | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 | 21.0 |
| Gross Product Revenue Build | | | | | | | | | | | | | | |
| MicrO2 | 47,692 | 50,077 | 42,437 | 31,462 | 39,511 | 41,486 | 43,561 | 45,739 | 48,026 | 50,427 | 52,948 | 55,596 | 58,375 | 61,294 |
| IA | 152,821 | 160,462 | 114,034 | 96,974 | 126,604 | 132,935 | 139,581 | 146,560 | 153,888 | 161,583 | 169,662 | 178,145 | 187,052 | 196,405 |
| EVO | 2,804,576 | 2,944,805 | 1,671,786 | 2,213,265 | 2,323,455 | 2,439,628 | 2,561,609 | 2,689,690 | 2,824,174 | 2,965,383 | 3,113,652 | 3,269,334 | 3,432,801 | 3,604,441 |
| EVO PH | 768,397 | 806,816 | 471,506 | 599,187 | 636,579 | 668,408 | 701,829 | 736,920 | 773,766 | 812,454 | 853,077 | 895,731 | 940,517 | 987,543 |
| EVO Select | 1,169,001 | 1,227,451 | 592,150 | 854,910 | 968,461 | 1,016,884 | 1,067,728 | 1,121,114 | 1,177,170 | 1,236,028 | 1,297,830 | 1,362,721 | 1,430,857 | 1,502,400 |
| CA | 82,622 | 86,753 | 59,710 | 52,429 | 68,449 | 71,871 | 75,465 | 79,238 | 83,200 | 87,360 | 91,728 | 96,314 | 101,130 | 106,186 |
| PH | 158,401 | 166,321 | 96,872 | 125,595 | 131,227 | 137,789 | 144,678 | 151,912 | 159,508 | 167,483 | 175,857 | 184,650 | 193,883 | 203,577 |
| Compliance Revenue | 22,817 | 23,941 | 13,399 | 17,449 | 18,883 | 19,833 | 20,820 | 21,857 | 22,947 | 24,095 | 25,304 | 26,569 | 27,896 | 29,290 |
| Misc Revenue | 133,490 | 140,190 | 78,538 | 102,404 | 110,655 | 116,148 | 121,964 | 128,071 | 134,480 | 141,204 | 148,260 | 155,669 | 163,455 | 171,629 |
| **Gross Revenue** | **$ 5,341,955** | **$ 5,608,954** | **$ 3,141,616** | **$ 4,095,264** | **$ 4,425,577** | **$ 4,646,832** | **$ 4,879,141** | **$ 5,123,092** | **$ 5,379,259** | **$ 5,648,231** | **$ 5,930,646** | **$ 6,227,171** | **$ 6,538,525** | **$ 6,865,453** |
| Annual Gross Revenue Run-Rate | $ 64,103,454 | $ 67,307,448 | $ 37,699,398 | $ 49,143,170 | $ 53,106,926 | $ 55,761,981 | $ 58,549,689 | $ 61,477,103 | $ 64,551,106 | $ 67,778,775 | $ 71,167,749 | $ 74,726,047 | $ 78,462,299 | $ 82,385,431 |
| Catalog Discounts | | | | | | | | | | | | | | |
| Catalog Disc- M02 | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Catalog Disc- IA | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% |
| Catalog Disc- EVO | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% | -11% |
| Catalog Disc- EVO PH | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% | -28% |
| Catalog Disc- EVO Select | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% | -13% |
| Catalog Disc- CA | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% |
| Catalog Disc- PH | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% |
| Catalog Disc- Compl | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Catalog Disc- Misc | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% | -5% |
| **Catalog Discounts** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** | **-13%** |
| Catalog Discounts | | | | | | | | | | | | | | |
| Catalog Disc- M02 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Catalog Disc- IA | (3,922) | (4,118) | (2,927) | (2,489) | (3,249) | (3,412) | (3,582) | (3,761) | (3,949) | (4,147) | (4,354) | (4,572) | (4,801) | (5,041) |
| Catalog Disc- EVO | (299,307) | (314,272) | (178,414) | (236,201) | (247,961) | (260,359) | (273,377) | (287,046) | (301,398) | (316,468) | (332,291) | (348,906) | (366,351) | (384,669) |
| Catalog Disc- EVO PH | (214,162) | (224,870) | (131,415) | (167,001) | (177,423) | (186,294) | (195,609) | (205,389) | (215,659) | (226,442) | (237,764) | (249,652) | (262,135) | (275,241) |
| Catalog Disc- EVO Select | (147,236) | (154,598) | (74,581) | (107,676) | (121,978) | (128,077) | (134,480) | (141,204) | (148,265) | (155,678) | (163,462) | (171,635) | (180,217) | (189,227) |
| Catalog Disc- CA | (4,394) | (4,613) | (3,175) | (2,788) | (3,640) | (3,822) | (4,013) | (4,214) | (4,425) | (4,646) | (4,878) | (5,122) | (5,378) | (5,647) |
| Catalog Disc- PH | (5,222) | (5,483) | (3,194) | (4,140) | (4,326) | (4,542) | (4,770) | (5,008) | (5,258) | (5,521) | (5,797) | (6,087) | (6,392) | (6,711) |
| Catalog Disc- Compl | (49) | (51) | (29) | (37) | (40) | (42) | (44) | (47) | (49) | (51) | (54) | (57) | (59) | (62) |
| Catalog Disc- Misc | (6,580) | (6,910) | (3,871) | (5,048) | (5,454) | (5,725) | (6,012) | (6,313) | (6,629) | (6,960) | (7,308) | (7,673) | (8,057) | (8,460) |
| **Catalog Discounts** | **$ (681,004)** | **$ (715,051)** | **$ (397,680)** | **$ (525,480)** | **$ (564,181)** | **$ (592,389)** | **$ (622,007)** | **$ (653,107)** | **$ (685,763)** | **$ (720,052)** | **$ (756,054)** | **$ (793,857)** | **$ (833,549)** | **$ (875,227)** |
| **Net Revenue before Other Contra Revenue** | **$ 4,660,950** | **$ 4,893,903** | **$ 2,743,937** | **$ 3,569,784** | **$ 3,861,396** | **$ 4,054,443** | **$ 4,257,134** | **$ 4,469,985** | **$ 4,693,496** | **$ 4,928,180** | **$ 5,174,591** | **$ 5,433,314** | **$ 5,704,976** | **$ 5,990,226** |
| Other Contra Revenue | | | | | | | | | | | | | | |
| Remakes/Warranties | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% | -4% |
| Discounts | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% | -3% |
| Earned Discounts | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% | -6% |
| **Other Contra Revenue** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** | **-12.2%** |
| Other Contra Revenue | | | | | | | | | | | | | | |
| Remakes/Warranties | (204,905) | (215,146) | (120,505) | (157,085) | (169,755) | (178,242) | (187,152) | (196,510) | (206,336) | (216,653) | (227,486) | (238,860) | (250,803) | (263,343) |
| Discounts | (143,533) | (150,707) | (84,412) | (110,035) | (118,910) | (124,855) | (131,097) | (137,652) | (144,535) | (151,762) | (159,350) | (167,317) | (175,683) | (184,467) |
| Earned Discounts | (302,623) | (317,749) | (177,974) | (231,998) | (250,710) | (263,244) | (276,405) | (290,225) | (304,737) | (319,974) | (335,973) | (352,771) | (370,409) | (388,930) |
| **Other Contra Revenue** | **$ (651,061)** | **$ (683,602)** | **$ (382,890)** | **$ (499,118)** | **$ (539,376)** | **$ (566,341)** | **$ (594,654)** | **$ (624,387)** | **$ (655,607)** | **$ (688,389)** | **$ (722,809)** | **$ (758,948)** | **$ (796,895)** | **$ (836,740)** |
| **Net Revenue** | **$ 4,009,890** | **$ 4,210,301** | **$ 2,361,046** | **$ 3,070,666** | **$ 3,322,020** | **$ 3,488,101** | **$ 3,662,479** | **$ 3,845,598** | **$ 4,037,889** | **$ 4,239,791** | **$ 4,451,783** | **$ 4,674,366** | **$ 4,908,081** | **$ 5,153,486** |
| **Annual Net Revenue Run-Rate** | **$ 48,118,675** | **$ 50,523,612** | **$ 28,332,553** | **$ 36,847,990** | **$ 39,864,243** | **$ 41,857,216** | **$ 43,949,753** | **$ 46,147,181** | **$ 48,454,662** | **$ 50,877,489** | **$ 53,421,394** | **$ 56,092,389** | **$ 58,896,967** | **$ 61,841,829** |
| **Net ASP** | **$ 548** | **$ 548** | **$ 558** | **$ 558** | **$ 559** | **$ 559** | **$ 559** | **$ 559** | **$ 559** | **$ 559** | **$ 559** | **$ 559** | **$ 559** | **$ 559** |
| Shipping Revenue - % of Gross Revenue | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| **Shipping Revenue** | **$ 160,259** | **$ 168,269** | **$ 94,248** | **$ 122,858** | **$ 132,767** | **$ 139,405** | **$ 146,374** | **$ 153,693** | **$ 161,378** | **$ 169,447** | **$ 177,919** | **$ 186,815** | **$ 196,156** | **$ 205,964** |
| Rush/COD Revenue | $ 3,344 | $ 3,337 | $ 3,338 | $ 3,339 | $ 3,338 | $ 3,338 | $ 3,339 | $ 3,338 | $ 3,338 | $ 3,338 | $ 3,338 | $ 3,338 | $ 3,338 | $ 3,338 |
| **Net Revenue + Shipping** | **$ 4,173,492** | **$ 4,381,907** | **$ 2,458,632** | **$ 3,196,863** | **$ 3,458,126** | **$ 3,630,845** | **$ 3,812,192** | **$ 4,002,629** | **$ 4,202,605** | **$ 4,412,576** | **$ 4,633,041** | **$ 4,864,519** | **$ 5,107,575** | **$ 5,362,788** |
| GM % | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% | 55% |
| **Gross Profit** | **$ 2,274,553** | **$ 2,427,576** | **$ 1,352,248** | **$ 1,758,275** | **$ 1,901,969** | **$ 1,996,965** | **$ 2,096,706** | **$ 2,201,446** | **$ 2,311,433** | **$ 2,426,917** | **$ 2,548,172** | **$ 2,675,486** | **$ 2,809,166** | **$ 2,949,533** |
| OpEx Build | | | | | | | | | | | | | | |
| Labor | $ 34,125 | $ 34,125 | $ 34,125 | $ 34,125 | $ 34,125 | $ 34,125 | $ 34,125 | $ 34,125 | $ 35,263 | $ 35,263 | $ 35,263 | $ 35,831 | $ 35,831 | $ 35,831 |
| Non-Labor | $ 137,649 | $ 137,649 | $ 100,084 | $ 100,084 | $ 100,084 | $ 125,723 | $ 125,723 | $ 125,723 | $ 145,540 | $ 145,540 | $ 145,540 | $ 168,481 | $ 168,481 | $ 168,481 |
| **Marketing** | **$ 171,774** | **$ 171,774** | **$ 134,209** | **$ 134,209** | **$ 134,209** | **$ 159,848** | **$ 159,848** | **$ 159,848** | **$ 180,803** | **$ 180,803** | **$ 180,803** | **$ 204,312** | **$ 204,312** | **$ 204,312** |
| Labor (excl commissions) | $ 250,782 | $ 250,782 | $ 225,647 | $ 225,647 | $ 225,647 | $ 242,802 | $ 242,802 | $ 242,802 | $ 261,351 | $ 261,351 | $ 261,351 | $ 289,497 | $ 289,497 | $ 289,497 |
| Commissions | $ 307,002 | $ 307,002 | $ 223,220 | $ 223,220 | $ 223,220 | $ 280,403 | $ 280,403 | $ 280,403 | $ 324,601 | $ 324,601 | $ 324,601 | $ 375,766 | $ 375,766 | $ 375,766 |
| Non-Labor | $ 78,750 | $ 78,750 | $ 84,000 | $ 84,000 | $ 84,000 | $ 84,000 | $ 84,000 | $ 84,000 | $ 86,800 | $ 86,800 | $ 86,800 | $ 93,713 | $ 93,713 | $ 93,713 |
| **Sales** | **$ 636,534** | **$ 636,534** | **$ 532,867** | **$ 532,867** | **$ 532,867** | **$ 607,205** | **$ 607,205** | **$ 607,205** | **$ 672,752** | **$ 672,752** | **$ 672,752** | **$ 758,976** | **$ 758,976** | **$ 758,976** |
| Labor (excl commissions) | $ 97,252 | $ 97,252 | $ 94,459 | $ 94,459 | $ 94,459 | $ 96,366 | $ 96,366 | $ 96,366 | $ 100,740 | $ 100,740 | $ 100,740 | $ 103,895 | $ 103,895 | $ 103,895 |

| | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Commissions | 1.0% | $ 26,547 | 26,520 | 2,445 | 25,458 | 25,458 | 25,458 | 29,465 | 29,465 | 29,465 | 34,111 | 34,111 | 34,111 | 24,802 | 24,802 | 24,802 | 33,156 | 33,156 | 33,156 | 36,067 | 36,067 | 36,067 | 41,752 | 41,752 | 41,752 |
| | 5.0% | 67,381 | 68,407 | 31,105 | 38,150 | 38,150 | 38,150 | 39,422 | 39,422 | 39,422 | 40,058 | 40,058 | 40,058 | 40,058 | 40,058 | 40,058 | 41,393 | 41,393 | 41,393 | 42,060 | 42,060 | 42,060 |
| **Int Business Development** | | **$ 223,092** | **217,171** | **247,203** | **154,120** | **154,120** | **154,120** | **163,363** | **163,363** | **163,363** | **171,421** | **171,421** | **171,421** | **159,319** | **159,319** | **159,319** | **167,579** | **167,579** | **167,579** | **178,200** | **178,200** | **178,200** | **187,707** | **187,707** | **187,707** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| Labor | 3.0% | 53,411 | 56,835 | 40,143 | 72,204 | 72,204 | 72,204 | 74,611 | 74,611 | 74,611 | 75,814 | 75,814 | 75,814 | 75,814 | 75,814 | 75,814 | 95,385 | 95,385 | 95,385 | 96,924 | 96,924 | 96,924 |
| Non-Labor | | | - | - | 10,483 | 10,483 | 10,483 | 12,133 | 12,133 | 12,133 | 14,046 | 14,046 | 14,046 | 10,213 | 10,213 | 10,213 | 12,829 | 12,829 | 12,829 | 14,851 | 14,851 | 14,851 | 17,192 | 17,192 | 17,192 |
| **Customer Care** | | **$ 53,411** | **56,835** | **40,143** | **82,687** | **82,687** | **82,687** | **86,744** | **86,744** | **86,744** | **89,860** | **89,860** | **89,860** | **86,027** | **86,027** | **86,027** | **88,643** | **88,643** | **88,643** | **110,236** | **110,236** | **110,236** | **114,115** | **114,115** | **114,115** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| Labor | 3.0% | 37,577 | 32,818 | 48,221 | 45,500 | 45,500 | 45,500 | 47,017 | 47,017 | 47,017 | 54,600 | 54,600 | 54,600 | 54,600 | 54,600 | 54,600 | 58,771 | 58,771 | 58,771 | 64,496 | 64,496 | 64,496 |
| Non-Labor | 4.0% | 39,695 | 17,939 | 243,218 | 101,083 | 101,083 | 101,083 | 116,993 | 116,993 | 116,993 | 135,442 | 135,442 | 135,442 | 98,479 | 98,479 | 98,479 | 123,707 | 123,707 | 123,707 | 143,206 | 143,206 | 143,206 | 165,779 | 165,779 | 165,779 |
| **Distribution** | | **$ 76,769** | **50,758** | **291,440** | **146,583** | **146,583** | **146,583** | **164,010** | **164,010** | **164,010** | **190,042** | **190,042** | **190,042** | **153,079** | **153,079** | **153,079** | **178,307** | **178,307** | **178,307** | **201,977** | **201,977** | **201,977** | **230,275** | **230,275** | **230,275** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| Labor | 5.0% | 185,455 | 170,432 | (193,390) | 195,217 | 195,217 | 195,217 | 227,620 | 227,620 | 227,620 | 247,293 | 247,293 | 247,293 | 257,606 | 257,606 | 257,606 | 287,333 | 287,333 | 287,333 | 301,612 | 301,612 | 301,612 | 311,334 | 311,334 | 311,334 |
| Credit Card Fees | 2.1% | 58,896 | 50,248 | 70,194 | 62,896 | 62,896 | 62,896 | 72,796 | 72,796 | 72,796 | 84,275 | 84,275 | 84,275 | 61,276 | 61,276 | 61,276 | 76,973 | 76,973 | 76,973 | 89,106 | 89,106 | 89,106 | 103,152 | 103,152 | 103,152 |
| Non-Labor | 5.0% | 177,297 | 214,612 | 1,216,783 | 208,274 | 208,274 | 208,274 | 191,550 | 191,550 | 191,550 | 189,280 | 189,280 | 189,280 | 188,208 | 188,208 | 188,208 | 183,921 | 183,921 | 183,921 | 190,051 | 190,051 | 190,051 | 193,117 | 193,117 | 193,117 |
| **G&A** | | **$ 421,649** | **435,302** | **1,093,588** | **466,387** | **466,387** | **466,387** | **491,966** | **491,966** | **491,966** | **520,848** | **520,848** | **520,848** | **507,090** | **507,090** | **507,090** | **548,226** | **548,226** | **548,226** | **580,769** | **580,769** | **580,769** | **607,602** | **607,602** | **607,602** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Occupancy** | 3.0% | **144,486** | **143,924** | **182,665** | **151,375** | **151,375** | **151,375** | **155,894** | **155,894** | **155,894** | **158,154** | **158,154** | **158,154** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** | **151,375** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| Labor | 3.0% | 179,075 | 181,215 | 218,640 | 140,400 | 140,400 | 140,400 | 145,080 | 145,080 | 145,080 | 147,420 | 147,420 | 147,420 | 147,420 | 147,420 | 147,420 | 147,420 | 147,420 | 147,420 | 152,334 | 152,334 | 152,334 | 154,791 | 154,791 | 154,791 |
| Non-Labor | 3.0% | 8,953 | 13,568 | 59,861 | 63,750 | 63,750 | 63,750 | 67,986 | 67,986 | 67,986 | 68,438 | 68,438 | 68,438 | 49,438 | 49,438 | 49,438 | 51,085 | 51,085 | 51,085 | 51,909 | 51,909 | 51,909 |
| **Engineering** | | **$ 188,028** | **194,563** | **278,481** | **204,150** | **204,150** | **204,150** | **213,066** | **213,066** | **213,066** | **215,858** | **215,858** | **215,858** | **196,858** | **196,858** | **196,858** | **196,858** | **196,858** | **196,858** | **203,419** | **203,419** | **203,419** | **206,700** | **206,700** | **206,700** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| Labor | 3.0% | 53,030 | 30,489 | 85,759 | 58,988 | 58,988 | 58,988 | 60,954 | 60,954 | 60,954 | 61,937 | 61,937 | 61,937 | 65,814 | 65,814 | 65,814 | 73,568 | 73,568 | 73,568 | 76,020 | 76,020 | 76,020 | 77,246 | 77,246 | 77,246 |
| Non-Labor | 3.0% | 31,787 | 27,644 | 57,952 | 24,917 | 24,917 | 24,917 | 25,747 | 25,747 | 25,747 | 26,163 | 26,163 | 26,163 | 36,663 | 36,663 | 36,663 | 37,885 | 37,885 | 37,885 | 38,496 | 38,496 | 38,496 |
| **Medical Affairs** | | **$ 84,817** | **58,133** | **143,711** | **83,904** | **83,904** | **83,904** | **86,701** | **86,701** | **86,701** | **88,099** | **88,099** | **88,099** | **102,476** | **102,476** | **102,476** | **110,230** | **110,230** | **110,230** | **113,905** | **113,905** | **113,905** | **115,742** | **115,742** | **115,742** |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Total Opts** | | **$ 1,481,136** | **1,518,843** | **2,324,806** | **1,520,005** | **1,520,005** | **1,520,005** | **2,068,431** | **2,068,431** | **2,068,431** | **2,242,589** | **2,242,589** | **2,242,589** | **2,023,301** | **2,023,301** | **2,023,301** | **2,208,271** | **2,208,271** | **2,208,271** | **2,399,437** | **2,399,437** | **2,399,437** | **2,576,805** | **2,576,805** | **2,576,805** |
| Checks | | | TRUE | TRUE | TRUE | | | | | | | | | | | | | | | | | | | | |

*Monthly Breakeven Analysis*

| | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating Income | | $ (711,522) | (491,341) | (765,055) | (436,154) | (362,146) | (284,627) | (320,681) | (200,856) | (79,245) | (111,957) | 31,964 | 184,987 | (671,054) | (265,027) | (121,332) | (211,306) | (111,565) | (6,825) | (82,004) | 33,480 | 154,736 | 98,680 | 232,361 | 372,728 |
| D&A + Non-Cash | | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 | 215,164 |
| Less: Working Capital | $ (2,000,000) | (166,667) | (166,667) | (166,667) | (145,000) | (145,000) | (145,000) | (26,921) | | (557,910) | (185,000) | (185,000) | 220,858 | | (933,063) | (185,000) | (185,000) | 711,098 | | (272,649) | | | | 325,549 |
| Less: Equipment Leases | | (145,000) | (145,000) | (145,000) | (145,000) | (145,000) | (145,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (185,000) | (235,000) | (235,000) | (235,000) | (235,000) | (235,000) | (235,000) |
| Less: CapEx | $ (1,000,000) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) | (83,333) |
| **Cash Flow Breakeven** | | **$ (891,358)** | **(671,176)** | **(944,891)** | **(449,323)** | **(375,315)** | **(364,717)** | **(373,850)** | **(254,025)** | **(684,325)** | **(165,126)** | **(21,205)** | **358,676** | **(724,223)** | **(318,196)** | **(1,107,564)** | **(264,475)** | **(164,734)** | **601,104** | **(185,173)** | **(69,689)** | **324,216** | **(4,489)** | **129,192** | **595,108** |
| Capital Required | | $ (8,033,855) | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | |
| **Annual Net Revenue Run-Rate** | | **$ 22,304,008** | **29,521,817** | **32,569,688** | **34,208,241** | **35,911,962** | **37,702,108** | **39,582,792** | **41,562,798** | **43,646,773** | **45,829,152** | **48,118,675** | **50,523,612** | **28,332,553** | **36,847,990** | **39,864,243** | **41,857,216** | **43,949,753** | **46,147,181** | **48,454,662** | **50,877,489** | **53,421,394** | **56,092,389** | **58,896,967** | **61,841,829** |

**Exhibit F**
Backstop Commitment Documentation

**TERM SHEET**
**FOR EXIT EQUITY FINANCING OF**
**PROSOMNUS, INC.**

June 21, 2024

This term sheet ("**Term Sheet**") summarizes the principal terms of the proposed exit equity financing (the "**Transaction**") of ProSomnus, Inc., a Delaware corporation (the "**Company**"), by one or more investment vehicles managed by Cetus Capital VI, L.P. and SMC Holdings II, LP (collectively, the "**Investors**"). The Transaction described in this Term Sheet is conditioned on acceptance by the Company and the Sponsoring Noteholders (identified on the signature page below) (the "**Sponsoring Noteholders**"), and mutually acceptable definitive Transaction agreements being executed and delivered by all parties, as well as the satisfactory completion of the other conditions to closing set forth below.

## TRANSACTION TERMS

| | |
|---|---|
| *Security:* | Newly issued shares of the Company's Common Stock (the "**Investor Stock**"), which will be the only outstanding class of equity securities at Closing. The Investor Stock shall be exempt from the registration requirements of the Securities Act as a result of Bankruptcy Code section 1145 to the maximum extent permitted by law. |
| *Closing Date:* | As soon as practicable following the later of: (i) the effective date of the Company's Chapter 11 plan of reorganization (as amended, the "**Plan**") which Plan shall be consistent in all material respects with the terms and conditions set forth in the Restructuring Term Sheet (filed with the Company's Chapter 11 Petition and supporting "first-day" declaration) and otherwise in form and substance reasonably acceptable to the Investors; and (ii) seventy-five (75) days after the Company files its Voluntary Petition (the "**Petition Date**"), subject in either case to the execution and delivery of mutually acceptable definitive Transaction documents and the satisfaction of all other conditions to closing set forth herein and therein (the "**Closing**"). |
| *Investors and Syndication:* | The Investors shall purchase at least $9.0 million of Investor Stock at the Closing (the "**Minimum Investment Amount**"). Notwithstanding the foregoing, the Investors, in consultation with the Company, reserve the right to syndicate their minimum committed investment amount of $9.0 million to other investors reasonably acceptable to the Company (with the Company's consent not to be unreasonably withheld) including, but not limited to, the Sponsoring Noteholders (the "**Other Investors**" and together with the Investors, the "**Syndicate**"). |

1

| | |
|---|---|
| *Amount Raised:* | At least $9.0 million. |
| *Pre-Money Valuation:* | The price per share of the Investor Stock shall be the price determined on the basis of a fully-diluted pre-money valuation of $7 million, which pre-money valuation shall not include (i) the unallocated and uncommitted interests in the Management Incentive Plan (as defined in the Plan and the Restructuring Term Sheet), and (ii) Commitment Fee Shares (as defined below). |
| *Conditions to Closing:* | The Syndicate's obligation to consummate the Transaction shall be conditioned on, among other things: |

- the entry into definitive Transaction documentation consistent in all material respects with the terms and conditions set forth herein and otherwise satisfactory to the Syndicate in their sole discretion and acting reasonably, with such Transaction documentation in full force and effect as of the Closing;

- the Company's post-bankruptcy capital structure (which shall be presented as part of confirmation of the Plan) shall be substantially similar to the projected capital structure set forth on Exhibit "A";

- the reorganized Company's certificate of incorporation shall be satisfactory to the Syndicate in their sole discretion and acting reasonably;[1]

- the terms of the Company's Restructuring Support Agreement, Restructuring Term Sheet, Plan and other Plan-related documents including, but not limited to, the proposed confirmation order, shall all be satisfactory to the Syndicate in their sole discretion and acting reasonably and not subject to a "Termination Event" (as that term is defined in the Restructuring Support Agreement);

- the entry of a final, non-appealable order confirming the Plan (with each order not vacated nor stayed pending appeal), which incorporates and approves the terms of the Restructuring Support Agreement, the Restructuring

---

[1] For the avoidance of doubt, any review and consent rights afforded to the Syndicate herein shall in no way modify or limit the review and consent rights afforded to the Sponsoring Noteholders pursuant to the Restructuring Support Agreement, Restructuring Term Sheet, Plan and other Plan-related documents.

Term Sheet, and this Term Sheet (including the Commitment Fee);

- all conditions to the occurrence of the effective date of the Plan shall be satisfied or waived other than the closing of the Transaction; and the effective date of the Plan will have occurred no later than 105 calendar days following the Petition Date;

- the entry of DIP Financing Orders approving the DIP Facility (which shall be consistent in all material respects with the terms set forth in the Restructuring Term Sheet), and such DIP Facility not being subsequently terminated during the pendency of the Company's bankruptcy cases or in default as of the effective date of the Plan;

- no trustee or examiner with expanded powers will be appointed in any of the Company's bankruptcy cases and none of the bankruptcy cases will be converted to a Chapter 7 or dismissed;

- no order modifying or terminating the Company's exclusive right to file and solicit acceptances of a plan of reorganization (including the Plan);

- no temporary restraining order, preliminary or permanent injunction or other order issued by any governmental authority preventing consummation of the restructuring contemplated in the Plan shall be in effect;

- no material adverse change in the Company's business or financial position shall have occurred between the acceptance date of this Term Sheet and the Closing;

- representations and warranties in the definitive Transaction documents shall be true and correct in all material respects and the covenants contained therein shall be fully performed in all material respects;

- any and all required governmental, regulatory and/or third-party approvals for the Transaction are obtained and in full force and effect on or prior to Closing; and

- the Investor Stock shall have been qualified under applicable Blue Sky laws, with customary

representations by all Investors that they are "accredited investors".

*Advisory Fee:*  None

*Commitment Fee:*  8.00% of the Minimum Investment Amount, Paid-In-Kind, split 50/50 among Cetus Capital VI, L.P. and SMC Holdings II, LP (or their respective investment vehicles).  Commitment Fee to be approved by Bankruptcy Court (which may be in connection with order confirming the Plan).  Commitment Fee to be paid in shares of the reorganized Company's Common Stock (such shares, the "**Commitment Fee Shares**") upon receipt of gross proceeds equal to the Minimum Investment Amount from the Syndicate at the Closing.

## VOTING RIGHTS

*Voting Rights:*  The Investor Stock shall vote together with the Company's Common Stock, and not as a separate class.

## STOCK PURCHASE AGREEMENT

*Representations and Warranties:*  Standard representations and warranties by the Company customary for its size and industry.

*Counsel and Expenses:*  Company counsel to draft applicable documents, which documents shall be reasonably acceptable to the Syndicate.

## INVESTORS' RIGHTS AGREEMENT

*Registration Rights:*  Holders of Common Stock will receive market standard registration rights following an initial public offering ("**IPO**") by the Company, including demand, Form S-3 and piggyback registration rights and customary payment of Syndicate expenses relating thereto.  In connection with an IPO, if requested by the managing underwriter, the Syndicate will agree not to sell or transfer Common Stock held immediately before the effective date of the IPO for a period of up to 180 days following the IPO (provided all directors and officers and 1% stockholders of the Company agree to the same lock-up).

*Information Rights:*  Holders of Common Stock equal to 20% or more of the Common Stock issued and outstanding (the "**Major Holders**") will be granted access to Company facilities and personnel during normal business hours and with reasonable advance notification. The Company will deliver to such Major Holders (i) annual and quarterly financial statements, monthly balance sheets and cash-flow statements, and other information as determined by the

Board of Directors; (ii) thirty days prior to the end of each fiscal year, a comprehensive operating budget forecasting the Company's revenues, expenses, and cash position on a month-to-month basis for the upcoming fiscal year; and (iii) within 45 days following the end of each quarter an up-to-date capitalization table with sufficient detail to enable the Major Holders to calculate their respective percentage equity ownership in the Company.

## OTHER MATTERS

*Confidentiality:*

The Company will not disclose the terms of this Term Sheet to any person other than key employees, stockholders, members of the Board of Directors, the Company's accountants and attorneys, and other potential investors acceptable to the Investors. Notwithstanding the foregoing, the Company shall be permitted to disclose the terms of this Term Sheet in accordance with applicable rules, regulations and practices of Chapter 11 restructuring proceedings, in consultation with the Investors and the Subordinated Noteholders.

*Expiration:*

This Term Sheet expires at the end of the day on June 23, 2024 if not accepted by the Company and the Sponsoring Noteholders by that date.

*Amendment:*

This Term Sheet may be amended or modified only with the written consent of Investors, the Company, and the Sponsoring Noteholders.

*Governing Law:*

This Term Sheet shall be governed by and construed in all respects by the laws of Delaware, without regard to its conflict of laws principles.

*Severability:*

In the event that any part or parts of this Term Sheet shall be held illegal or unenforceable by any court of competent jurisdiction, such determination shall not affect the remaining provisions of this Term Sheet which shall remain in full force and effect.

*Bankruptcy Matters:*

The Company's entry into this Term Sheet and any Transaction documents shall be effective upon Bankruptcy Court approval (which approval may be entry of an order confirming the Plan). Nothing in this Term Sheet or the Transaction documents shall require any director or officer of the Company to violate their fiduciary duties to the Company. No action or inaction on the part of any director or officer of the Company that such director or officer reasonably believes, after consultation with outside counsel, is required by their fiduciary duties to the Company

5

shall be limited or precluded by this Term Sheet or the Transaction documents.

*[Signature Page Follows]*

EXECUTED this 21st day of June, 2024.

**Investors**:

SMC Holdings II, LP

By: _____
Name: Gregory P. Ho
Title: Managing Member of the General Partner

Cetus Capital VI, L.P.

By: _____
Name:
Title:

EXECUTED this 21st day of June, 2024.

**<u>Investors</u>**:

SMC Holdings II, LP

By: _____
Name:
Title:

Cetus Capital VI, L.P.

By: _____
Name:
Title:   Robert E Davis
         Managing Director

ACKNOWLEDGED & AGREED

**Company**:

ProSomnus, Inc.

By: _____

Name: Brian B. Dow

Title: Chief Financial Officer

Date:

ACKNOWLEDGED & AGREED

**<u>Sponsoring Noteholders</u>:**

CEDARVIEW OPPORTUNITIES MASTER FUND, LP

By: _____

Name: Burton Weinstein
Title: Managing Partner

DESTINATIONS GLOBAL FIXED INCOME
OPPORTUNITIES FUND

By: _____
Name: Bruce A. Falbaum
Title: Authorized Agent as Investment Advisor

RIVERPARK STRATEGIC INCOME FUND

By: _____
Name: Bruce A. Falbaum
Title: Authorized Agent as Investment Advisor

DESTINATIONS LOW DURATION FIXED
INCOME FUND

By: _____

Name: Bruce A. Falbaum
Title: Authorized Agent as Investment Advisor

CROSSINGBRIDGE LOW DURATION HIGH YIELD FUND

By: _____
Name: Bruce A. Falbaum
Title: Authorized Agent as Investment Advisor

LEAFFILTER NORTH HOLDINGS INC.

By: _____
Name: Bruce A. Falbaum
Title: Authorized Agent as Investment Advisor

COHANZICK ABSOLUTE RETURN MASTER FUND, LTD.

By: _____
Name: Bruce A. Falbaum
Title: Authorized Agent as Investment Advisor

SMC HOLDINGS II, LP

By: _____

Name: Gregory P. Ho

Title: Managing Member of the General Partner of SMC Holdings II, LP

CETUS CAPITAL VI, L.P.

By: _____

Name: Robert Davis
Title: Managing Director

INTREPID INCOME FUND

By: _____

Name: Hunter K. Hayes

Title: Authorized Signatory

## EXHIBIT A

## POST-CLOSING CAPITAL STRUCTURE

| Debt at Exit | | | % Stock Ownership |
|---|---|---|---|
| | | | |
| Senior Notes (*) | $ | 17,811,554 | |
| | $ | (2,000,000) | |
| Senior Notes - On Effective Date | $ | 15,811,554 | |
| | | | |
| **Equity on Exit** | | | |
| Subordinated Notes - Equitization | $ | 7,000,000 | 22.48% |
| | | | |
| DIP - New Money Equitization | $ | 6,922,102 | 22.23% |
| DIP - Senior Debt Equitization | $ | 2,000,000 | 6.42% |
| DIP - Bridge Equitization | $ | 4,014,000 | 12.89% |
| DIP Exit Fee | $ | 1,293,610 | 4.15% |
| DIP - Interest (**) | $ | 187,418 | 0.60% |
| Total DIP Equity Value | $ | 14,417,130 | 46.30% |
| | | | |
| New Equity Financing | $ | 9,000,000 | 28.90% |
| Commitment Fee | $ | 720,000 | 2.31% |
| | | | |
| **Total Equity at Exit** | $ | 31,137,130 | |

(*) - Amount represents pre-equitization principal of $17,525,774 as of 5/13/2024 plus 9% interest on the post-equitization balance through July 31, 2024. Actual amount will reflect the interest from May 14 through the exit date.

(**) - Interest calculated through July 31, 2024, actual to reflect interest through the exit date